**No. 2024-1541**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

NETFLIX, INC.,

*Appellant*,

*v.*

DIVX, LLC,

*Appellee.*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2020-00558

**BRIEF FOR APPELLANT NETFLIX, INC.**

NORA N. XU
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 663-6000

LAUREN E. MATLOCK-COLANGELO
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center,
250 Greenwich Street
New York, NY 10007
(212) 230-8800

MARK C. FLEMING
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

*Attorneys for Appellant Netflix, Inc.*

June 3, 2024

# EXEMPLARY PATENT CLAIM

Claim 1 of U.S. Patent No. 10,225,588, which is illustrative for purposes of this appeal, is set forth below.

> 1. [a] A playback device for playing protected content from a plurality of alternative streams, comprising:
>
> [b] a set of one or more processors; and
>
> a non-volatile storage containing an application for causing the set of one or more processors to perform the steps of:
>
> [c] obtaining a top level index file identifying a plurality of alternative streams of protected video, [d] wherein each of the alternative streams of protected video includes partially encrypted video frames [e] that are encrypted using a set of common keys comprising at least one key, [f] and wherein the partially encrypted video frames contain encrypted portions and unencrypted portions of data;
>
> [g] obtaining a copy of the set of common keys;
>
> [h] detecting streaming conditions for the playback device;
>
> [i] selecting a stream from the plurality of alternative streams of protected video based on the detected streaming conditions;
>
> [j] receiving a container index that provides byte ranges for portions of the selected stream of protected video within an associated container file;
>
> [k] requesting portions of the selected stream of protected video based on the provided byte ranges;
>
> [*l*] ***locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video***;

> [m] decrypting each encrypted portion of the frames of video identified within the located encryption information using the set of common keys; and
>
> [n] playing back the decrypted frames of video obtained from the requested portions of the selected stream of protected video.

Appx118(27:30-63) (emphasis and bracketed letters added).

## CERTIFICATE OF INTEREST

Counsel for Appellant Netflix, Inc. certifies the following:

**1. Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Netflix, Inc.

**2. Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

**3. Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP: Harper Batts, Jeffrey Liang, Chris Ponder

**5. Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

[X] Yes (file separate notice; see below) [ ] No [ ] N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

Already filed.

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: June 3, 2024

/s/ Mark C. Fleming

MARK C. FLEMING
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

# TABLE OF CONTENTS

Page

EXEMPLARY PATENT CLAIM

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ vi

STATEMENT OF RELATED CASES ........ 1

INTRODUCTION ........ 2

JURISDICTIONAL STATEMENT ........ 5

STATEMENT OF ISSUE ON APPEAL ........ 5

STATEMENT OF THE CASE ........ 5

A. The Parties ........ 5

B. Technology Background And Prior Art ........ 5

1. Adaptive bitrate streaming ........ 5

2. Partial frame encryption ........ 8

C. The '588 Patent ........ 11

D. Prior Board Proceedings ........ 14

E. Appeal And Remand Proceedings ........ 17

SUMMARY OF THE ARGUMENT ........ 22

ARGUMENT ........ 26

I. STANDARD OF REVIEW ........ 26

II. THE PANEL MAJORITY MISCONSTRUED LIMITATION [*l*] ........ 26

A. The Panel Majority's Construction Of Limitation [*l*] Is Contrary To Its Ordinary And Customary Meaning ........................... 26

1. The panel majority's construction of limitation [*l*] is contrary to the precepts of English grammar ........................ 27

2. The panel majority's reading of limitation [*l*] is refuted by the context of claim 1 as a whole ............................ 35

B. The Panel Majority Improperly Confined Limitation [*l*] Based On Select Embodiments From The Specification .................... 39

1. The select embodiments on which the panel majority relied cannot limit the plain meaning of limitation [*l*] ........................................................................ 39

2. In any event, several embodiments of the '588 patent do not require the encryption information to be within the requested portions of the selected stream ......................................................................... 47

C. The Panel Majority's Construction Is Inconsistent With The '588 Patent's Related Patents And Its Prosecution History ................................................................................ 51

1. The panel majority's construction is inconsistent with the related '522 patent...................................................... 51

2. Other DivX patents in the same family show that DivX knew how to draft claim limitations that specify a clear location for the encryption information ....................................................................... 57

3. The panel majority's construction is inconsistent with the '588 patent's prosecution history ................................ 58

D. DivX's Expert Testimony Does Not Support The Panel Majority's Construction ...................................................................... 60

III. UNDER THE CORRECT CONSTRUCTION, THE PRIOR ART DISCLOSES LIMITATION [*l*] ....................................................................... 63

CONCLUSION .......................................................................................................66

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American International Group v. Bank of America Corp.*,
712 F.3d 775 (2d Cir. 2013) ....................29

*Anhydrides & Chemicals, Inc. v. United States*,
130 F.3d 1481 (Fed. Cir. 1997) ....................30, 31

*Apple Inc. v. Corephotonics, Ltd.*,
81 F.4th 1353 (Fed. Cir. 2023) ....................26

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) ....................39

*CA, Inc. v. Simple.com, Inc.*,
780 F. Supp. 2d 196 (E.D.N.Y. 2009) ....................31

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008) ....................29, 30

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ....................54

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024) ....................63

*Hill-Rom Services, Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ....................41, 44

*Honeywell International Inc. v. Mexichem Amanco Holding S.A. de C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ....................56

*In re Donaldson Co.*,
16 F.3d 1189 (Fed. Cir. 1994) ....................46

*In re Hyatt*,
708 F.2d 712 (Fed. Cir. 1983) ....................27, 28

*In re Merck & Co.*,
800 F.2d 1091 (Fed. Cir. 1986) ....................65

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ....................................................27, 39, 40, 44

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
No. 6:16-CV-01003, 2017 WL 3033400 (E.D. Tex. July 18, 2017)..................30

*Kahn Lucas Lancaster, Inc. v. Lark International Ltd.*,
186 F.3d 210 (2d Cir. 1999) ..........................................................................29

*Lockhart v. United States*,
577 U.S. 347 (2016)........................................................................... 29-30

*Lowe v. ShieldMark, Inc.*,
No. 2021-2164, 2022 WL 636100 (Fed. Cir. Mar. 4, 2022)
(nonprecedential) ..........................................................................................58

*Nestle USA, Inc. v. Steuben Foods, Inc.*,
686 F. App'x 917 (Fed. Cir. 2017) (nonprecedential).......................................63

*Netflix, Inc. v. DivX, LLC*,
No. 2022-1083, 2023 WL 2298768 (Fed. Cir. Mar. 1, 2023)
(nonprecedential) ..................................................................................*passim*

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ...................................................................*passim*

*Polygroup Ltd. MCO v. Willis Electric Co.*,
780 F. App'x 880 (Fed. Cir. 2019) (nonprecedential).......................................56

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013) .......................................................................60

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
358 F.3d 870 (Fed. Cir. 2004) ...................................................................45, 46

*Teleflex, Inc. v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ...................................................................39, 45

*Texas Instruments, Inc. v. U.S. International Trade Commission*,
805 F.2d 1558 (Fed. Cir. 1986) .......................................................................45

*Uniloc 2017 LLC v. Facebook, Inc.*,
No. 2019-2159, 2021 WL 5370480 (Fed. Cir. Nov. 18, 2021)
(nonprecedential) ....................30

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ....................45

*Weber, Inc. v. Provisur Technologies, Inc.*,
92 F.4th 1059 (Fed. Cir. 2024) ....................26

*Wisconsin Alumni Research Foundation v. Apple Inc.*,
905 F.3d 1341 (Fed. Cir. 2018) ....................46

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ....................5

35 U.S.C.
§ 141(c) ....................5
§ 314....................5

## OTHER AUTHORITIES

*Black's Law Dictionary* (9th ed. 2009)....................30

*Black's Law Dictionary* (11th ed. 2019)....................28

*Chicago Manual of Style* (16th ed. 2010) ....................28, 33

*Merriam-Webster's Dictionary of Law* (1996)....................30

Root, Joseph E., *Rules of Patent Drafting: Guidelines from Federal Circuit Case Law* (2011)....................28

Scalia, Antonin & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................... 28-29

Strunk, Jr., William & E.B. White, *The Elements of Style* (4th ed. 2000) ....................15, 28, 29

**STATEMENT OF RELATED CASES**

This Court previously decided an appeal from this *inter partes* review ("IPR") proceeding in *Netflix, Inc. v. DivX, LLC*, No. 2022-1083, 2023 WL 2298768 (Fed. Cir. Mar. 1, 2023) (Taranto, J., joined by Newman & Reyna, JJ.) (non-precedential).

This appeal concerns U.S. Patent No. 10,225,588 (the "'588 patent"). In *DivX, LLC v. Amazon.com, Inc.*, No. 3:22-cv-00687-DJN (E.D. Va.), Appellee DivX, LLC ("DivX") filed suit against Amazon.com, Inc. ("Amazon"), alleging infringement of the '588 patent, among others.

In *DivX, LLC v. Netflix, Inc.*, No. 2:19-cv-01602 (C.D. Cal.), DivX filed suit against Appellant Netflix, Inc. ("Netflix"), alleging infringement of the '588 patent, among others.

In *Certain Video Processing Devices and Components Thereof,* Inv. No. 337-TA-1343 (ITC), DivX filed a complaint against Amazon and VIZIO, Inc., alleging violations of section 337 of the Tariff Act of 1930 based on the importation of certain video processing devices and components alleged to infringe the '588 patent, among others.

Counsel for Netflix know of no other case pending in this or any other court that may affect or be directly affected by this case.

## INTRODUCTION

In the prior appeal in this case, this Court held that the Board committed legal error when finding no reasonable expectation of success. Instead of addressing that issue on remand, a two-member majority of the Board changed course entirely by altering its claim construction of a single limitation—limitation [*l*] of claim 1 of the ’588 patent. But as Administrative Patent Judge (“APJ”) Turner explained in dissent, the panel majority’s interpretation is legally wrong, and there is no genuine dispute that the prior art discloses limitation [*l*] under the proper construction. This Court should vacate the Board’s decision and remand for further proceedings.

The Board majority’s claim construction error is, at a high level, an error of English grammar and usage. Limitation [*l*] recites “locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video.” The question is: what do the words “within the requested portions” modify? Is it sufficient that the immediately preceding feature—“encrypted portions of frames of video”—be “within the requested portions,” as the Board originally believed and as APJ Turner maintained in dissent? Or does the claim additionally require that an earlier-recited feature—“encryption information”—also be “within the requested portions”?

The Board twice recognized that this limitation's natural reading requires only that the "encrypted portions of frames of video" be "within the requested portions of the selected stream of protected video." On remand, however, the panel majority went astray by concluding for the first time that limitation [*l*] requires that the "encryption information" also be "within the requested portions of the selected stream of protected video." That was legal error.

First, and most importantly, the panel majority's construction is contrary to the plain language of limitation [*l*]. Under well-established rules of English grammar and usage, the "within" prepositional phrase modifies the noun phrase it immediately follows, which is "encrypted portions of frames of video." Notably, in its attempt to justify its different understanding, the panel majority felt compelled to rewrite the claim by adding commas "to illustrate" its meaning. Appx13 (adding commas to the language of limitation [*l*]). But the claim is not written with the panel majority's added punctuation, which itself is contrary to ordinary English usage. Rather, the claim as written states that the "encrypted portions of frames of video" are within the requested portions, but is agnostic as to whether the "encryption information" is also within the requested portions. The claim's broader context only confirms the error of the panel majority's analysis.

The panel majority's flawed construction also rested on its erroneous belief that all of the specification's disclosed embodiments present the encryption

information, referred to in the patent specification as “DRMInfo” or “DRM information,” within the requested portions of the selected stream of video. In fact, several embodiments, including the first two in the specification, do not specify that the encryption information is within the requested portions of the selected stream of video. This supports the Board’s original understanding that the encryption information ***may or may not*** be within the requested portions.

Other evidence also undermines the panel majority’s construction. By prosecuting U.S. Patent No. 9,621,522 (the “’522 patent”), a related patent with the same specification as the ’588 patent, DivX represented to the Patent Office that the specification ***must*** support claims in which the encryption information is ***outside*** of the requested stream of protected video, namely in a top-level index file. Appx11433. The panel majority wrongly rejected this evidence by inconsistently treating “DRM information”—which it cited as the claimed “encryption information” in analyzing the ’588 patent—as somehow *not* “encryption information” when claimed by the related ’522 patent based on the same disclosure. The record provides no support for the panel majority’s self-contradictory reasoning.

Once the correct claim construction is restored, the prior art plainly disclosed limitation [*l*] as properly understood. The Court should so hold, vacate the final written decision, and remand this case for further proceedings.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction pursuant to 35 U.S.C. § 314. The Board issued its Final Written Decision on remand on February 22, 2024. Appx1. Netflix timely appealed on March 4, 2024. Appx11876-11878. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF ISSUE ON APPEAL

Whether the Board legally erred in construing claim limitation [*l*] contrary to the precepts of English grammar and usage and the intrinsic record.

## STATEMENT OF THE CASE

### A. The Parties

Netflix creates and distributes video entertainment, including films and television series, by delivering video over the internet to millions of users around the world.

DivX, an affiliate of Fortress Investment Group and SoftBank Group Corp., licenses and asserts patents.

### B. Technology Background And Prior Art

#### 1. Adaptive bitrate streaming

This case relates to media streaming technologies that have been widely used for decades. In particular, this appeal involves a well-known prior art media streaming technique called adaptive bitrate streaming ("ABS").

Media streaming has long allowed end-user clients to watch and listen to video streams in real time, rather than waiting for the entire file to download. Appx5434(¶¶15-21); Appx5517(1:20-30). ABS is a form of media streaming "that uses diminution in quality of the media to prevent (or minimize)" "interruption of playback to await receipt of the next needed portion of the media." *Netflix, Inc. v. DivX, LLC*, No. 2022-1083, 2023 WL 2298768, at *1 (Fed. Cir. Mar. 1, 2023). "For ABS, the source media is encoded in multiple versions, each with a different bitrate (amount of data transmitted per unit of time), and a playback device adjusts the stream quality by switching between the different encodings depending on available resources, with a higher bitrate corresponding to higher quality." *Id.*

In ABS systems, video content was divided into portions of data that could be transmitted to the client device. For example, data could be divided into the following categories (listed in decreasing order of size): representations, segments, fragments, and frames.[1] A presentation, such as a movie, included multiple representations encoded at different bitrates. Appx5436-5437(¶¶66-71); Appx5431(Fig. 27); Appx3967(¶76); Appx5442(¶130). In turn, each representation was divided into segments, which themselves would be further

[1] These categories of data were sometimes referred to using different terms. For example, "streamlets" was sometimes used rather than "segments." Appx5519-5520(6:66-7:1); Appx4018(¶150); Appx11043.

divided into fragments. Appx5436-5437(¶¶70-71, 74); Appx5431(Fig. 27); Appx5544(7:56-59); Appx3967(¶77); Appx5442(¶130). Each fragment constituted, for example, a half second of a movie. Appx5443(¶141); Appx5541(2:28-30). Finally, fragments would be divided into, for example, 12-30 frames, i.e., the individual images that together make a movie. Appx9922; Appx9442(¶51); Appx5557(34:37-41); Appx5547(13:66-14:11).

There is no dispute that ABS was known by September 2011, the earliest possible priority date for the '588 patent. *See* Appx76 (listing claims of priority); *Netflix*, 2023 WL 2298768, at *1 (the patent "makes clear that ABS (at least in some form) … pre-dated the '588 patent"). Indeed, three cited prior art references, described below, taught ABS.

U.S. Patent Application Publication No. 2011/0096828 A1 ("Chen") provided a detailed discussion of video streaming using alternative representations encoded at different bitrates. *See, e.g.*, Appx5436-5437(¶¶63-64, 70) ("The media, such as video, may be encoded at multiple bitrates to form different versions, or representations."); Appx5449-5450(¶¶219, 223) ("Representations may be alternatives in a sense that the client selects one out of the different alternatives, or they may be complementary in a sense that the client selects several of the representations, each possibly also from a set of alternatives, and presents them jointly.").

Similarly, U.S. Patent No. 8,683,066 B2 ("Hurst") disclosed a streaming system using alternative representations, i.e., "streams having different bitrates" corresponding to "varying degrees of quality and bandwidth." Appx5518(3:65-68); *see also* Appx5520(7:18-20) ("One skilled in the art will recognize that any number of streams having different bitrates may be generated from the original context 200.").

Finally, U.S. Patent Application No. 8,243,924 ("Chen-924") "describe[d] ABS with partial frame encryption using various container file formats." *Netflix*, 2023 WL 2298768, at *3.[2] For example, Chen-924 described an "adaptive streaming" system that was configured to "dynamically modify the downloading based on … the network conditions" such as "bandwidth changes." Appx5578-5579(14:61-15:60).

**2. Partial frame encryption**

By September 2011, digital rights management ("DRM") had long been used to protect video content from unauthorized access, copying, and use. Appx5472(¶522) (discussing encryption); Appx5489(¶8) (same); Appx5525(18:47-55) (discussing a "DRM server"); Appx5572(1:53-59)

---

[2] Chen-924 and Chen are different references with different lead inventors. Chen was the primary reference in the obviousness ground. Appx11020. Chen-924 taught an express motivation for a skilled artisan to combine the prior art references with a reasonable expectation of success. *See, e.g.*, Appx11027-11028; Appx11606-11607(9:15-10:2).

(addressing an "encrypted file"). One common DRM technique was partial encryption or "selective encryption," which encrypted only select portions of the protected video content. Appx5574(5:63-6:9) (discussing selective encryption); Appx5489(¶10) (disclosing "partially encrypt[ed] media files"); Appx3970-3971(¶83) ("Partial encryption was known and used since the 1990s."). For example, partial frame encryption could be used to encrypt portions of individual frames to prevent an unauthorized user from viewing the most important part of a movie's image. Appx5482(Figs. 5A-5C); Appx5492(¶55); Appx11645-11646(48:25-49:2); Appx9922; Appx9599-9600(109:2-110:8).

Two cited prior art references, Chen-924 and U.S. Patent Publication No. 2007/0083467 A1 ("Lindahl"), disclosed partial frame encryption. *See, e.g.*, Appx5574(6:7-9) (Chen-924 disclosing "selectively encrypting at least a portion of an I-frame, P-frame, B-frame, and any combination of P, B, and I frames"); Appx5492(¶55) (Lindahl describing a "media file includ[ing] a series of frames," wherein each of the frames is further divided into "blocks" and "only a portion of the block 540 is encrypted").

As relevant here, Lindahl taught using encryption information, which Lindahl called "encryption parameters," to identify encrypted portions of video frames. Appx5493(¶¶56-59). Lindahl used the variables X, Y, and Z to refer to these encryption parameters. *Id.* (¶57).

Lindahl depicted an embodiment of its encryption method in Figure 6A, which is shown below. Appx5493(¶56). Lindahl explained that for partially encrypted block 600 of Figure 6A, "[t]he size of the unencrypted portion 602 is denoted by the variable X, the size of the encrypted portion 604 is denoted by the variable Y, and the size of the unencrypted portion 606 is denoted by the variable Z." *Id.* (¶57). Thus, "the size of the partially encrypted block 600 is the sum of the variables X, Y and Z." *Id.*



FIG. 6A
(ANNOTATIONS ADDED)

Appx11061.

Lindahl also taught a decryption process, explaining that "[a]fter a media file to be decrypted has been identified …, encryption parameters associated with the media file are retrieved" and "utilized to decrypt the media file that was previously encrypted." Appx5494(¶72).

As this Court previously held, the combination of partial frame encryption and ABS was known and described in Chen-924. *Netflix*, 2023 WL 2298768, at *3 ("Chen-924 … describes ABS with partial frame encryption." (citing Appx5572-5573(1:21-27, 2:66-3:6))).

**C. The '588 Patent**

According to DivX, the '588 patent's alleged invention and improvement over the prior art was the "common keys" limitation of claim 1. Appx5808-5809(¶227); *see also Netflix*, 2023 WL 2298768, at *1 ("In contrast to pre-existing ABS and encryption systems," the '588 patent used "'partially encrypted video frames that are encrypted using a set of common keys.'" (quoting Appx118(27:37-40))).

In this proceeding, Netflix demonstrated that the "common keys" limitation was disclosed in the prior art, and the Board did not find otherwise. *See* Appx11233-11237 (DivX "does not deny that Hurst teaches that the same key can be used to encrypt all streams"); Appx11353; Appx31-32 (panel majority noting that "Hurst further discloses that the streamlets may be encrypted with the same key" (citing Appx5525-5526(18:66-19:2))). Thus, the allegedly inventive "common keys" limitation is not at issue in this appeal.

Rather, this appeal involves a limitation of claim 1 that the specification does not identify as novel, namely limitation [*l*], which recites "locating encryption

information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video." Appx118(27:54-57).

Like Chen, Hurst, and Chen-924, the '588 patent is directed to "adaptive bitrate streaming using alternative streams of protected [video] content." Appx108(8:37-40). As this Court previously held, the '588 patent's background section admits that video streaming, including ABS, was a well-developed field. *See Netflix*, 2023 WL 2298768, at *1 ("The patent makes clear that ABS (at least in some form), encryption, Matroska container files, and HTTP all pre-dated the '588 patent."); Appx105(1:45-2:46).

The '588 patent claims "ABS of media stored within Matroska container files." *Netflix*, 2023 WL 2298768, at *1. Like ABS, Matroska container files were known. *Id.* While some embodiments of the '588 patent are directed to a modified Matroska container file, "many embodiments … utilize a conventional Matroska container." Appx114(20:27-32).

The '588 patent also describes prior art DRM and partial encryption techniques, explaining that such systems "typically involve[d] the use of cryptographic information," including using "encryption keys to encrypt some or all of the content." Appx105(2:47-62).

Most relevant here, the '588 patent discloses several different embodiments of partial frame encryption using encryption information, otherwise called "DRM

information." The disclosed ABS system works by requesting only a portion of one video stream out of multiple alternative streams. Because each alternative stream contains a full video presentation made of many partially encrypted frames, the DRM information's role is to identify the encrypted portions of each frame within the specific portion of the video that was requested from the selected stream.

The very first embodiment of the '588 patent uses a "plurality of alternative streams of protected content," but does not reference any particular location for encryption information necessary to encrypt and decrypt this "protected content." Appx106(3:1-30). The second embodiment in the specification discloses a client device that "configures [a] processor to: obtain a protected frame of video" from "alternative streams of protected video." Appx106(3:13-30). In order to decrypt this requested portion of protected video, the processor is configured to "obtain DRM information indicating a portion of the protected frame of video that is encrypted." *Id.* While this embodiment discloses that "each of the alternative ***streams*** of protected video includes [this] DRM information" (*id.*), it does not require—as the panel majority's construction would have it—that the DRM information be "within ***the requested portions*** of the selected stream."[3]

---

[3] All emphasis added unless otherwise indicated.

Finally, another embodiment similarly discloses that the decryption process comprises "obtaining a protected frame of video from one of the alternative streams of protected video" and then using "DRM information indicating a portion of the protected frame of video" to facilitate decryption. Appx107(5:4-23). This embodiment discloses that the DRM information is included in "each of the alternative ***streams*** of protected video," but it does not require that the DRM information be within the "***requested portions*** of the selected stream." *See id.*

### D. Prior Board Proceedings

Netflix's IPR petition challenged claims 1-24 of the '588 patent as obvious over Chen, Lindahl, and Hurst. Appx11020.[4] The Board instituted review. Appx11259. As relevant here, the Board's Institution Decision expressly found that Netflix "sufficiently establish[ed] that the combined teachings of Chen, Lindahl, and Hurst [met] limitation [*l*] of independent claim 1." Appx11245. In so finding, the Board rejected DivX's effort to confine limitation [*l*] to implementations where the ***encryption information*** must be "within the requested portions of the selected stream of protected video." Appx11242-11243. The Board determined that DivX's proposed construction was "too restrictive" and "not supported in view of the disclosure of the '588 patent." Appx11242; Appx11245.

[4] Hulu, LLC was also a petitioner, but is no longer a party to this proceeding. Appx1 n.1.

Rather, the Board concluded, limitation [*l*] requires only that the "encrypted portions of frames of video"—not the encryption information—be "within the requested portions of the selected stream of protected video." Appx11242-11244 (emphasis removed).

To determine the proper scope of limitation [*l*], the Board first looked to a "common treatise on grammar," which explained that the position of words in a sentence is the principal "means for showing their relationship" and "[t]he writer must, therefore, bring together the words and groups of words that are related in thought and keep apart those that are not so related." Appx11244 (quoting Strunk & White, *The Elements of Style* 28[5] (4th ed. 2000) ("Strunk & White")). The Board therefore concluded that, under the rules of English grammar and usage, "[t]he 'within' … most clearly connotes where the particular encrypted portions of frames of video must be located, not necessarily where the encryption information must be located." Appx11244. This is because the "within" prepositional phrase would be understood to modify the noun phrase it immediately follows, which is "encrypted portions of frames of video." Appx118(27:54-57).

The Board also considered the intrinsic evidence, concluding that, while DivX's "cited portions of the Specification of the '588 Patent ***could*** support

[5] At this point and elsewhere, the Board cited page 36 of Strunk & White. The quoted language in fact appears at page 28 of the 2000 edition of Strunk & White.

[DivX's] [proposed] construction, [it was] not persuaded that the cited portions require or compel such a restricted construction." Appx11243. The Board determined that "although embodiments disclosed in the Specification of the '588 Patent support Patent Owner's more restrictive construction, the same embodiments also support the more grammatically correct construction as well." Appx11244.

In its original Final Written Decision, the Board did not deny that the prior art disclosed all the claim limitations and agreed "the Petition provide[d] 'ample motivation to combine.'" Appx11701 (quoting Appx11416-11417). Again, the Board found DivX's construction of limitation [*l*] "to be unpersuasive." Appx11692. The Board nevertheless determined that a skilled artisan would not have reasonably expected success in combining the prior art. Appx11711-11712. Specifically, the Board believed that a skilled artisan would not have reasonably expected success in combining Lindahl with Chen's claimed "system," i.e., an ABS system using forward error correction ("FEC") and scalable layers, even though FEC and scalable layers were not recited in the claims-at-issue. *Netflix*, 2023 WL 2298768, at *4; *see also* Appx11705-11707 (original Final Written Decision discussing FEC and scalable layers).

### E. Appeal And Remand Proceedings

On appeal, this Court vacated the Board's decision, concluding that "the Board legally erred in its obviousness analysis." *Netflix*, 2023 WL 2298768, at *1. In particular, this Court held that the Board legally erred by focusing on Chen's "inventive system," because Netflix's petition relied on "the portions in Chen describing pre-Chen art, without scalability or FEC features." *Id.* at *4.

On remand, DivX's briefing to the Board once again focused on motivation to combine and reasonable expectation of success, including the same flawed arguments regarding Chen's scalability and FEC features previously rejected by this Court. Appx11824-11840; Appx11861-11875; Appx11781. DivX asserted in a single sentence that "[t]he Board should also address Patent Owner's other arguments," including arguments regarding limitation [*l*]. Appx11827. However, when discussing the remand with the Board, DivX conceded that nothing had changed with respect to claim construction. Appx7053(17:2-5) (DivX's counsel: "we do not believe any additional briefing are required" on "the issues of common keys or claim construction"); Appx7054(23:18-24:5) (similar).

In its second Final Written Decision, the Board did not find that the combination of ABS and partial frame encryption was new. Nor did the Board

find a lack of motivation to combine or reasonable expectation of success.[6] Instead, a two-member majority of the Board panel reversed course from both the Institution Decision and original Final Written Decision and held that limitation [*l*] requires "that the encryption information is located within the requested portions of the selected stream of protected video." Appx12 (emphasis removed).

*First*, the panel majority stated that "[t]he limitation begins with the verb 'locating,' and it therefore makes sense that the clause would recite what is located (i.e., encryption information) and where it is located (i.e., within the requested portions of the selected stream of protected video)." Appx13. The panel majority asserted that "it is reasonable that the second and third clauses of the limitation both modify the first clause." *Id.* (emphasis removed). The panel majority then stated that its reading:

> could perhaps be expressed through the use of commas as "locating encryption information, that identifies encrypted portions of frames of video, within the requested portions of the selected stream of protected video."

*Id.* (annotations added to show commas supplied by the majority). The panel majority acknowledged that "the use of commas to set off phrases in claim drafting

[6] Indeed, the Board previously found sufficient motivation to combine. *Netflix*, 2023 WL 2298768, at *5 ("[T]he Board 'agree[d]' with petitioners that 'the Petition provides ample motivation to combine' and stated that petitioners 'sufficiently established … some motivation to combine the teachings of Chen, Lindahl, and Hurst'" (citing Appx11701)).

is not consistent" and stated that its added commas were designed "to illustrate [DivX's] understanding of the claim limitation." Appx13 n.10. Though the panel majority acknowledged that Netflix's "reading of the limitation" was "not unreasonable," it nevertheless determined that Netflix's reading—which was also the Board's original reading—"ma[de] less sense" than DivX's proposed construction. Appx13-14.

The panel majority also ventured that it was not "necessary for the claim to expressly recite" where the encrypted portions were found. Appx14. But its reasoning was that the immediately following limitation (limitation [m]) does not expressly recite that the encrypted portions are "within the requested portions of the selected stream." *Id.* The panel majority did not grapple with the fact that limitation [m] did not need to recite this matter precisely because it derives antecedent basis from limitation [*l*], which ***does*** recite that the encrypted portions are "within the requested portions of the selected stream." Appx118(27:55-56).

*Second*, the panel majority stated—incorrectly, as shown below (pp. 47-50)—that every embodiment of the '588 patent included encryption information within the requested portions of the video. Appx14-17.

*Third*, the panel majority disagreed that the prosecution history "runs counter to Patent Owner's reading of the limitation." Appx21.

*Fourth*, the panel majority concluded that the extrinsic evidence did not "conclusively establish that there is *only* one proper interpretation of the claim limitation based on rules of English grammar alone." Appx23 (emphasis in original). While the panel majority acknowledged that "this determination differs from [its] initial understanding discussed in the Institution Decision," it was "convinced to change [its] view after consideration of the complete record." Appx23. But the panel majority identified no change in the record that supposedly justified its change in course.

Based on its new construction of limitation [*l*], the panel majority determined that Netflix had not established obviousness. Appx33.

APJ Turner, who authored the original Final Written Decision vacated by this Court, filed a 37-page dissent explaining that he would have found the challenged claims unpatentable as obvious. Appx37-74. APJ Turner specifically disagreed with the panel majority's construction of limitation [*l*]. Appx38.

*First*, APJ Turner pointed out that the panel majority's construction involved rewriting the claim, in that the panel majority "asserts that Patent Owner's interpretation, where latter limitations modify the first clause, can be understood through the use of commas," while also "acknowledg[ing] that limitation [*l*] of independent claim 1 contains no [such] commas." Appx39.

*Second*, APJ Turner explained that the prosecution history contradicted DivX's position that locating encrypted information within the requested portions of the selected stream was "one of the central aspects of the '588 [patent]'s inventive system." Appx39. APJ Turner explained that the language in question was not in the original claims and "came not from the inventor or the Patent Owner" but from "an examiner's amendment." *Id*.

*Third*, APJ Turner "determine[d] that although the examples cited by Patent Owner in the Specification of the '588 Patent do not exclude Patent Owner's construction, neither do they compel such a restricted construction." Appx40. As APJ Turner explained, "the Specification also is consistent with the more grammatically correct construction as well," i.e., Netflix's construction. Appx45.

*Fourth*, APJ Turner explained that "the Specification can support placement of DRM information in different places (i.e., not only in the requested portions of the selected stream of protected video)." Appx43.

*Fifth*, APJ Turner considered treatises on grammar and concluded that the word "within" "most clearly connotes where the particular encrypted portions of frames of video must be located, not necessarily where the encryption information must be located." Appx44. He therefore concluded that the "most natural reading of limitation [*l*]" was as the Board had previously construed it (and how Netflix continues to construe it). *Id.*

On the merits, APJ Turner agreed a skilled artisan "would have had a motivation to combine Chen, Lindahl, and Hurst" with a reasonable expectation of success. Appx52; Appx54. Finally, he found that the combination of Chen, Lindahl, and Hurst taught all the limitations of the challenged claims. Appx56-73.

As relevant here, APJ Turner found that all of DivX's arguments regarding limitation [*l*] "rest[ed]" on the claim construction he "d[id] not adopt." Appx64. He further found that, "on the complete record, … Petitioner sufficiently establishe[d] that the combined teachings of Chen, Lindahl, and Hurst meet limitation [*l*] of independent claim 1." Appx64-65. After addressing and rejecting DivX's remaining arguments, APJ Turner determined that Netflix "has shown by a preponderance of evidence that claims 1–24 would have been obvious over Chen, Lindahl, and Hurst." Appx45-73.

## SUMMARY OF THE ARGUMENT

The panel majority's revised construction of limitation [*l*] is contrary to the well-established rules of English grammar and usage, as well as the intrinsic record. The panel majority's legally erroneous construction should be corrected, and its decision vacated and remanded for further proceedings.

*First*, the panel majority's construction of limitation [*l*] is contrary to its ordinary and customary meaning. Under the rules of English grammar and usage, including the nearest-reasonable-referent canon, the prepositional phrase "within

the requested portions of the selected stream of protected video" is properly understood as modifying only the phrase directly in front of it, i.e., "encrypted portions of frames of video." The panel majority tacitly admitted that its construction, which requires the "within" prepositional phrase to instead modify the more remote phrase "encryption information," is not the natural reading of limitation [*l*]. The panel majority and DivX had to go so far as to modify the claim language by inserting commas (or in DivX's case, adding the verb "is") between the three clauses of limitation [*l*] to produce their desired meaning.

Further, the panel majority's construction is inconsistent within the context of claim 1 as a whole. Limitation [*l*] functions to "identif[y] encrypted portions of frames of video within the requested portions of the selected stream" so that the identified encrypted portions of frames can then be decrypted (limitation [m]) and the video then played back (limitation [n]). The "within" prepositional phrase is necessary to express the spatial relationship between the "encrypted portions of" video frames and "the requested portions of the selected stream." The panel majority erred in believing that limitation [*l*] did not need to specify where each encrypted portion of frames of video is stored because subsequent limitation [m], which recites "decrypting each encrypted portion of the frames of video," Appx119(29:18-20), does not do so. Appx14. The panel majority's conclusion ignores the evident reason why limitation [m] does not specify where the encrypted

portions are stored: limitation [m] derives antecedent basis from the immediately preceding limitation [*l*], which already specified where the encrypted portions are stored.

*Second*, the panel majority improperly narrowed limitation [*l*] based on the erroneous belief that all the disclosed embodiments situate the encryption information "within the requested portions of the selected stream of protected video." Even if that were true, it would not demonstrate a clear intent to confine the claim scope more narrowly than the language's ordinary meaning. And in any event, the panel majority ignored several embodiments that are either agnostic about where the encryption information is stored or do not specify that it is within the requested portions of the selected stream.

*Third*, the panel majority's construction is inconsistent with other patents in the '588 patent's family. The '522 patent, which issued from a parent application of the '588 patent and shares the same specification, includes claims with encryption information (or "DRM information") in a top-level index file that is ***outside of*** the requested portions of the selected stream of protected video. Accordingly, by submitting the '522 patent's claims to the Patent Office, DivX represented that the common specification supports situating the encryption information ***outside*** the requested portions of the selected stream of protected video. In rejecting this evidence, the panel majority inconsistently concluded that

the "DRMInfo element" in the '588 patent corresponded to the claimed "encryption information," but that the "DRM Information" in the '522 patent's identical specification did not. The panel majority also attempted to distinguish the '522 patent because its claims are not limited to partial frame encryption. But which particular portion of data is encrypted is immaterial to whether the encryption information must be stored in the "requested portions of the selected stream of protected video." Appx118(27:54-57). And in any event, claim 1 of the '522 patent is broader than the claims of the '588 patent and can therefore encompass partial frame encryption.

The Board also failed to consider that other patents in the '588 patent's family expressly recite a clear location for the encryption information, confirming that DivX knew how to draft such claims when it intended to do so.

*Fourth*, the panel majority's construction is inconsistent with the '588 patent's prosecution history. The "within" prepositional phrase was modified by an examiner's amendment meant in part to ***clarify*** the claims. The panel majority's construction has the effect of transforming this clarifying amendment into a radical narrowing of limitation [*l*] without explanation or stated reason. Further, the original claims of the '588 patent did not even recite the full "within" prepositional phrase, which refutes DivX's suggestion that situating encryption

information "within the requested portions of the selected stream of protected video" was somehow a central aspect of the '588 patent's purported invention.

Under the correct construction, it is undisputed that the prior art discloses limitation [*l*]. Accordingly, this Court should vacate the Board's decision and remand for further proceedings.

## ARGUMENT

### I. Standard Of Review

Claim construction is a question of law reviewed de novo. *Weber, Inc. v. Provisur Techs., Inc.*, 92 F.4th 1059, 1066 (Fed. Cir. 2024). The panel majority made no underlying findings of fact to which deference would be owed. *Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1357 (Fed. Cir. 2023) ("The parties and the Board each cite only the patent's intrinsic evidence, making this a question of law that we review de novo.").

Obviousness is a question of law reviewed de novo, with underlying factual determinations reviewed for substantial evidence. *Weber*, 92 F.4th at 1067.

### II. The Panel Majority Misconstrued Limitation [*l*]

#### A. The Panel Majority's Construction Of Limitation [*l*] Is Contrary To Its Ordinary And Customary Meaning

"[A] claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to 'particularly point[] out and distinctly claim[] the subject matter which the patentee

regards as his invention.'" *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (citation omitted). A claim term is "generally given [its] ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 1313 (Fed. Cir. 2005) (internal quotation marks and citations omitted). "A claim must be read in accordance with the precepts of English grammar." *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

#### 1. The panel majority's construction of limitation [*l*] is contrary to the precepts of English grammar

The Board originally and correctly determined that Netflix's proposed construction—requiring only that the "encrypted portions of frames of video" be "within the requested portions of the selected stream of protected video"—is "[m]ore natural to the language of claim 1" and "the more grammatically correct construction." Appx11244; *see also* Appx11692. On remand, the panel majority erred by reversing course and concluding that the "within" phrase modifies the earlier-claimed "encryption information," such that it is the "encryption information" that must be "within the requested portions of the selected stream of protected video." There are at least two reasons why the claim language cannot support the panel majority's attempt to restrict the claim in that way.

*First*, the panel majority's construction is contrary to the "precepts of English grammar." *Hyatt*, 708 F.2d at 714; *see also* Root, *Rules of Patent Drafting: Guidelines from Federal Circuit Case Law* 279 (2011) ("[c]laim construction proceeds in accordance with normal rules of grammar and syntax"). Ordinarily, modifiers and qualifying phrases attach to the terms that are nearest. *See* Strunk & White 30 ("Modifiers should come, if possible, next to the words they modify."); *id.* at 28 ("The position of words in a sentence is the principal means of showing their relationship. … The writer must therefore, so far as possible, bring together the words and groups of words, that are related in thought, and keep apart those which are not so related."). "A prepositional phrase with an adverbial or adjectival function," such as the "within" prepositional phrase at issue, "should be as close as possible to the word it modifies." *Chicago Manual of Style* § 5.175 (16th ed. 2010), p. 248.[7]

The nearest-reasonable-referent canon, another "precept[] of English grammar," provides that "a preposition or postpositive modifier normally applies only to the nearest reasonable referent." Nearest-Reasonable-Referent Canon, *Black's Law Dictionary* 1240 (11th ed. 2019); Scalia & Garner, *Reading Law: The*

[7] "A preposition [such as 'within'] is a word or phrase that links an object and an antecedent to show the relationship between them." *Chicago Manual of Style* § 5.169, p. 247. "A prepositional phrase … can be used as … an adjective (also called an adjectival phrase) {the cathedrals *of Paris*}." *Id.* at § 5.174, p. 248.

*Interpretation of Legal Texts* 152 (2012) (same). "In contrast, '[w]hen a modifier is set off from a series of antecedents by a comma, the modifier should be read to apply to each of those antecedents'"; that is, the comma indicates that the modifier relates to more than the last antecedent. *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008) (quoting *Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215 (2d Cir. 1999)); *see also American Int'l Grp. v. Bank of Am. Corp.*, 712 F.3d 775, 781-782 (2d Cir. 2013) ("One of the methods by which a writer indicates whether a modifier that follows a list of nouns or phrases is intended to modify the entire list, or only the immediate antecedent, is by punctuation …. When there is no comma, … the subsequent modifier is ordinarily understood to apply only to its last antecedent."). The phrase "within the requested portions of the selected stream of protected video" makes up a prepositional phrase, is not set off by a comma, and therefore is properly understood as modifying only the nearest reasonable referent, i.e., the phrase directly in front of it. Appx44 (citing Strunk & White 28); Appx11244 (same).

The Supreme Court and other courts have applied this rule "from [their] earliest decisions to [] more recent," sometimes calling it the "rule of the last antecedent," which provides that, absent contrary "indicia of meaning," "a limiting clause or phrase … should ordinarily be read as modifying ***only*** the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351-352

(2016) (quotation marks omitted); *see also Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997) (construing the qualifying phrase to apply only to the immediately preceding antecedent, "where no contrary intention appears" (citations omitted)). The rule is "[a]n interpretive principle by which a court determines that qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing." Rule of Last Antecedent, *Black's Law Dictionary* 1449-1450 (9th ed. 2009); *Merriam-Webster's Dictionary of Law* at 281 (1996) (the "last antecedent rule" provides that "qualifying words or phrases refer only to the last antecedent word or phrase unless the context or entire action clearly requires otherwise"). This Court has applied this principle of English grammar in the patent law context. *See, e.g.*, *Finisar*, 523 F.3d at 1336 (applying principles of English grammar and the last antecedent rule in the context of determining the meaning of a prior art reference) (citing *Anhydrides*, 130 F.3d at 1483); *Uniloc 2017 LLC v. Facebook, Inc.*, No. 2019-2159, 2021 WL 5370480, at *1 (Fed. Cir. Nov. 18, 2021) (applying the last antecedent rule to resolve a dispute regarding the arguments raised in an IPR petition and reply); *see also Iridescent Networks, Inc. v. AT&T Mobility, LLC*, No. 6:16-CV-01003, 2017 WL 3033400, at *8 (E.D. Tex. July 18, 2017) (in construing a claim limitation, the last antecedent rule and the fact that the modifier "is not set

off by a comma" "dictate that only the [last antecedent] is modified"); *CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 234 (E.D.N.Y. 2009) (applying the last antecedent rule in claim construction).

In *Anhydrides*, this Court interpreted a clause of the Harmonized Tariff Schedule:

> anhydrides, halides, peroxides, peroxyacids and other derivatives derived in whole or in part from aromatic hydrocarbons, of maleic acid, ***of succinic acid derived in whole or in part from maleic anhydride or from cyclohexane*** or of glutaric acid derived in whole or in part from cyclopentanone, not elsewhere specified or included:

130 F.3d at 1482. The Court "appl[ied] the rules of grammar" to conclude "the phrase 'derived in whole or in part from maleic anhydride or from cyclohexane' modifies 'succinic acid,' not 'anhydrides, halides, peroxides, peroxyacids and other derivatives.'" *Id.* at 1483. "Since 'succinic acid' is the last antecedent to 'derived in whole or in part from maleic anhydride or cyclohexane,' whereas 'anhydride' appears earlier in the sentence, the clause is properly read as modifying 'succinic acid.'" *Id.* This reasoning applies equally here: because "encrypted portions of frames of video" appears right before the "within" phrase, that phrase is "properly read as modifying" the phrase "encrypted portions of frames of video" and only that phrase.

*Second*, the IPR panel majority tacitly admitted that its more restrictive construction—where the "within" prepositional phrase modifies the more remote noun phrase, "encryption information"—is not apparent from or supported by the plain language of limitation [*l*]. *See* Appx13. To even explain its understanding of what the limitation should mean, the panel majority was forced to modify the claim language by adding commas to limitation [*l*]:

> locating encryption information, that identifies encrypted portions of frames of video, within the requested portions of the selected stream of protected video

Appx13 (annotations added to indicate the panel majority's added commas); *see* Appx39 (APJ Turner explaining, in dissent, that although limitation [*l*] "contains no commas," the panel majority inserted commas and "acknowledge[d] … their placement would have been helpful to understand [DivX]'s intent in creating and amending such a limitation"). The need to modify the claim language "to illustrate" its meaning (*see* Appx13) plainly demonstrates the panel majority's construction is not the limitation's natural reading.

Moreover, the panel majority's addition of commas is itself contrary to normal usage, as it improperly sets off a restrictive adjective clause with commas. Because the adjective clause in the Board's rewriting ("that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video") is necessary to define the preceding noun ("encryption

information"), it is improper to set the adjective clause off with commas. *Chicago Manual of Style* § 6.22 (16th ed. 2010), pp. 313-314 (restrictive clauses are "introduced by *that*" "and are never set off by commas from the rest of the sentence" (emphasis in original)); *see also* Appx9643-9644 ("*That* is the defining, or restrictive pronoun, *which* the nondefining, or nonrestrictive." (emphasis in original)); Appx9651-9652 ("A nonrestrictive phrase or clause is one that could be taken out of the sentence without changing the meaning. It gives additional description or information that is incidental to the central meaning of the sentence."). Thus, in an effort to "illustrate" its unnatural reading, the panel majority not only rewrote the claim, but did so by introducing grammatical errors.

In advocating for its narrow construction, DivX was also forced to modify the claim language. DivX referenced two example sentences from grammar treatises and asserted they were analogous to limitation [*l*]. *See* Appx11333. But DivX's examples uniformly employed the verb "is" before the prepositional phrase to make clear that the third phrase of the sentence modified the subject of the sentence, not the immediately preceding relative clause:

"[T]he lawn mower that is broken ***<u>is</u>*** in the garage."

"The meeting that starts at 10 a.m. ***<u>is</u>*** about the Matthews case."

Appx11333 (quoting Appx9643; Appx9651). The Board agreed that DivX's proposed construction would have been "clearer" if the claim language were

modified by "insert[ing] [] the verb 'is.'" Appx19 n.13. But of course, the claim was not drafted that way, though it could have been (e.g., "locating encryption information that identifies encrypted portions of frames of video ***and is*** within the requested portions of the selected stream of protected video"). Thus, when DivX sought to liken limitation [*l*] to its examples, it had to rewrite the claim as though it recited that "[t]he 'located encryption information' ***(a)*** identifies encrypted portions of frames of video ***and (b) is*** within the requested portions of the selected stream of protected video." Appx11333-11334. Once again, that is not the claim language DivX chose for the '588 patent, even though DivX could easily have done so.

The panel majority's decision and DivX's arguments show that, had DivX intended the "within" prepositional phrase to modify "encryption information," DivX could have accomplished that during prosecution or in a motion to amend by either (1) inserting commas, as done by the panel majority, or (2) inserting "and is" before "within the requested portions," as done by DivX in its briefing. *Supra* pp. 32-34. DivX cannot now change the scope of its claim through a construction that is inconsistent with the issued claim's actual language and ordinary and customary meaning.

### 2. The panel majority's reading of limitation [*l*] is refuted by the context of claim 1 as a whole

Reading limitation [*l*] in the broader context of claim 1 as a whole confirms that the "within" prepositional phrase modifies the "encrypted portions of frames of video." "[T]he context in which a term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. Here, the surrounding language of claim 1 confirms that the encrypted portions of frames of video (from limitation [*l*]) are within the requested portions of the selected stream. Limitation [*l*] "identifies encrypted portions of frames of video within the requested portions of the selected stream" (Appx119(29:15-17)) so that subsequent steps can "decrypt[] each encrypted portion of the frames of video" (limitation [m], Appx119(29:18-20)) and then "play[] back the decrypted frames of video obtained from the requested portions of the selected stream" (limitation [n], Appx119(29:21-23)). *See* Appx11244; Appx44. By contrast, the location of the "encryption information" is irrelevant within the context of claim 1. The operation of claim 1 is unaffected by whether the encryption information is inside or outside of the requested portions of the selected stream.

Claim 1's preceding limitations show that the claim is directed to an ABS system that contains "a plurality of alternative streams of protected video," each of which includes "partially encrypted video frames" (limitations [c]-[d]). Appx118(27:36-39). Each "partially encrypted video frame[] contain[s]" both

"encrypted portions and unencrypted portions of the data" (limitation [f]). Appx118(27:41-43). The steps of claim 1 recite "selecting" one of the "alternative streams of protected video based on the detected streaming conditions" (limitation [i])—in other words, based on "e.g. the user's network bandwidth and CPU capacity" (Appx105(1:59-64))—and then "requesting portions of the selected stream of protected video" (limitation [k]). Appx118(27:46-53). To play back the protected video, the processor needs to decrypt the requested portions of the selected stream of protected video. *See* Appx118(27:58-63) (limitations [m]-[n]). And before it can decrypt, the processor needs to "identif[y]" which portions of the video frames within those requested portions of the stream actually need decrypting—in other words, differentiate between the encrypted and unencrypted portions of data within each partially encrypted video frame. Appx11614(17:54-57) (limitation [*l*]); *see id.* (17:22-26); Appx9549-9551(59:14-61:15). The processor cannot decrypt the ***entire*** requested portions of the selected stream; it must identify which portions are encrypted and need to be decrypted. *See* Appx118(27:41-43) (limitation [f]).

To identify the encrypted portions, the processor therefore must "locat[e] encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video." Appx119(29:15-17); *see also* Appx11614(17:54-57). The "encryption information" needed to

perform the decryption is very specific. It is not enough that the processor identify encrypted portions of video frames within ***any*** of the alternative streams of protected video, or even within ***any portion*** of the ***selected*** stream of protected video. Rather, the processor needs to know which portions of video frames are encrypted "within the ***requested portions*** of the selected stream of protected video," because the processor is specifically trying to make it possible to play back the ***requested*** portions of the selected stream. The prepositional phrase at issue—"within the requested portions of the selected stream of protected video"—thus makes plain which specific encrypted portions are to be identified and decrypted: the "encrypted portions of frames of video" that are "within the requested portions of the selected stream." Appx118(27:54-57).

In rejecting this natural reading of limitation [*l*], the panel majority ventured that it would be "[un]necessary" for the claim to "expressly recite" that the "encrypted portions of frames … [are] located within the requested portions of the stream" because their location is "obvious." Appx14. That is exactly wrong. In fact, it ***is*** necessary to expressly recite the location of the relevant encrypted portions of video frames. Limitation [*l*] is the first time the claim uses the phrase "encrypted portions of frames of video"; it is not preceded by "the" and has no antecedent basis. The "within" prepositional phrase is therefore necessary to specify how the "encrypted portions of frames of video" that are to be decrypted

(limitation [*l*]) differ from the "partially encrypted video frames [that] contain encrypted portions and unencrypted portions of data" (limitation [f]). Appx118(27:37-39, 41-43, 54-57). As explained above, to perform decryption, the processor must, after "requesting portions of the selected stream of protected video" (limitation [k]), "identif[y]" which "portions of frames of video" are "encrypted" "within the requested portions of the selected stream" (limitation [*l*]). It is therefore necessary for limitation [*l*] to express the spatial relationship between the encrypted portions of video frames and the requested portions of the selected stream.

The panel majority also erroneously relied on the fact that limitation [m], which follows limitation [*l*], "refers to 'each encrypted portion of the frames of video' but does not expressly recite 'within the requested portions of the selected stream.'" Appx14 (quoting Appx118(27:58-60)). According to the panel majority, it was unnecessary for limitation [*l*] to specify the location of the "encrypted portions of frames of video" because limitation [m] does not do so. Appx14. Again, that is exactly wrong: the reason limitation [m] does not specify the encrypted portions' location is because ***limitation [l] already did so***. Limitation [m] expressly recites "***each*** encrypted portion of ***the*** frames of video," thus deriving antecedent basis from limitation [*l*]'s "encrypted portions of frames of video." Appx118(27:54-60). It would therefore be redundant for limitation [m] to

repeat the same "within" phrase of limitation [*l*]. If anything, limitation [m]'s use of limitation [*l*]'s "encrypted portions of frames of video" as antecedent basis ***without*** repeating the "within" prepositional phrase confirms that the more natural reading of the "within" prepositional phrase is as modifying the "encrypted portions of frames of video."

Accordingly, the plain language of limitation [*l*], when read in light of the precepts of English grammar and usage and in the context of claim 1 as a whole, confirms the correctness of the Board's original construction and the error in the panel majority's about-face.

### B. The Panel Majority Improperly Confined Limitation [*l*] Based On Select Embodiments From The Specification

#### 1. The select embodiments on which the panel majority relied cannot limit the plain meaning of limitation [*l*]

"[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117. "It is not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit a claim term beyond its ordinary meaning." *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). "[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has

demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Innova/Pure Water*, 381 F.3d at 1117 (internal quotation marks omitted). Here, the panel majority improperly used select embodiments from the specification to limit claim language that has a broader plain meaning.

Further, as APJ Turner explained, the embodiments cited by the panel majority and DivX (Appx15-16; Appx11328-11329) do not "compel such a restricted construction" because they do not demonstrate a clear intention to limit the claim scope of limitation [*l*]. Appx40; *Innova*, 381 F.3d at 1117. The specification explicitly states that the cited passages merely describe ***some*** (not all) embodiments of the claimed invention. *See, e.g.*, Appx106(4:39-58) ("In still another ***additional embodiment***"); Appx94(Fig. 4e); Appx108(7:58-62) ("Fig. 4e conceptually illustrates … ***an embodiment*** of the invention."); Appx109(9:23-29) ("In a number of ***embodiments***"); Appx111(13:57-63) ("In a number of ***embodiments***"); Appx112(16:30-52) ("In the ***illustrated embodiment***"); Appx115(22:4-21) ("A process … in accordance with ***embodiments*** of the invention is illustrated"); Appx116(24:58-25:21) ("In ***many embodiments***"). Indeed, the specification states the "embodiments of the present invention should be considered in all respects as illustrative and not restrictive." Appx118(27:26-

27). Thus, these statements are descriptions of particular embodiments, not characterizations of the claimed invention as a whole.

The specification does not limit the invention by, for example, disclosing "the present invention 'is,' 'includes,' or 'refers to'" encryption information within the requested portions of the selected stream, "and there is nothing expressing the advantages, importance, or essentiality of" placing the encryption information within, as opposed to outside, the requested portions of the selected stream. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014) (in construing the term "datalink," "absent some language in the specification or prosecution history suggesting that the wired connection [disclosed in certain embodiments] [wa]s important, essential, necessary, or the 'present invention,' there is no basis to narrow the plain and ordinary meaning of the term datalink to" wired connections). As APJ Turner recognized, "the Specification can support placement of DRM information in different places (i.e., not only in the requested portions of the selected stream of protected video)." Appx43. Although the "encryption information *can* be found within the requested portions," the '588 patent does not "implicitly or explicitly require[] such a relationship." Appx45 (emphasis in original).

The panel majority seemed to believe that select embodiments utilizing the modified Matroska file format supported its restrictive construction. The '588

patent explains that a Matroska "container file 32" can be composed of a "Segment element 36." Appx111-112(14:63-15:7); *see also* Appx91(Fig. 3) (showing the elements of a Matroska container file). The Segment element, in turn, is composed of several different elements, including "a plurality of Cluster elements" that each contain "a plurality of BlockGroup elements including encoded portions of content." Appx106(4:29-38); *see also* Appx92 (Fig. 4a, Fig. 4b) (showing the BlockGroup elements within the Cluster elements). The Board focused narrowly on embodiments that describe the following:

> each of the Matroska container files containing an alternative stream of protected video *includes a DRMInfo element in a BlockGroup element* containing a protected frame of video, where the DRMInfo element indicates at least a portion of the protected frames of video that is encrypted

Appx14-15 (quoting Appx106(4:41-56) (emphasis in original)); *see also* Appx15-16 (citing Appx108(7:58-62), Appx109(9:23-29), Appx111(13:57-63), Appx94 (Fig. 4e)). The panel majority concluded that these embodiments required the encryption information (i.e., "the DRMInfo element") to be included within the requested portion of video (i.e., "the BlockGroup element"). *See* Appx14-15 ("The BlockGroup element is parsed to locate the DRMInfo *within* the BlockGroup element, i.e., the requested portion of the video, not elsewhere." (emphasis in original)); *see also* Appx11329.

But once again, the panel majority wrongly confined the claim to this narrow embodiment, with no basis for doing so. While the ’588 patent discloses a modified Matroska file that places the encryption information (i.e., the DRMInfo) in the BlockGroup elements, the specification does not ***require*** that the DRMInfo be included in the BlockGroup element. As Netflix’s expert Dr. McDaniel explained, a skilled artisan “reading the ’588 [patent], would know that it would be possible to put [the encryption information] … [o]utside the cluster, for example.” Appx9543(53:1-11); *see also* Appx9540(50:15-21); Appx9545(55:5-15).

Indeed, the ’588 patent states that “many embodiments of the invention utilize a ***conventional*** Matroska container” file format. Appx114(20:27-32). DivX’s expert Dr. Nielson testified that standard Matroska container files ***cannot contain DRMInfo at all***, let alone within a BlockGroup element, and needed to be “modified” to do so. Appx9461(¶90). It is therefore undisputed that unmodified, “conventional” Matroska container files could not “contain the [] encryption information.” *Id.*; Appx11634(37:18-20). Accordingly, there is no support for the panel majority’s conclusion that ***every*** embodiment in the specification must store the encryption information within the requested portion of video. Appx14. Embodiments involving a “conventional” Matroska container file ***cannot and do not*** do so. Thus, the specification contemplates that the encryption information need not be stored in the Matroska file at all, and could instead be stored in another

file used within the same system, for example, in the top-level index file. *See infra* p. 53 (Figure 2 of the ’588 patent showing the top-level index file 30 is separate from the container files 32).

Of course, it would not matter even if every embodiment in the patent had specified that the encryption information was within the requested portions of the selected stream (though that is not the case); it would still have been error to import that limitation into the claim. The Court in *Innova/Pure Water* reversed a construction of “operatively connected” requiring a filter tube and cap be affixed to one another to form a unitary structure. *Innova/Pure Water,* 381 F.3d at 1118. The district court had “proceeded beyond th[e] plain meaning based on the examples of means for connecting the tube to the cap disclosed in the [patent-at-issue], ***all of which*** reflect a physical engagement [between the tube and the cap] that results in a unitary structure.” *Id.* (quotation marks omitted). In *Hill-Rom*, this Court concluded that the district court erred in limiting the claimed term “datalink” to a wired datalink, where its ordinary meaning encompassed both wired and wireless datalinks. 755 F.3d at 1372-1374. Even though “the specification d[id] not contain an embodiment that teaches use of a wireless receiver” and contained “figures depicting the use of a wired datalink,” that was not a valid “reason to limit the term to a wired” datalink absent clear exclusion of wireless datalinks. *Id.* at 1373-1374.

Similarly, the Court rejected a proposed construction for "the claim term 'translating,' to require that the [claimed] system 'directly convert a higher level protocol identifier of a node to a different lower level protocol.'" *Verizon Servs. Corp. v. Vonage Holdings Corp*., 503 F.3d 1295, 1302 (Fed. Cir. 2007). "The mere fact that the specification's examples of translation may involve a change in protocol from a higher to a lower level protocol does not establish that such a limitation should be imported into the claims." *Id.* at 1302-1303 (citing *Phillips*, 415 F.3d at 1323; *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1563 (Fed. Cir. 1986)). Even where "the specification describe[d] only one embodiment," this Court determined that limiting the claim term "to the embodiment described in the specification" was "too narrow[]" a construction where the intrinsic evidence did not indicate the term should be so limited. *Teleflex*, 299 F.3d at 1327-1328.

Accordingly, there is "no reason here to limit the scope of the claimed invention … when" the claim language "is broad enough to encompass" encryption information outside the requested portions of the selected stream, "nothing in the written description" of the '588 patent "precludes" the ordinary meaning, and a skilled artisan would understand that the encryption information can be either inside or outside the requested portions of the selected stream. *SuperGuide Corp. v. DirecTV Enters., Inc*., 358 F.3d 870, 880 (Fed. Cir. 2004).

The panel majority attempted to distinguish *Verizon* and *SuperGuide* by arguing that "the limitation [in question] [wa]s not recited in the claims" of *Verizon* and *SuperGuide*. Appx18 n.12. But "the limitation" the panel majority imported here is also not in the claims, at least not without defying the rules of English grammar or modifying the claim language. *Supra* pp. 28-34. As in *SuperGuide*, "[h]ad [DivX] intended to limit the disputed claim term[]" as the panel majority did, DivX "could have easily done so by explicitly modifying the disputed claim language" as discussed above. 358 F.3d at 880.

The panel majority also cited *In re Donaldson Co.* and *Wisconsin Alumni Research Foundation v. Apple Inc.*, but neither is apposite. Appx18. *Donaldson* considered how the Patent Office should interpret a means-plus-function claim, 16 F.3d 1189, 1193-1195 (Fed. Cir. 1994), which is not at issue here. And in *Wisconsin Alumni Research Foundation*, the patent challenger argued that the term "prediction" included both "static" and "dynamic" predictions. 905 F.3d 1341, 1351 (Fed. Cir. 2018). The Court disagreed because the specification did not "describe[] a static prediction." *Id.*

Here, by contrast, the specification describes embodiments that are agnostic as to whether the encryption information is or is not within the requested portions of the selected stream. *Infra* pp. 47-49. Further, the Board expressly recognized that while "embodiments disclosed in the Specification of the '588 Patent support

Patent Owner's more restrictive construction, the same embodiments also support" Netflix's construction. Appx11244. Accordingly, the Board erred by importing select embodiments into the meaning of the claims.

**2. In any event, several embodiments of the '588 patent do not require the encryption information to be within the requested portions of the selected stream**

The panel majority also erred in finding that "every embodiment disclosed in the '588 patent specification describes encryption information located within the requested portion of the video." Appx16; *see also* Appx14. The panel majority ignored the fact that several embodiments in the specification do ***not*** require the encryption information (described as "DRM information"[8]) to be "within the requested portions of the selected stream of protected video." As APJ Turner noted, "other portions of the Specification" beyond the embodiments cited by DivX "support [Netflix]'s interpretation of the plain and ordinary meaning" of limitation [*l*]. Appx41-42.

---

[8] The Board and DivX recognized the claim-recited "encryption information" as including the disclosed "DRM information" and "DRMInfo element." *See, e.g.*, Appx14-16 (pointing to the "DRMInfo element" as the encryption information); Appx14 (citing Appx109(9:23-29); Appx111(13:57-63); Appx112(16:33-49); Appx115(22:14-17); and Appx117(25:10-21), which refer to the "DRMInfo element"); Appx6551-6552(145:17-146:16) (DivX's expert testifying that "the DRM information" is referring to the "encryption information"); Appx11329 (Patent Owner Response referring to the "encryption information" as the "DRMInfo").

In particular, the first two embodiments disclosed in the specification are silent about whether the encryption information is "within the requested portions of the selected stream of protected video" or not. The first disclosed embodiment uses "a plurality of alternative streams of protected content," but does not specify any location for any encryption information necessary to encrypt and decrypt this "protected content." Appx106(3:1-12). In the second disclosed embodiment and several other embodiments, "***each of the alternative streams*** of protected video ***includes DRM information*** indicating portions of frames of video that are encrypted," and the processor "obtain[s] a protected frame of video from one of the alternative streams of protected video." Appx106(3:13-30); Appx107(5:4-23); Appx108(7:8-25). In order to "decrypt the encrypted portion of the protected frame of video," the processor "obtain[s] [the] DRM information [that] indicat[es] [the] portion of the protected frame of video that is encrypted." Appx106(3:13-30). The embodiments thus disclose only that the "encryption information" (i.e., DRM information) is "include[d]" within "each of the alternative streams of protected video," *id.*; they say nothing about whether or not the "DRM information" is "within the ***requested portions*** of the selected stream of protected video." *See id.* Accordingly, the patent's first two embodiments are consistent with interpreting limitation [*l*] such that the encryption information is ***either inside or outside*** the requested portions of the selected stream.

Further, the specification discloses that the DRM elements (including the DRM information) could be stored within the modified Matroska container file using "a variety of mechanisms," Appx109(9:18-32), suggesting flexibility in the location of the encryption information beyond the one mechanism relied on by the panel majority, where a DRMInfo element is stored in the BlockGroup element. Thus, the patent's disclosure that encryption information ***can*** be in a modified Matroska container file, but that conventional Matroska files (which cannot hold encryption information) can also be used, shows that the encryption information is not necessarily stored within the requested portions of the selected stream.

A skilled artisan reading the '588 patent specification would thus understand that the encryption information does not need to be within, and could be outside of, the requested portions of the selected stream, as Netflix's expert Dr. McDaniel explained. Appx9543(53:1-11) (a skilled artisan "would know that it would be possible to put" the encryption information "[o]utside the cluster, for example"); Appx9540(50:15-21); Appx9605-9607(115:16-117:19); *see also* Appx11433-11436; Appx11615-11616(18:20-19:21).

Finally, contrary to the panel majority's assertion, Netflix's expert Dr. McDaniel did not "agree[] that the embodiments described in the Specification consistently locate the encryption information within the requested portion of the video *and* that there is no embodiment in the Specification where the encryption

information is not within the requested portion of the video." Appx16-17 (citing Appx9537-9539(47:2-49:20), Appx9545(55:5-15)) (emphasis in original). In the cited testimony, Dr. McDaniel merely acknowledged that some embodiments (described above, pp. 40-42) included encryption information within the requested portion of the protected video. Appx9537-9539(47:2-49:20). When asked by DivX's attorney whether there are embodiments "where the encryption information of a given cluster is not located within that cluster," Dr. McDaniel clarified that although "there is not an explicit embodiment," there are "embodiments that don't have an explicit description of where the information lies"—i.e., the patent's first two embodiments, *see supra* pp. 48-49—and a skilled artisan would not restrict the claim scope to only the specific embodiments DivX focused on. Appx9540(50:15-21); Appx9545(55:5-15).

Nor is it accurate to say that Dr. McDaniel "did not address this claim construction issue." Appx17 n.11. He consistently testified that "the encryption information [of limitation [*l*]] can either be located within [a] stream or someplace else." Appx9605-9607(115:16-117:19); *see also* Appx9540(50:15-21); Appx9543(53:1-11). He testified that, correctly construed, limitation [*l*] means: "identifying … encryption information that identifies the encrypted portions of frames, and those frames are part of the video within the requested portions of the selected stream." Appx9550-9551(60:17-61:51). Dr. McDaniel's first declaration

applied this correct construction. *See* Appx3978-3979(¶¶100-101); Appx4049-4055(¶¶182-187); Appx9605-9607(115:16-117:19) (Dr. McDaniel testifying that the Board's construction of limitation [*l*] from the "Institution decision reflects the thinking of the Board from reviewing my report, … that the encryption information can either be located within [a] stream or someplace else"). Thus, DivX was wrong to "contend[] that Dr. Nielson's testimony" regarding the construction of limitation [*l*] is "unrebutted." Appx17 n.11 (citing Appx11495).

### C. The Panel Majority's Construction Is Inconsistent With The '588 Patent's Related Patents And Its Prosecution History

Related patents to the '588 patent and the '588 patent's prosecution history show that the "within" prepositional phrase of limitation [*l*] was intended to modify the encrypted portions of frames of video, not the encryption information.

#### 1. The panel majority's construction is inconsistent with the related '522 patent

The '522 patent, a related patent with the same specification as the '588 patent, refutes the Board majority's restrictive reading of limitation [*l*]. For the '522 patent, DivX represented to the Patent Office that the common specification supports situating the encryption information ***outside*** the requested portions of the selected stream of protected video. Appx11616-11617(19:22-20:6). DivX obtained claims in the '522 patent where the encryption information ("DRM information") is in the top-level index file, which is separate from the requested

portions of the selected stream. Appx6328(27:31-41); *see also* Appx11433-11434; Appx7021. Claim 1 of the ’522 patent recites, in part:

> obtain a top level index file from the content distribution server, wherein ***the top level index file identifies a plurality of alternative streams of protected video*** that have been protected by a common set of frame keys generated by a source encoder, and wherein ***the top level index file comprises*** … a set of ***DRM information that identifies protected portions of the alternative streams of protected video*** and frame keys to utilize in accessing the protected portions of the alternative streams;

Appx6328(27:31-41).

Because “the top level index file identifies a plurality of alternative streams of protected video” (*id.*; *see also* Appx109(9:38-43)), it must be outside the alternative streams of protected video that it identifies. Appx11434. The common specification confirms as much. For example, in discussing Figure 2, the specification explains: “The files utilized in the adaptive bitrate streaming of the source media include a top level index 30 and a plurality of container files 32 that each contain at least one stream.” Appx111(13:28-33); Appx6321(13:19-24) (same). “The top level index file describes the content of each of the container files” and can be “an SMIL file,” and the container files can be Matroska (MKV) container files. Appx111(13:34-38); Appx6321(13:25-29); *see also* Appx109(9:12-14); Appx6319(9:33-35). Figure 2 (excerpted below) shows the “SMIL File” 30—i.e., the top-level index file containing the DRM information—

outside of the several Matroska container files ("MKVFile[s]") 32. Appx90(Fig. 2); Appx6300(Fig. 2).




*FIG. 2*

Appx90 (Fig. 2); Appx6300 (Fig. 2). Accordingly, the '522 patent claims the encryption information (DRM information) inside of the top-level index file and outside of the requested portions of the selected stream of video.

The panel majority erred in determining there was no "inconsistency" between the '522 patent's claims and DivX's assertion that "in ***every embodiment***" of the common specification, the "encryption information is 'located' 'within the requested portions of the selected stream of protected video.'" Appx20; Appx11328-11329. DivX's assertion about the common specification cannot be accurate if, as the '522 patent claims, the "DRM information" can be outside the

selected stream of protected video.[9] By presenting that claim limitation in the ’522 patent’s application, DivX represented to the Patent Office that the limitation was supported by the common specification of the ’522 and ’588 patents. *See Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (an applicant must comply with the written description requirement “by describing the invention with all its claimed limitations”).

The panel majority’s discussion of the ’522 patent is also inconsistent with its discussion of the ’588 patent. When construing the ’588 patent, the panel majority concluded that the disclosed “DRM information” and “DRMInfo element” correspond to the claimed “encryption information.” *Supra* p. 47 n.8. That is, the panel majority viewed the “DRM information” and “DRMInfo element” as the “encryption information” for purposes of finding that some embodiments supported DivX’s construction. *See* Appx14-16.

Yet when it considered the ’522 patent, the panel majority inconsistently determined that the claimed “DRM information that identifies protected portions of the alternative streams” was “directed to different aspects of the disclosed

---

[9] DivX’s expert agreed that “DRM information” is “the encryption information that’s recited in the challenged claims.” *See* Appx6551-6552(145:17-146:16) (“So [the specification] says that the DRM information indicates portions of frames of videos that are encrypted. … Yes, I would say that that is encryption information that indicates portions of frames of video that are encrypted.”).

invention" from the "encryption information" claimed in the '588 patent. Appx20. The panel majority did not explain how the common specification's reference to "DRM information" could correspond to the "encryption information" for purposes of the '588 patent, but not for purposes of the '522 patent. Rather, the panel majority focused on the fact that claim 1 of the '522 patent does not recite partial frame encryption and asserted that the '522 patent claims "are directed to different aspects of the disclosed invention." *Id.* Partial frame encryption is a technique that encrypts only a portion of an individual frame of video. *Supra* p. 9. By contrast, other encryption techniques encrypt larger portions of data that are themselves made up of multiple frames of video. *See, e.g.*, Appx5472(¶522) (disclosing an exemplary embodiment in which "each fragment" of video is encrypted); *see also supra* p. 7 (each fragment comprises multiple frames). These latter techniques therefore necessarily encrypt full individual frames of video. The fact that claim 1 of the '522 patent does not recite partial frame encryption is irrelevant, because where the encryption information is stored (e.g., in the top-level index file or within the requested portions of the selected stream) is not affected by the particular portion of data that is encrypted, i.e., whether the individual frames of video are partially or fully encrypted.

Further, the claims of the '522 patent are broader than those of the '588 patent and thus could encompass partial frame encryption. *Compare* Appx6328

*with* Appx118. The "DRM information that identifies protected portions of the alternative streams of protected video" recited by the '522 patent claims, Appx6328(27:38-41), is broader than, but inclusive of, the "encryption information that identifies encrypted portions of frames of video within the requested portions" recited by the '588 patent claims. The "frames of video" ('588 patent claims) are inside "the alternative streams of protected video" ('522 patent claims), and in claim 1 of the '588 patent, the encrypted portions of video frames constitute the protected portions of the alternative streams. Appx118(27:37-39) ("each of the alternative streams of protected video includes partially encrypted video frames").

The panel majority erred in treating the "DRM information" inconsistently with respect to the '522 and '588 patents. At a minimum, the panel majority's opinion should be vacated as internally inconsistent. *See, e.g.*, *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. de C.V.*, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (vacating Board's decision in part because it was "internally inconsistent"); *Polygroup Ltd. MCO v. Willis Electric Co.*, 780 F. App'x 880, 884 (Fed. Cir. 2019) ("We do not regard such internally inconsistent findings as supported by substantial evidence.").

### 2. Other DivX patents in the same family show that DivX knew how to draft claim limitations that specify a clear location for the encryption information

The panel majority failed to consider other patents in the ’588 patent’s family that—unlike the ’588 patent—expressly specified the encryption information’s location. U.S. Patent Nos. 9,247,311 (the “’311 patent”) and 8,909,922 (the “’922 patent”) issued from parent applications of the ’588 patent and share the same specification. Claim 1 of the ’311 patent recites: “***write DRM information to each separate container file*** that identifies the encrypted portions of several encoded video frames written to the separate container file.” Appx6366(26:45-67). The ’922 patent contains claims reciting: “wherein ***each of the container files*** containing the alternative streams of protected video ***comprises*** … ***DRM information*** that identifies encrypted portions of the video frames.” Appx6403(26:52-58). These claims clearly specify that the encryption information is within the container files, which also “contain[]” “each of the alternative streams of protected [video]” so that the processor can request portions of the selected stream of protected video from one of the container files. Appx106(3:31-34, 4:16-28).

While these claims do not specify that the DRM information is within the requested portions of the selected stream, they do explicitly recite where the DRM information is stored and therefore show that DivX knew how to draft claims

specifying where the encryption information was stored (for the ’311 and ’922 patents, in the container files) but omitted any such limitation from the ’588 patent claims. It would be improper to now import such a limitation under the guise of claim construction. *See Lowe v. ShieldMark, Inc.*, No. 2021-2164, 2022 WL 636100, at *5 (Fed. Cir. Mar. 4, 2022) (district court erred in construing the claimed invention as requiring a tape with “shoulders demarcating a recess” where the parent application expressly claimed “that the tape has ‘shoulders’ and a ‘recess’” and thus “the patentee knew how to claim tape with shoulders and a recess when specifically intended”).

**3. The panel majority’s construction is inconsistent with the ’588 patent’s prosecution history**

The ’588 patent’s prosecution history confirms the panel majority’s error. The panel majority relied on testimony of DivX’s expert, Dr. Nielson, that “locating encryption information within the requested portions of the stream is ***one of the central aspects*** of the ’588 [patent]’s inventive system.” Appx16 (quoting Appx9461(¶90)). But the original claims of the ’588 patent did not even recite the phrase “within the requested portions of the selected stream of protected video.” Appx1057. The original language of limitation [*l*], as submitted by DivX, recited:

> locating encryption information that identifies encrypted portions of frames of video within the selected stream;

Appx1057; *see also* Appx39. To place the claims in "condition for allowance," the examiner amended limitation [*l*] to add the underlined language below:

> locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video;

Appx1565 (underlining in original). If locating encryption information within the requested portions of the stream really had been a "central aspect[]" of the '588 patent, Appx9461-9462(¶90), then the original claims would have included that feature—but they did not. *See* Appx1057. Moreover, Dr. Nielson's assertion that the location of the encryption information is somehow critical to the invention is also inconsistent with DivX's representation in the district court litigation that the inventive aspect of the claim relates to the use of common keys—a fact this Court also recognized. Appx5808-5809(¶227) (DivX's complaint asserting: "Prior ABS video encryption formats and index files did not encrypt alternative streams using a set of common keys"); *Netflix*, 2023 WL 2298768, at *1.

In the Notice of Allowance accompanying the amendment to limitation [*l*], the examiner stated the purpose of the amendments shown above was, in part, to "***clarify*** the claim limitations." Appx1564 (Notice of Allowance); Appx1576 (Examiner-Initiated Interview Summary). Yet the panel majority's construction of

limitation [*l*] means that the examiner radically narrowed limitation [*l*] without explanation or stated reason, which is at the very least counterintuitive.[10]

### D. DivX's Expert Testimony Does Not Support The Panel Majority's Construction

The panel majority relied on the unsupported testimony of DivX's expert, Dr. Nielson, in construing limitation [*l*] restrictively. Appx13 (citing Appx9459-9460(¶¶85-87)); Appx16 (citing Appx9460-9462(¶¶88, 90)); Appx24. But as APJ Turner correctly recognized, Dr. Nielson's testimony was "conclusory and unpersuasive" (Appx55), and thus cannot support the panel majority's construction. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) ("'[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.'" (quoting *Phillips*, 415 F.3d at 1318)).

*First*, the panel majority referenced Dr. Nielson's testimony regarding "the plain meaning of the claim language to a POSITA." Appx13 (citing Appx9459-9460(¶¶85-87)). But Dr. Nielson merely asserted that the "within" prepositional phrase modified "encryption information" without any convincing detail or

---

[10] The panel majority criticized APJ Turner for considering the prosecution history (Appx21 n.14), but DivX itself had relied on the prosecution history. *See, e.g.*, Appx11132; Appx11632(35:6-10); Appx11634(37:6-9); *see also* Appx11187. In any event, the proper claim construction is compelled by the claims' plain language and context, as well as the scope of related patents; nothing prevents this Court from considering that that construction is also consistent with the prosecution history.

explanation. *See* Appx9459-9460(¶¶85-87). He did not support his conclusion that DivX's proposed construction is "the plain meaning of the claim language" with any references to grammar or style guides. *See id.*

*Second*, the panel majority was "persuaded by Dr. Nielson's testimony" (Appx24) that the claimed invention required "modif[ying] the Matroska file format to add" the encryption information functionality. Appx9461-9462(¶90). However, the '588 patent explicitly states that "many embodiments of the invention utilize a ***conventional*** Matroska container," not a modified Matroska container file (Appx114(20:27-32)), and conventional Matroska container files undisputedly could not store the encryption information. *See supra* pp. 43-44. The particular paragraph that Dr. Nielson pointed to for support even states that "many"—not all—embodiments employ a modified Matroska file format. Appx110(11:45-50). Moreover, even for the embodiments that employ a modified Matroska file format, the addition of the encryption information functionality does not require that the encryption information be within the requested portions of the selected stream; rather, the encryption information could be elsewhere. *See supra* pp. 48-49, 52-53.

*Third*, the panel majority cited Dr. Nielson's testimony in concluding that every embodiment of the '588 patent specified that the encryption information was within the requested portions of the protected video. Appx14 (citing

Appx9460(¶88)). But Dr. Nielson did not in fact say that. Rather, his declaration was far more careful: he said that "[i]n every embodiment of the '588 Patent ***where a location for the encryption information is disclosed***, 'encryption information' is located within the 'requested portion' of the video." Appx9460(¶88) (original emphasis removed). Dr. Nielson did not rule out the possibility of embodiments of the invention that were silent, or agnostic, as to the location of encryption information. And as is shown above, the patent's first two embodiments are either silent as to the location of any encryption information or do not require the location to be within the requested portions of the selected stream, as Dr. McDaniel recognized (*see* Appx9543(53:1-11); Appx9540(50:15-21)). *Supra* pp. 48-49. The first disclosed embodiment does not specify any location for any encryption information. Appx106(3:1-30). And while the second embodiment and several other embodiments disclose the location of the encryption information, they do not require it to be within the ***requested portions*** of the selected stream. Appx106(3:13-30) ("In a further embodiment, the alternative streams of protected content are alternative streams of protected video, ***each of the alternative streams of protected video includes DRM information*** indicating portions of frames of video that are encrypted … ."); Appx107(5:4-23) (same); Appx108(7:8-25) (same).

Finally, the panel majority relied on Dr. Nielson's testimony that a skilled artisan "would have understood that 'locating encryption information within the

requested portions of the stream is one of the central aspects of the '588 [patent]'s inventive system.'" Appx16 (quoting Appx9461-9462(¶90)) (panel majority "find[ing] Dr. Nielson's testimony credible"). As explained above (pp. 58-59), Dr. Nielson's assertion is belied by the prosecution history of the '588 patent; the purported feature Dr. Nielson asserts was "central" to the invention was not even included in the original claims. *Compare* Appx1057 *with* Appx118(27:30-63). Accordingly, Dr. Nielson's testimony should be disregarded as "at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history." *Phillips*, 415 F.3d at 1318.

## III. Under The Correct Construction, The Prior Art Discloses Limitation [*l*]

The Board's non-obviousness determination rested on its erroneous construction and should be vacated. *See, e.g.*, *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1059 (Fed. Cir. 2024) (vacating final written decision finding claims non-obvious in light of an "erroneous" claim construction); *Nestle USA, Inc. v. Steuben Foods, Inc.*, 686 F. App'x 917, 920 (Fed. Cir. 2017) (same). The Board's error was not harmless. There can be no genuine dispute that Lindahl disclosed limitation [*l*] under its proper construction, because Lindahl taught using encryption information, which it called "encryption parameters," to identify encrypted portions of video frames within a requested stream of video.

Lindahl taught that video frames could be divided "into a plurality of blocks" to facilitate partial frame encryption. Appx5489-5490(¶14). For example, Figure 6A depicted a partially encrypted block 600 that included unencrypted portions 602 and 606, and encrypted portion 604. *Supra* p. 10; Appx5483; Appx5493(¶56). Lindahl explained that, for partially encrypted block 600, "[t]he size of the unencrypted portion 602 is denoted by variable X, the size of the encrypted portion 604 is denoted by variable Y, and the size of the unencrypted portion 606 is denoted by variable Z." Appx5493(¶57). Thus, "the size of the partially encrypted block 600 is the sum of the variables X, Y and Z." *Id.*

Lindahl further taught that encryption parameters X, Y, and Z were "retrieved" to decrypt a selected portion of video. Appx5494(¶72). Specifically, Lindahl taught that the decryption process began by identifying "a media file to be decrypted." *Id.* Once the desired file was identified, it was examined to "locate frame boundaries" and decrypt the encrypted blocks that made up that frame "in accordance with the encryption parameters." *Id.* Thus, Lindahl indisputably disclosed encryption information that identified encrypted portions of frames of video within the requested portions of the selected stream of protected video.

As the Board recognized, DivX effectively conceded as much. Appx11245 (DivX "acknowledged that 'Lindahl only teaches how to deliver [encryption] information in a separate file,' such that limitation [*l*] is acknowledged as being

disclosed by Lindahl, under [Netflix's construction]" (quoting Appx11153; citations omitted)). Further, as APJ Turner found, all of DivX's arguments regarding this limitation "rest[ed] on [its] interpretation" of the claim language. Appx64; *see also, e.g.*, Appx11326 (DivX arguing that "to the extent that Lindahl locates any encryption information, it does not locate the information 'within the *requested portions* of the *selected stream* of protected video'" (emphasis in original)).

DivX argued to the Board that Lindahl does not teach ***other*** features, *i.e.* "it does not relate to a system in which content is partially requested or one of a plurality of 'alternative streams' is 'selected.'" Appx11326-11327. That argument repeats the very error that caused this Court to reverse the Board's previous decision: it ignores the ***combination*** of references on which Netflix relies. *See Netflix*, 2023 WL 2298768, at *4. As set forth in the petition, Netflix relied on Chen—not Lindahl—as disclosing a system in which content is partially requested. *See, e.g.*, Appx11030; Appx11034; Appx11038. Lindahl was therefore not required to disclose this aspect of the claim. *See, e.g.*, *In re Merck & Co.*, 800 F.2d 1091, 1097-1098 (Fed. Cir. 1986) (explaining that a reference in obviousness combination "must be read, not in isolation, but for what it fairly teaches in combination with the prior art as a whole" and "[n]on-obviousness cannot be

established by attacking references individually where the rejection is based upon the teachings of a combination of references”).

Accordingly, the Court should determine that Lindahl discloses limitation [*l*] under the correct construction.

**CONCLUSION**

This Court should correct the Board’s claim construction, hold that Lindahl discloses limitation [*l*] under the correct construction, vacate the Board’s final written decision, and remand for further proceedings.

Respectfully submitted,

/s/ Mark C. Fleming

MARK C. FLEMING
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Mark.Fleming@wilmerhale.com

*Attorneys for Appellant Netflix, Inc.*

NORA N. XU
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

LAUREN E. MATLOCK-COLANGELO
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center,
250 Greenwich Street
New York, NY 10007
(212) 230-8800

June 3, 2024

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Final Written Decision On remand, Paper No. 66 (Feb. 22, 2024) .......... Appx1-74

U.S. Patent No. 10,225,588 (Exhibit 1001) .......... Appx75-119

Trials@uspto.gov
571-272-7822

Paper 66
Date: February 22, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

NETFLIX, INC.
Petitioner,[1]

v.

DIVX, LLC,
Patent Owner.

---

IPR2020-00558
Patent 10,225,588 B2

---

Before KEVIN F. TURNER, BART A. GERSTENBLITH, and IFTIKHAR AHMED, *Administrative Patent Judges*.

Opinion for the Board filed by AHMED, *Administrative Patent Judge*.

Opinion dissenting filed by TURNER, *Administrative Patent Judge*.

AHMED, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining No Challenged Claims Unpatentable
*35 U.S.C. §§ 314, 318*

[1] Hulu, LLC ("Hulu") also was a petitioner in this proceeding, but is no longer a party to this proceeding. *See* Paper 63 (ORDER Settlement as to Hulu, LLC).

# I. INTRODUCTION

This case is on remand from the United States Court of Appeals for the Federal Circuit to address the patentability of claims 1–24 of U.S. Patent No. 10,225,588 B2 (Ex. 1001, "the '588 patent"). *Netflix, Inc. v. DivX LLC*, No. 2022-1083, 2023 WL 2298768 (Fed. Cir. Mar. 1, 2023) (nonprecedential). For the reasons discussed herein, we determine that Petitioner has not shown, by a preponderance of the evidence, that claims 1–24 are unpatentable.

## *A. Procedural Background*

Netflix, Inc. ("Petitioner") and Hulu filed a Petition (Paper 3, "Pet.") requesting institution of *inter partes* review of claims 1–24 (the "challenged claims") of the '588 patent.

Pursuant to 35 U.S.C. § 314(a), on August 26, 2020, we instituted *inter partes* review on the ground of:

| Claims Challenged | 35 U.S.C. §[2] | References |
|---|---|---|
| 1–24 | 103(a) | Chen,[3] Lindahl,[4] Hurst[5] |

*See* Pet. 12; Paper 10 ("Inst. Dec."). Petitioner relies upon a Declaration by Dr. Patrick McDaniel (Ex. 1003).

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103. Because the effective filing date of the challenged claims of the '558 patent is before March 16, 2013 (the effective date of the relevant amendment), the pre-AIA version of § 103 applies. *See* Ex. 1001, codes (60), (63).
[3] U.S. Patent Application Publication No. US 2011/0096828 A1, published April 28, 2011 (Ex. 1006, "Chen").
[4] U.S. Patent Application Publication No. US 2007/0083467 A1, published April 12, 2007 (Ex. 1007, "Lindahl").
[5] U.S. Patent No. 8,683,066 B2, issued March 25, 2014 (Ex. 1008, "Hurst").

DivX, LLC ("Patent Owner") filed a Patent Owner Response (Paper 17, "PO Resp."), along with a Declaration of Dr. Seth Nielson (Ex. 2012) to support its positions. Petitioner filed a Reply (Paper 29, "Pet. Reply") to the Patent Owner Response, along with a Reply Declaration of Dr. McDaniel (Ex. 1031). Patent Owner filed a Sur-reply to Petitioner's Reply (Paper 40, "PO Sur-reply"), along with a Declaration of Dr. Chandrajit Bajaj (Ex. 2027), that had been made of record in another proceeding between Petitioner and Patent Owner, IPR2020-00646. An oral hearing was held on May 25, 2021. A transcript of the hearing is included in the record. Paper 49 ("Tr.").

We issued a Final Written Decision determining that Petitioner had not proven by a preponderance of evidence that claims 1−24 are unpatentable. Paper 50 ("Final Decision" or "Final Dec."), 36. In particular, our Final Written Decision addressed one of three main arguments raised by Patent Owner—whether Petitioner established that one of ordinary skill in the art would have been motivated to combine the teachings of the references as proposed by Petitioner with a reasonable expectation of success.[6] *Id.* at 9–28. We did not decide two other issues raised by Patent Owner—(1) the proper construction of limitation [1] of claim 1 ("locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video") and (2) whether the combination would have rendered obvious video frames in alternative streams that are encrypted using a set of common keys. *See, e.g.*, PO Resp. i–ii (table of contents identifying the arguments raised in the

---

[6] Patent Owner's argument also contested motivation to combine. *See, e.g.*, PO Resp. 1–24.

Patent Owner Response); *see also* Final Dec. 8 (explaining that "we need not resolve the issue" as to the proper meaning of limitation [l] of claim 1 because "we determine that Petitioner has not shown . . . that the challenged claims are unpatentable on another basis").

Petitioner filed a Notice of Appeal of the Final Written Decision with the Federal Circuit. Paper 52. On March 1, 2023, the Federal Circuit issued a decision in the appeal vacating our Final Decision and remanding for further proceedings consistent with its decision. *Netflix*, 2023 WL 2298768, at *6. The Federal Circuit determined that "the Board committed a fundamental legal error in defining the combination it was evaluating as Lindahl with Chen's 'system,' *i.e.*, with the system Chen teaches as its advance over the prior art (its inventive system)." *Id.* at *4. The Federal Circuit left it to our discretion on remand "whether to reconsider the issue of motivation to combine," but also set forth certain contours for our reconsideration if we chose to undertake it. *Id.* at *7. The Federal Circuit, however, did not address the other two issues raised by Patent Owner since we did not decide either of those issues in the Final Written Decision and they were not presented for appeal. *See generally Netflix*.

After the Federal Circuit issued its mandate on April 7, 2023, we conducted a conference call with the parties (Ex. 1036) and requested briefing specifically pointing out the issues that must be decided to reach a conclusion on the patentability of the challenged claims of the '588 patent. Paper 56 (Order, Conduct of the Proceeding). Subsequently, we issued an order with a remand briefing schedule permitting the parties to address the impact of the Federal Circuit's opinion but not permitting the parties to introduce new evidence. *Id.* The parties then filed the following briefs:

Petitioner's Brief on Remand (Paper 61, "Pet. Remand Br."), Patent Owner's Brief on Remand (Paper 62, "PO Remand Br."),[7] Petitioner's Response Brief on Remand (Paper 64, "Pet. Remand Resp. Br."), and Patent Owner's Response Brief on Remand (Paper 65, "PO Remand Resp. Br.").[8]

*B. Related Matters*

Petitioner and Patent Owner identify the following related matters: *DivX, LLC v. Netflix, Inc.*, No. 2:19-cv-01602 (C.D. Cal.); *DivX, LLC v. Hulu, Inc.*, No. 2:19-cv-01606 (C.D. Cal.) (dismissed Aug. 25, 2022). Pet. 84; Paper 5, 1; Paper 60, 3–4.

---

[7] Patent Owner's Brief on Remand recognizes that there are two arguments Patent Owner raised in its Patent Owner Response that were not addressed in the Final Written Decision. *See* PO Remand Br. 1 (citing PO Resp. 24–37 (the construction of "locating encrypted information . . . within requested portions"), 38–58 (referring to Patent Owner's "common keys" argument)).

[8] The Final Decision also addressed Petitioner's Motion to Exclude (Paper 42). *See* Final Dec. 28–37 (granting-in-part, denying-in-part, and dismissing-in-part Petitioner's Motion). Our determinations on that Motion were part of Petitioner's appeal to the Federal Circuit. *See* Paper 52. Because the Federal Circuit did not address this aspect of the Final Written Decision and the Federal Circuit's decision does not impact our previous rulings on the Motion, we maintain those rulings here. Additionally, on remand, Petitioner requested authorization to file a motion for sanctions, which we held in abeyance until the parties' briefing on remand was complete. *See* Ex. 3003, 1. Petitioner requests sanctions because of the impropriety of Patent Owner's remand brief, including new claim construction arguments for limitations [1j] and [1k], and prejudice to Petitioner. *Id.* at 3, 5. Although we reserved further consideration of Petitioner's request, we expanded both the time and pages allowed for Petitioner's responsive brief, and also allowed Petitioner to address any related issues in its responsive brief. *Id.* at 1. Having considered the parties' briefing on remand, and given that we do not reach the claim construction arguments that Petitioner objected to in its request for authorization to file a motion for sanctions, we deny Petitioner's request.

*C. The ’588 Patent*

The ’588 patent is directed to “[s]ystems and methods for performing adaptive bitrate streaming using alternative streams of protected content.” Ex. 1001, code (57). The Background section of the ’588 patent details that “content can be divided into audio, video, and subtitle streams and some streams can be encoded as alternative streams that are suitable for different network connection bandwidths or comply with specific geographic restrictions and/or other restrictions.” *Id.* at 1:54–58. That same section also details that adaptive bit rate streaming involves “detecting the present streaming conditions . . . in real time and adjusting the quality of the streamed media accordingly by selecting between different streams encoded for use at different network connection data rates.” *Id.* at 1:60–64. The Background section of the ’588 patent also details that “[i]n adaptive streaming systems, the source media is typically stored on a media server as a top level index file pointing to a number of alternate streams that contain the actual video and audio data. Each stream is typically stored in one or more container files.” *Id.* at 2:12–16. The ’588 patent also confirms that it was known to protect content “using cryptographic information such as (but not limited to) one or more encryption keys to encrypt *some or all* of the content.” *Id.* at 2:52–54 (emphasis added).

The ’588 patent describes, according to specific embodiments, that a system uses a top level index file identifying the alternative streams of protected video, with each including partially encrypted video frames encrypted using a set of common keys. Ex. 1001, 16:43–49, 23:24–28. A copy of the set of common keys is obtained and the streaming conditions for the playback device are detected. *Id.* at 23:46–51. A stream is selected,

based on those conditions, and a container index is used to determine the byte ranges for portions of those streams, which are then requested. *Id.* at 24:51–57, 25:6–10. Based on encryption information that identifies encrypted portions of the frames of video, the encrypted portions are decrypted using the set of common keys and the streamed video is played back. *Id.* at 25:10–21.

Challenged claims 1 and 12 are independent. Claim 1 is illustrative of the claimed subject matter and is reproduced below, with Petitioner's bracketing added for reference:

> 1. [a] A playback device for playing protected content from a plurality of alternative streams, comprising:
>
> [b] a set of one or more processors; and
>
> a non-volatile storage containing an application for causing the set of one or more processors to perform the steps of:
>
> [c] obtaining a top level index file identifying a plurality of alternative streams of protected video, [d] wherein each of the alternative streams of protected video includes partially encrypted video frames [e] that are encrypted using a set of common keys comprising at least one key, [f] and wherein the partially encrypted video frames contain encrypted portions and unencrypted portions of data;
>
> [g] obtaining a copy of the set of common keys;
>
> [h] detecting streaming conditions for the playback device;
>
> [i] selecting a stream from the plurality of alternative streams of protected video based on the detected streaming conditions;
>
> [j] receiving a container index that provides byte ranges for portions of the selected stream of protected video within an associated container file;
>
> [k] requesting portions of the selected stream of protected video based on the provided byte ranges;

> [l] locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video;
>
> [m] decrypting each encrypted portion of the frames of video identified within the located encryption information using the set of common keys; and
>
> [n] playing back the decrypted frames of video obtained from the requested portions of the selected stream of protected video.

Ex. 1001, 27:30–63.

## II. ANALYSIS

### *A. Principles of Law*

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

As set forth in 35 U.S.C. § 103(a),

> [a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level

of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness.[9] *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016).

We analyze the asserted grounds of unpatentability in accordance with these principles to determine whether Petitioner has met its burden of establishing unpatentability of the challenged claims by a preponderance of the evidence.

*B. Level of Ordinary Skill in the Art*

Petitioner, supported by Dr. McDaniel's testimony, proposes that a person of ordinary skill in the art at the time of the invention ("POSITA") would have had "a bachelor's degree in mechanical engineering, electrical engineering, computer science, or a similar field with at least two years of experience in video streaming and media security or . . . a master's degree in mechanical engineering, electrical engineering, computer science, or a

[9] Neither party presents evidence of objective considerations of non-obviousness.

similar field with a specialization in video streaming and media security." Pet. 14–15 (citing Ex. 1003 ¶¶ 65–67). Patent Owner does not refute Petitioner's assessment and appears to apply such a level of skill in its arguments against combining Chen, Lindahl, and Hurst to teach or suggest the elements of the challenged claims. *See generally* PO Resp.

As such, we continue to adopt and apply Petitioner's unopposed position as to the level of ordinary skill in the art for purposes of this decision. *See* Inst. Dec. 6; Final Dec. 6.

### *C. Claim Construction*

In this *inter partes* review, "claims are construed using the same claim construction standard that would be used to construe the claim[s] in a civil action under 35 U.S.C. § 282(b)." *See* 37 C.F.R. § 42.100(b) (2019). The claim construction standard includes construing claims in accordance with their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *See id.*; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc). In construing claims in accordance with their ordinary and customary meaning, we take into account the specification and prosecution history. *Phillips*, 415 F.3d at 1315–17. The specification is the single best guide to the meaning of a disputed term and is usually dispositive. *Id.* at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

If the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). Another exception to the general rule that claims are

given their ordinary and customary meaning is "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1313 (Fed. Cir. 2013) (quoting *Thorner v. Sony Computer Entm't Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

Additionally, only terms that are in controversy need to be construed, and these need be construed only to the extent necessary to resolve the controversy. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs.* in the context of an *inter partes* review).

*1. [l] locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video;*

The chronology is important for a complete understanding of the issue before us. In our Institution Decision, we noted that neither party presented any claim terms for construction at that stage of the proceeding. Inst. Dec. 8. Nonetheless, we understood that Patent Owner's argument pertaining to limitation [l] of claim 1 is based on Patent Owner's interpretation of the phrase. *Id.* at 28 ("Patent Owner's arguments . . . rely on a specific construction of limitation [l]"). On the record at that time, we disagreed with Patent Owner's construction. *Id.* at 28–30.

As explained above, our Final Written Decision was based on a different issue raised by Patent Owner. Although we stated that "we continue to find Patent Owner's arguments about limitation [l] to be

unpersuasive," we did not "resolve the issue as we determine[d] that Petitioner has not shown, by a preponderance of the evidence, that the challenged claims are unpatentable on another basis." Final Dec. 8. Thus, as both parties recognize, one of the issues remaining for our consideration on remand is the construction of limitation [l]—an issue that was thoroughly briefed by the parties in the Patent Owner Response, Petitioner's Reply, and Patent Owner's Sur-reply. Pet. Remand Br. 9–11; PO Remand Br. 1; *see* PO Resp. 26–34; Pet. Reply 20–23; PO Sur-reply 1–8.

Patent Owner argues that the clause "within the requested portions of the selected stream of protected video" in limitation [l] of claim 1 modifies "locating encryption information," and, properly construed, dictates that the "encryption information" must be "located," "within the requested portions of the selected stream of protected video." PO Resp. 26–39 (citing Ex. 2012 ¶ 85); PO Sur-reply 1–8. Petitioner asks us to reject Patent Owner's arguments, and adopt our preliminary determination at the institution stage that the "within" term of limitation [l] connotes where the particular encrypted portions of frames of video must be located, not necessarily where the encryption information must be located. Pet. Reply 20–23.

Even though we preliminarily construed this term differently, having fully considered the parties' arguments and the evidence presented during trial, we determine for the reasons explained below that the evidence overwhelmingly supports Patent Owner's reading of limitation [l]—that the encryption information is located within the *requested portions* of the selected stream of protected video.

"In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language

itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006). We begin our analysis with the claim language, which recites "locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video." Ex. 1001, 27:54–57. Relying upon Dr. Nielson's testimony, Patent Owner contends that a person of ordinary skill in the art would have understood that "the most natural reading of the claim is that the 'within' clause modifies the 'locating.'" PO Resp. 26–27 (citing Ex. 2012 ¶¶ 85–87). Dr. Nielsen testifies that the second clause of the claim limitation informs the person of ordinary skill in the art of the *function* of the "encrypted information," whereas the third clause informs where that encrypted information is located. Ex. 2012 ¶ 87.

We determine Patent Owner's reading of the claim limitation is the better one. The limitation begins with the verb "locating," and it therefore makes sense that the clause would recite what is located (i.e., encryption information) and where it is located (i.e., within the requested portions of the selected stream of protected video). In other words, it is reasonable that the second and third clauses of the limitation *both* modify the first clause (for example, as could perhaps be expressed through the use of commas as "locating encryption information, that identifies encrypted portions of frames of video, within the requested portions of the selected stream of protected video").[10] On the other hand, Petitioner's reading of the limitation,

[10] In general, we recognize that the use of commas to set off phrases in claim drafting is not consistent. We included commas above to illustrate Patent Owner's understanding of the claim limitation.

allowing *only* the second clause to modify the first, while not unreasonable, makes less sense. That is, the encrypted information identifies the encrypted portions of frames, which in turn are within the requested portions of the selected stream of protected video. Reading the claim in its entirety, the encrypted portions of frames would be understood to be located within the requested portions of the stream; it does not seem necessary for the claim to expressly recite that aspect. For example, the very next limitation—limitation [m] of claim 1—refers to "each encrypted portion of the frames of video" but does not expressly recite "within the requested portions of the selected stream." Ex. 1001, 27:58–60. Thus, when limitation [l] recites "within the requested portions of the selected stream," it seems more likely that the clause refers to where that encrypted information is located rather than simply to indicate the obvious location of the encrypted portion of the frames of video. We therefore view Patent Owner's reading of the claim language as the better one.

Next, we turn to the Specification, the single best guide to the meaning of a disputed term, *Phillips*, 415 F.3d at 1315, which we determine supports *only one* of the two proposed interpretations of the claim. Patent Owner argues, and we agree, that "in *every embodiment* of the '588 [patent], 'encryption information' is located within the 'requested portion' of the video." PO Resp. 27–28 (citing Ex. 1001, 9:23–29, 13:57-63, 16:33-49, 22:14-17, 25:10-21; Ex. 2012 ¶ 88; Ex. 2013, 47:2–49:20; 55:5–15); PO Sur-reply 1–2. For example, the Specification explains that "each of the Matroska container files containing an alternative stream of protected video *includes a DRMInfo element in a BlockGroup element* containing a protected frame of video, where the DRMInfo element indicates at least a

portion of the protected frames of video that is encrypted," and that the client application "*parse[s] the BlockGroup element* to obtain a DRMInfo element indicating at least a portion of the protected frame of video that is encrypted." Ex. 1001, 4:41–56. The BlockGroup element is parsed to locate the DRMInfo *within* the BlockGroup element, i.e., the requested portion of the video, not elsewhere. Other portions of the Specification confirm this requirement:

> In a number of embodiments, common cryptographic information is included within a DRM header element in each of the Matroska container files and references to the common cryptographic information are made using DRMInfo elements *within a BlockGroup element corresponding to* a specific frame of encrypted video.

Ex. 1001, 9:23–29 (emphasis added); *see also id.* at 13:57–63 (same). Figure 4e of the '588 patent is reproduced below.



FIG. 4e

Figure 4e illustrates "the inclusion of a protected trick play track into the Clusters element of a Matroska container file." *Id.* at 7:58–62. The '588 patent discloses that

> The first BlockGroup element 62 includes a Block element 64, which specifies . . . a *DRMInfo element 65* that identifies a portion of the frame that is encrypted. . . . In other embodiments, any of a variety of information appropriate to identifying encrypted data *within a video frame* and decrypting the encrypted data can be stored w*ithin a DRMInfo element*.

*Id.* at 16:33–52; *see also id.* at 22:14–17 ("The DRMInfo element identifies the portion of the frame that is encrypted").

> Prior to decoding the encoded media, the playback device can check for the presence of a DRMInfo element *within each BlockGroup* of a video stream *to identify* whether the encoded media is protected. The playback device can use the information within the DRMInfo element to decrypt encrypted portions of the video prior to decoding.

*Id.* at 25:15-21.

According to Dr. Nielson, a person of ordinary skill in the art would have understood that "locating encryption information within the requested portions of the stream is one of the central aspects of the '588 [patent]'s inventive system." Ex. 2012 ¶ 90 (citing Ex. 1001, 11:45–50). Referring to Figure 4e (reproduced above), Dr. Nielson testifies that "the inventors did not simply utilize the industry standard Matroska container file which was not able to contain the necessary encryption information, but, rather, modified the Matroska file format to add this aspect of the invention." *Id.* We find Dr. Nielson's testimony credible and it helps explain why every embodiment disclosed in the '588 patent specification describes encryption information located within the requested portion of the video. *See id.* ¶ 88. Moreover, Petitioner's expert, Dr. McDaniel agrees that the embodiments

described in the Specification consistently locate the encryption information within the requested portion of the video *and* that there is no embodiment in the Specification where the encryption information is not within the requested portion of the video.[11] *See* Ex. 2013, 47:2–49:20; 55:5–15.

Petitioner points to the following portion of the Specification as supporting Petitioner's understanding of the claim limitation:

> Depending upon the structure of the [Uniform Resource Identifiers] contained within the top level index file, the playback device can either use information from the URIs or information from the headers of the Matroska container files *to request byte ranges* from the server that contain at least a portion of the index from relevant Matroska container files.

Ex. 1001, 24:63–25:2 (emphases added). This discussion, however, says nothing about locating encryption information that identifies encrypted portions of frames with a requested byte range; instead, it relates to an index of byte ranges of the streaming media that would allow the client to select *which byte ranges* of the streaming media *to request for viewing*.

Petitioner also argues that although embodiments disclosed in the '588 patent specification support Patent Owner's more restrictive construction, the same embodiments also support Petitioner's proposed construction. Pet. Reply 20; Pet. Remand Br. 9–11. That argument misses the point. In resolving the dispute between the parties, we need to look to where the Specification discloses the encryption information is located. There is no support in the Specification for locating encryption information

[11] As Patent Owner notes, Dr. McDaniel submitted two declarations in this proceeding but did not address this claim construction issue. PO Sur-reply 1–2 (citing Ex. 1003 ¶¶ 100–101, 182–187); *see also* Ex. 1031. Patent Owner contends that Dr. Nielsen's testimony concerning the correct construction is, thus, unrebutted. PO Sur-reply 2.

anywhere other than *within* the requested portions and Petitioner has not pointed us to any portion of the Specification that supports Petitioner's construction. Where, as here, "a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *See Wisconsin Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351–52 (Fed. Cir. 2018) (quoting *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016)).

Petitioner contends that it would be improper to import a limitation requiring encryption information to be located within the requested portion of the video (Pet. Reply 23), but nothing is being imported here. As discussed above, we read the claim language itself as specifying that the encryption information be located *within* the requested portions. In contrast to importing a limitation that is not expressly recited in the claim, what we address here is how to understand the interaction between words expressly recited in the claim.[12] *See Wisconsin Alumni Rsch. Found.*, 905 F.3d at 1351–52; *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994).

[12] The dissent also makes a similar argument, that examples from the Specification may not be used to import a limitation into the claims. Dissent 5 (citing *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1303 (Fed. Cir. 2007)). We could not agree more. But importing a limitation requires that the limitation is not recited in the claims. For example, in *Verizon*, the rejected claim construction sought to construe the term "translation" as requiring "a change in protocol from a higher-level to a lower-level protocol," whereas there was no indication in the claims that translation meant a change in protocol, let alone a change from a higher-level to a lower-level protocol. *Verizon*, 503 F.3d at 1303. The claim construction issue presented here is entirely different.

And the Specification is the single best guide to the meaning of a disputed term and is usually dispositive. *Phillips*, 415 F.3d at 1315.

Additionally, Petitioner argues that Patent Owner could have amended the claim to reach the construction Patent Owner now advocates, noting that Patent Owner "chose different language for the '588 patent where the natural reading includes no such requirement, reinforcing the fact that, during prosecution, [Patent Owner] did not intend the convoluted interpretation it now advocates." Pet. Reply 21–22. We are not persuaded that Patent Owner was required to amend the claims or that Patent Owner's interpretation is convoluted.[13]

Petitioner also argues that, "[f]or the parent application of the '588 Patent, which shares an identical specification, [Patent Owner] obtained claims where the encryption (DRM) information is located in a top-level index file." Pet. Reply 20–21 (citing U.S. Patent No. 9,621,522 (the "'522 Patent," Ex. 1026), 27:35–41). Further, Petitioner points out that other patents in the '588 patent family include express limitations requiring the encryption (DRM) information to be *inside* the video container files, which is not recited by limitation [l]. *Id.* at 22–23 (citing Ex. 1027, 26:59–65; Ex. 1028, 26:52–58). Patent Owner responds that "Petitioner is comparing apples and oranges," and that there is no inconsistency between "locating" "encryption information" that "identifies encrypted portions of frames of

[13] Petitioner also points out that Patent Owner inserts the verb "is," in its explanations of how the limitation should be construed, to connect a subject at the beginning with a clause at the end, but the limitation contains no such verb. Pet. Reply 22 (citing PO Resp. 32). Although we agree with Petitioner that the insertion of the verb "is" makes the meaning clearer, we are persuaded that when read in light of the Specification, the meaning of the limitation as drafted is discernable to one of ordinary skill in the art.

video" "within the requested portions of the selected stream," on the one hand, and storing "DRM information that identifies protected portions of the alternative streams" in a "top-level index file" on the other. PO Sur-reply 5.

We agree with Patent Owner that Petitioner confuses different aspects of the disclosed invention. The claims here are directed to locating encryption information that *identifies encrypted portions of frames* within the requested portions of the selected stream, while claim 1 of the '522 patent recites "DRM information that identifies protected *portions of the alternative streams*." *See* PO Sur-reply 4–5 (explaining that the two claims concern two different things found in two different places). We fail to see the alleged inconsistency between these claims. As Patent Owner notes, claim 1 of the '522 patent does not require "partial frame encryption," and it therefore seems reasonable that it does not recite locating encryption information that identifies *encrypted portions of frames*. *Id.* at 4. Portions of alternative streams are not the same as portions of frames, and as discussed above, we find nothing in the Specification to suggest encryption information that *identifies encrypted portions of frames of video*, is found anywhere other than in the requested portions. Because the claims of the '588 patent and those of the '522 patent are directed to different aspects of the disclosed invention, the '522 patent's claims do not support Petitioner's interpretation of limitation [l]. *See ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) (finding a parent patent's prosecution history irrelevant where the two patents do not share the same claim language); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001) ("The prosecution history of a related patent can

be relevant if, for example, it addresses a limitation in common with the patent in suit.”).

The dissent looks to the prosecution history to determine that the original recitation of limitation [l] “makes it much clearer that the limitation sought to require using encryption parameters to identify encrypted portions,” and runs counter to Patent Owner’s reading of the limitation.[14] Dissent 3–4 (citing Ex. 1002, 575–76). We respectfully disagree. First, the original *and* the amended versions of limitation [l] each recite “locating encryption information that identifies encryption portions.” *Compare* Ex. 1001, 27:54–57, *with* Ex. 1002, 565. Thus, we do not agree with the dissent that the original recitation of limitation [l] was clearer. Second, the Examiner’s Interview Summary specifically states that the amendment was proposed in-part to “clarify the claim limitations.” Ex. 1002, 576. Thus, the dissent’s proposition that the original version was more clear runs contrary to the examiner’s opinion. Third, as the examiner explains, the amendment was intended to overcome various rejections and objections, leaving the full context and precise reasoning unclear. *See* Ex. 1002, 576. What is clear, however, is that the claim amendments altered the claimed invention, including adding a container index that tracks portions of protected video by byte ranges and requesting portions of protected video by byte ranges. *Id.* at 565. Although altering several limitations, the amendments also reflect that

[14] As a threshold matter, this raises new arguments and evidence not contemplated by the parties in any argument presented to us, and therefore, fails to comport with the APA’s notice requirements. *See Magnum Oil*, 829 F.3d at 1381 (“[T]he Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond.”).

the changes to limitation [l] appear to be the result of tying back to (i.e., deriving antecedent basis from) previous recitations in the claim. *Compare id.* (amendment to limitation [i] adding "of protected video"), *with id.* (amendment to limitation [l] adding "of protected video"); *see also id.* (limitation [l] ("requested portions of the selected stream") and limitation [k] ("requesting portions of the selected stream")). The amendment also altered what is played back in the last limitation of the independent claims. *Id.* Given the extent of these amendments and lack of a clear explanation of the reasons for them, we decline to read much into the changes made to limitation [l]. *See Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1563 (Fed. Cir. 1991) ("We do not know why Claim 9 was cancelled and cannot speculate on the reasons for the cancellation; we can only interpret the clear language of the claims as granted."). And, the most we can read from the prosecution history, if anything, supports Patent Owner's argument since the examiner proposed the amendments to clarify the claims.[15]

The dissent also prefers "to view that limitation according to a broader interpretation." Dissent 5. Although we may have agreed with the dissent under our prior broadest reasonable interpretation claim construction standard, we are now required to construe claims in *inter partes* review proceedings in accordance with their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention, under the *Phillips* standard, using the specification as the single best guide. *See* 37 C.F.R. § 42.100(b).

[15] In this regard, we note that Petitioner did not argue that the examiner's amendment supported its view of limitation [l].

Turning to extrinsic evidence, although we previously considered a common treatise on grammar in arriving at our preliminary claim construction (Inst. Dec. 30) and Patent Owner cites to different portions of the same treatise as well as to a different treatise as requiring a different reading of the claim (PO Resp. 32),[16] having reviewed the complete record, we are not persuaded that either of those guides conclusively establish that there is *only* one proper interpretation of the claim limitation based on rules of English grammar alone. In our Institution Decision, we looked to a treatise on grammar that taught that "[t]he position of words in a sentence is the principle means for showing their relationship," and that "[t]he writer must, therefore, bring together the words and groups of words that are related in thought and keep apart those that are not so related." Inst. Dec. 30 (citing William Strunk, Jr. & E.B. White, *The Elements of Style* 36 (4th ed. 2000)). On the full record, however, we determine that Patent Owner's interpretation does not violate that concept since the "within" clause of limitation [l] follows the "locating encryption information" clause and they are only spaced apart by another description of the encryption information (i.e., "that identifies encrypted portions of frames of video"). We recognize that this determination differs from our initial understanding discussed in the Institution Decision, but we were convinced to change our view after consideration of the complete record. *Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1340 (Fed. Cir. 2020) (encouraging the Board to

---

[16] Patent Owner points to other examples in the same treatise as well as a different treatise that suggest that limitation [l] could be read as proposed by Patent Owner. PO Resp. 32 (citing The Elements of Style 87; Bryan Garner, *The Redbook, A Manual on Legal Style* (Ex. 2015, 5)) (listing for example, "[t]he lawn mower that is broken is in the garage").

change its view of the merits after further development of the record if convinced its initial inclinations were incorrect (citing *TriVascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016)).

Additionally, the parties' arguments comparing and contrasting different examples from the treatises illustrate that these are not conclusive guides in our effort to construction limitation [l]. PO Resp. 32–33 (providing two examples from two treatises that support Patent Owner's reading of the claim); Pet. Reply 22 (discussing how Patent Owner's examples can be read as supporting Petitioner's interpretation). Rather, the arguments further cement the importance of the intrinsic record and particularly the claim language and Specification in the construction we now reach.

In conclusion, we determine that the Specification and claims of the '588 patent require locating encryption information *within* the requested portions of the selected stream of protected video. As noted above, first, we determine that the language of limitation [l] supports Patent Owner's proposed construction and understanding thereof. Next, we find no support in the Specification for the placement of encryption information outside of the requested portions of the selected stream of protected video in contrast to Petitioner's construction. Lastly, as we are persuaded by Dr. Nielson's testimony that an ordinary skilled artisan would have understood the '588 patent specification as disclosing a modified Matroska file format and thus would have understood limitation [l] in the manner proposed by Patent Owner. Accordingly, we construe limitation [l] as requiring that the encryption information be within the requested portions of the selected stream of protected video.

The Federal Circuit has held that "in an IPR proceeding, the Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1381 (Fed. Cir. 2023) (internal quotations and citations omitted). The court has further explained that

> under the [Administrative Procedure Act (APA)] it is permissible for the Board to adopt a new construction, proposed either by the patent owner or by the Board itself, in a final written decision. But before the Board decides a case under a construction adopted after the institution decision, it must give a petitioner an opportunity to respond to the new construction, whether that construction was first proposed by the patent owner or the Board.

*Id*. (footnotes omitted) (citing *SAS Inst., Inc. v. ComplementSoft, LLC.*, 825 F.3d 1341, 1351 (Fed. Cir. 2016), *rev'd and remanded sub nom. SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018)). The court has however held that those requirements are met when the petitioner is able to respond in its reply or at oral argument to the construction proposed in the patent owner response. *Id.* at 1383 (citing *Hamilton Beach Brands, Inc. v. f'real Foods, LLC*, 908 F.3d 1328, 1338–39 (Fed. Cir. 2018)); *see also Google LLC v. EcoFactor, Inc.*, No. 2022-1750, 2024 WL 463231, at *5 (Fed. Cir. Feb. 7, 2024) (finding no APA violation where both parties recognized that the core issue related to the scope and boundaries of the claim limitation and, thus, were afforded both notice and opportunity to address the issue). In *Hamilton Beach*, prior to institution, neither party had proposed an express construction of the relevant terms, and the Board instituted trial under the parties' implicit understanding of the terms. *Hamilton Beach*, 908 F.3d at 1335. After institution, the patent owner response proposed a new construction, which the Board adopted in its final written decision. *Id*. at

1338–39. In rejecting petitioner's argument that the Board violated the APA in adopting its own constructions, the court held that petitioner had received adequate notice and opportunity to respond, "as shown by the fact that [petitioner] argued against [patent owner's] proposed constructions in its reply brief and during the oral hearing." *Id.* As in *Hamilton Beach*, Petitioner here has had adequate notice and opportunity to respond to Patent Owner's proposed construction, which was first raised in the Patent Owner's Preliminary Response and argued extensively in Patent Owner's Response. *See* PO Resp. 26–34; Pet. Reply 20–23; Tr. 17:1–24:14, 61:6–63:21. And Petitioner did respond, both in its Reply (Pet. Reply 20–23) and at oral argument (*see, e.g.*, Tr. 17:3–24:14 (addressing dispute number two)). Further, Petitioner addressed Patent Owner's proposed construction and reiterated its arguments in its Brief on Remand. *See* Pet. Remand Br. 9–11. Thus, Petitioner has had notice, the opportunity to respond, and has responded to Patent Owner's proposed claim construction.[17]

#### 2. *Remaining Claim Terms*

We determine that it is not necessary to explicitly construe any other term or phrase for the purposes of this Decision, and we give all remaining claim terms their ordinary and customary meaning. *See Realtime Data*, 912 F.3d at 1375.

### D. *Overview of the Asserted Prior Art*

#### 1. *Chen*

Chen is directed to enhanced block-request streaming using scalable encoding, which provides for improvements in the user experience and

[17] Petitioner also did not request an opportunity to provide any additional briefing on this issue.

bandwidth efficiency. Ex. 1006, codes (54), (57). Chen details that video may be "encoded at multiple bitrates to form different versions, or representations," and those representations are broken into smaller pieces, "perhaps on the order of a few seconds each, to form segments," with each segment stored as a separate file. *Id.* ¶ 63. As a client device requests segments, it "switch[es] to different data rates based on available bandwidth," such that the client device may request multiple representations, each presenting a different media component. *Id.* ¶ 64. Chen also discloses that a media presentation description ("MPD") is used, which "describe[s] a media presentation that is a structured collection of segments, each containing media components such that the client can present the included media in a synchronized manner and can provide advanced features, such as seeking, switching bitrates and joint presentation of media components in different representations." *Id.* ¶ 66. Figure 5 of Chen is reproduced below:




*FIG. 5*

Figure 5 of Chen provides possible structures of the content store with segments and MPD files, also illustrating a breakdown of segments, timing, and other structures in exemplary MPD file. *Id.* ¶ 216.

Chen also details that:

> The media presentation may be constructed to permit access by terminals with different capabilities, such as access to different access network types, different current network conditions, display sizes, access bitrates and codec support. The client may then extract the appropriate information to provide the streaming service to the user.

Ex. 1006 ¶ 68.

*2. Lindahl*

Lindahl is directed to partial encryption techniques for media data, providing that partially encrypted media files allow for decryption to be faster and less resource intensive. Ex. 1007, code (57), ¶ 95. Lindahl discloses that each block of a media file is encrypted in accordance with the

encryption parameters, and the process may utilize "one or more encryption keys when encrypting each block." *Id.* ¶ 54. Figures 5A–5C and 6A–6B of Lindahl are reproduced below:




FIG. 5A FIG. 5B FIG. 5C




FIG. 6A FIG. 6B

Figures 5A–5C and 6A–6B of Lindahl illustrate examples of the media file encryption process. *Id.* ¶¶ 55–58.

Lindahl discloses that media file 500 includes frames F1, F2, etc., with each frame having header information and media data. Ex. 1007 ¶ 55. Representative media frame 520, shown in Figure 5B, is divided into blocks, B1, B2, B3, of the same size, as well as partial block PB. *Id.* In representative block 540, shown in Figure 5C, only portion 542 is encrypted, with the remainder being unencrypted. *Id.* Partially encrypted block 600 has initial unencrypted portion 602, followed by encrypted portion 604, and followed by unencrypted portion 606. *Id.* ¶ 57, Fig. 6A. In another embodiment, partially encrypted block 620 includes encrypted portions 624 and 628, and unencrypted portions 622, 626, and 630, with the portions having lengths X, Y1, Z1, Y2, and Z2, measured in a number of bits or bytes. *Id.* ¶ 58, Fig. 6B.

Lindahl's system allows for client machines to access a media server to browse, select, download, and play purchased media files, where encryption processes impose limitations on access to those files. Ex. 1007 ¶ 40. Lindahl also discloses that a user may "receive a global key or other cryptographic key when a media file is purchased." *Id.* ¶ 64. Lindahl further discloses that the download of the media file "can be performed by streaming the media file through the data network to the user." *Id.* ¶ 65. Lindahl also discloses that "[a]ny cryptographic keys being used with respect to the encrypted media file are also stored in the client machine." *Id.* ¶ 66.

*3. Hurst*

Hurst is directed to the maintenance of a programming lineup of adaptive-bitrate content streaming, using a timeline module and a plurality of streamlets. Ex. 1008, code (57). Figures 2b, 3a, and 3b of Hurst are reproduced below.




FIG. 2b




FIG. 3a




FIG. 3b

Figures 2b, 3a, and 3b of Hurst illustrates a plurality of streams divided into a plurality of source streamlets. *Id.* at 6:46–7:8, 7:9–20.

Figure 2b illustrates plurality of streams 202 having varying degrees of quality and bandwidth, with low quality, medium quality, and high quality streams 204, 206, and 208, respectively, containing encoded representations of a content file encoded and compressed to varying bitrates. Ex. 1008, 6:46–53. Figure 3a illustrates stream 302 divided into a plurality of source streamlets 303, each encapsulated as an independent media object. *Id.* at 6:59–64. Figure 3b illustrates sets of streamlets 304, having identical time indices and durations but varying bitrates, such that set 306a includes encoded streamlets 304 having low 204, medium 206, and high 208 bitrates. *Id.* at 7:9–16. Hurst also discloses that its system uses a digital rights management ("DRM") server that is configured to maintain keys used to decrypt content and determine whether a client device is allowed to access content. *Id.* at 18:62–64. Hurst further discloses that the streamlets may be

encrypted with the same key or may be configured to encrypt each bit rate with a different set of encryption keys. *Id.* at 18:66–19:2.

### *E. Obviousness of Claims 1–24 over Chen, Lindahl, and Hurst*

Petitioner contends that claims 1–24 would have been obvious over the combination of Chen, Lindahl, and Hurst. Pet. 17–83. For the reasons that follow, we are not persuaded that Petitioner has established by a preponderance of the evidence that these claims are unpatentable under § 103 in view of the combination of Chen, Lindahl, and Hurst.

#### *1. Independent Claim 1*

Patent Owner argues that that the combination of Lindahl and Chen fails to teach the "locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video" limitation of independent claims 1 and 12. PO Resp. 24–37. We begin our discussion with the parties' arguments on this limitation.

##### *a. Limitation [l]*

Limitation [l] recites the step of locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video. Petitioner relies on Lindahl to teach or suggest this limitation of independent claim 1. Pet. 52–55.[18] Petitioner argues that Lindahl teaches using encryption parameters to identify encrypted portions, including X, Y, and Z, measured

---

[18] Although Petitioner's first sentence addressing this limitation states that "[t]he *combination* teaches or suggests" limitation [l], the entire discussion in the Petition relies on Lindahl and does not rely on Chen or Hurst for this limitation. Pet. 52–55.

in a number of bits or bytes. *Id.* at 52–53 (citing Ex. 1007 ¶¶ 56–59, Figs. 6A, 6B; Ex. 1003 ¶¶ 182–183). Petitioner argues that Lindahl teaches that the encryption parameters are "retrieved" to decrypt the media. *Id.* at 54 (citing Ex. 1007 ¶ 72). Petitioner also argues that a person of ordinary skill in the art "would have been motivated to use encryption parameters, as taught by Lindahl, because it provides flexibility and facilitates different levels of security by controlling the amount and portions of each frame that is encrypted." *Id.* (citing Ex. 1007 ¶¶ 57–58; Ex. 1003 ¶ 186).

Patent Owner responds that "the 'locating' limitation, properly construed, requires, *inter alia*, that 'encryption information' be 'locat[ed]' 'within the requested portions of the selected stream of protected video,'" and that the combination of Lindahl and Chen fails to teach or render obvious limitation [l]. PO Resp. 24–38; PO Sur-reply 1–8. Patent Owner contends that "the concepts of 'portions' of a video and 'alternative streams' simply do not exist in Lindahl." PO Resp. 35–36 (citing Ex. 2012 ¶ 97; Ex. 2013, 69:18–20). Patent Owner thus argues that "even if Lindahl is combined with Chen, and even if Chen does request portions of a video, there is nothing in the record to disclose locating encryption information 'within the requested portions of the selected stream,' as opposed to some other location." *Id.* at 36.

As discussed above (Section II.C.1), we are persuaded by Patent Owner's arguments as to how limitation [l] of claim 1 should be interpreted. We determine that the "within" term of limitation [l] most clearly connotes where the encryption information must be located. Petitioner's contentions as to Lindahl's teachings rest solely on its own interpretation, which we do not adopt. *See* Tr. 23:6–23 (Petitioner's counsel acknowledging that

Petitioner did not propose an alternative argument based on Patent Owner's construction); Pet. Reply 20–23 (addressing Patent Owner's claim construction position without raising an alternative argument that Lindahl satisfies limitation [l] under that construction). We therefore we do not agree with Petitioner's contention that Lindahl teaches limitation [l].

*b. Conclusion Regarding Independent Claim 1*

Because we determine that Petitioner has not shown by a preponderance of the evidence that the combination of Chen, Lindahl, and Hurst teaches limitations [l], we do not consider whether one of ordinary skill in the art would have had a motivation to combine, and a reasonable expectation of success in achieving the combination of Chen, Lindahl, and Hurst sufficient to render claim 1 obvious, or evaluate the Petition's showings with respect to the other elements of the challenged claims.

On the complete record, we determine, that Petitioner has not established by a preponderance of the evidence that the combined teachings of Chen, Lindahl, and Hurst meet limitation [l] of independent claim 1.

*2. Independent Claim 12*

Independent claim 12 is directed to a "method for playing protected content from a plurality of alternative streams on a playback device." Ex. 1001, 28:61–62. Petitioner asserts that independent claim 12 recites the same limitations as claim 1 "except for 'using a decoder' and is obvious for the same reasons." Pet. 78. Patent Owner focuses its discussion on claim 1, addressing claims 1 and 12 together, based on the language common to both claims. *See* PO Resp. 1, 24–25, 35, 38.

We agree with the parties that claims 1 and 12 recite analogous limitations. We have reviewed Petitioner's argument and evidence directed

to claim 12, *see* Pet. 78–79, and we determine that Petitioner has not shown, by a preponderance of the evidence, that the subject matter of independent claim 12 would have been obvious to one of ordinary skill in the art for the reasons discussed above with respect to claim 1.

*3. Dependent Claims 2–11 and 13–24*

Petitioner contends dependent claims 2–11 and 13–24 would have been obvious over the combination of Chen, Lindahl, and Hurst. Pet. 58–78, 79–83. Claims 2–11 and 23 depend directly or indirectly from claim 1, and claims 13–22 and 24 depend directly or indirectly from claim 12, and therefore, include the "locating" limitation discussed above. Ex. 1001, 27:64–28:30, 29:24–30:49. Accordingly, for the same reasons discussed above, Petitioner has not established by a preponderance of the evidence that the combination of Chen, Lindahl, and Hurst would have rendered the subject matter of claims 2–11 and 13–24 obvious to one of ordinary skill in the art at the time of the invention.

*4. Summary*

We determine that Petitioner has not shown by a preponderance of evidence that claims 1–24 would have been obvious over Chen, Lindahl, and Hurst.

## III. CONCLUSION

For the reasons discussed above, Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1–24 are unpatentable. Our conclusions regarding the challenged claims are summarized below:

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–24 | 103 | Chen, Lindahl, Hurst | | 1–24 |

## IV. ORDER

For the reasons given, it is:

ORDERED that Petitioner has not established, based on a preponderance of evidence, that claims 1–24 of U.S. Patent No. 10,225,588 B2 are unpatentable as obvious under 35 U.S.C. § 103; and

FURTHER ORDERED that because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

Trials@uspto.gov
571-272-7822

Paper 66
Date: February 22, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

NETFLIX, INC.
Petitioner,[19]

v.

DIVX, LLC,
Patent Owner.

---

IPR2020-00558
Patent 10,225,588 B2

---

Before KEVIN F. TURNER, BART A. GERSTENBLITH, and IFTIKHAR AHMED, *Administrative Patent Judges*.

TURNER, *Administrative Patent Judge*, dissenting.

I respectfully dissent from the majority's decision ("majority decision"[20]) that Petitioner has not shown by a preponderance of the evidence that claims 1–24 are unpatentable.

---

[19] Hulu, LLC ("Hulu") also was a petitioner in this proceeding, but is no longer a party to this proceeding. *See* Paper 63 (ORDER Settlement as to Hulu, LLC).

[20] This dissent assumes the reader is familiar with the facts set forth in the majority decision.

*A. Claim Construction*

As discussed in the majority decision (Sections I.C, II.C.1), limitation [l] recites "locating encryption information that identifies encrypted portions of frames of video *within* the requested portions of the selected stream of protected video." Ex. 1001, 27:54–57 (emphasis added). The analysis in the Petition reflects that Petitioner understood this limitation to require using encryption parameters to identify encrypted portions. Pet. 52–55. Contrary to Petitioner's understanding, Patent Owner takes the "within" portion of that limitation as determinative of *where* the encryption information is found, i.e., "within the requested portions." PO Resp. 25; PO Sur-reply 1. Patent Owner contends that a person of ordinary skill in the art would have understood the "within" clause as modifying the "locating" clause of limitation [l]. *Id*. at 26–27 (citing Ex. 2012 ¶ 87). I dissent from the majority's determination that "that the evidence overwhelmingly supports Patent Owner's reading of limitation [l]," for several reasons provided below, as well as considering additional information and evidence.

I do not find it surprising that Patent Owner seeks a narrow construction in defending a claim in view of the prior art. It is perhaps axiomatic that patent owners seek to read a claim broadly for purposes of infringement and narrowly for purposes of validity or patentability. As the majority notes, Petitioner's interpretation was accepted from institution through the final written decision, and it is only upon remand that reconsideration is given. We all appear to accept that the claim limitation in question is amenable to multiple interpretations, but we determine differently which interpretation comports with the evidence and arguments.

The majority asserts that Patent Owner's interpretation, where latter limitations modify the first clause, can be understood through the use of commas, and "seems more likely," and that Petitioner's interpretation "makes less sense." The majority opinion acknowledges that limitation [l] of independent claim 1 contains no commas, such that their placement would have been helpful to understand Patent Owner's intent in creating and amending such a limitation.

It should be noted, however, that the claim language in question, came not from the inventor or the Patent Owner, but arrived in the claims, and ultimately issued with the '588 patent, because of an examiner's amendment. In the Examiner-Initiated Interview Summary, the examiner asserted that "proposed an examiner amendment to the claims, to recite the claim limitations in [a] specific order [to] clarify the claim limitations and to remove 101, 112(b), Double Patenting (DP) rejection and objection issues." Ex. 1002, 575–576. Prior to that examiner's amendment, limitation [l] appeared as identified below:

> locating encryption information that identifies encrypted portions of frames of video within the selected stream;

whereas, the amended limitation is provided below:

> locating encryption information that identifies encrypted portions of frames of video within the <u>requested portions of the</u> selected stream <u>of protected video</u>.

As such, the original intent of the claim was not what Patent Owner now asserts to be "one of the central aspects of the '588's inventive system," i.e., "locating encryption information within the requested portions of the selected stream." PO Resp. 29 (citing Ex. 2012 ¶ 90). The original recitation of the claim limitation makes it much clearer that the limitation

sought to require using encryption parameters to identify encrypted portions. This evidence also sheds light on the majority decision's assertion that the next limiation, limitation [m], "does not expressly recite 'within the requested portions of the selected stream.'" The next limitation does not have such an express recitation because the examiner did not amend it to read as such.

Overall, I do not find that Patent Owner's interpretation to be more persuasive of how the claim limitation should be read. I continue to determine that, as we have determined previously, that a more reasonable construction of the same limitation is that the term "within" modifies the "frames of video," i.e., identifies what portions are encrypted portions of frames of video within the requested portions of the selected stream. *See* Inst. Dec. 28–29. That interpretation allows for the encryption information to be located elsewhere and used to determine which portions of the selected stream are encrypted, which is necessary with partial encryption.

I also determine that although the examples cited by Patent Owner in the Specification of the '588 Patent do not exclude Patent Owner's construction, neither do they compel such a restricted construction.

Patent Owner cites to the following, with Patent Owner's emphases provided:

> [E]ach of the Matroska container files containing an alternative stream of protected video includes ***a DRMInfo element in a BlockGroup*** element containing a protected frame of video, where ***the DRMInfo element indicates at least a portion of the protected frames of video that is encrypted*** …, and the client application configures the processor to access video frames in a stream of protected video using the common cryptographic information by configuring the processor to: obtain a BlockGroup containing a protected frame of video; ***parse the***

> ***BlockGroup element to obtain a DRMInfo element indicating at least a portion of the protected frame of video that is encrypted*** using an encryption key from the set of encryption keys.

PO Resp. 28 (quoting Ex. 1001, 4:39–58) (emphases in original). Patent Owner also argues that locating encryption information within the requested portions of the stream is one of the central aspects of the '588 Patent's inventive system and "is evidenced by the fact that the inventors did not simply utilize the industry standard Matroska container file, but, rather, modified the Matroska file format to add this aspect of the invention." *Id.* at 29 (citing Ex. 1001, 11:45–50; Ex. 2012 ¶ 90). Patent Owner further contends that every embodiment detailed in the Specification of the '588 Patent supports its construction or interpretation of limitation [1]. *Id.* at 30–31; *see also id.* at 28 (citing Ex. 2013 47:2–49:20; 55:5–15); PO Sur-reply 1–2.

Even though I agree with Patent Owner that the embodiments detailed in the Specification include encryption information within the requested portions of the selected stream of protected video, that does not end our inquiry because "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1302–03 (Fed. Cir. 2007) ("The mere fact that the specification's examples of translation may involve a change in protocol from a higher to a lower level protocol does not establish that such a limitation should be imported into the claims."). With respect to limitation [1] of claim 1, I continue to view that limitation according to a broader interpretation. Further, other portions of the Specification and the

prosecution history of patents related to the ’588 Patent support Petitioner’s interpretation of the plain and ordinary meaning.

First, the following portion of the Specification suggests Petitioner’s understanding is more correct:

> Depending upon the structure of the [Uniform Resource Identifiers] contained within the top level index file, the playback device can *either* use information from the URIs *or* information from the headers of the Matroska container files to request byte ranges from the server that contain at least a portion of the index from relevant Matroska container files.

Ex. 1001, 24:63–25:2 (emphases added). In particular, this discussion suggests that information regarding ranges in the files need not come from the files themselves, at least in some embodiments. Patent Owner disagrees, arguing that this portion of the Specification does not relate to the location of encryption information that identifies which portions of the frames within those requested byte ranges are encrypted. PO Resp. 31 (citing Ex. 2012 ¶¶ 84, 91). Although Patent Owner is correct with respect to the distinction it raises, the Specification overall still provides support that information regarding ranges in the files need not come from the files themselves. Thus, the Specification of the ’588 Patent supports Patent Owner’s narrower interpretation of limitation [1] as well as the more natural reading of the plain and ordinary meaning of the claim language.

Petitioner also argues that, “[f]or the parent application of the ’588 Patent, which shares an identical specification, [Patent Owner] obtained claims where the encryption (DRM) information is located in a top-level index file.” Pet. Reply 20–21 (citing Ex. 1026, 27:35–41). Further, Petitioner points out that other patents in the ’588 Patent family include express limitations requiring the encryption (DRM) information to be *inside*

the video container files, which is not recited by limitation [l]. *Id.* at 22–23. Patent Owner insists that "Petitioner is comparing apples and oranges," and that there is no inconsistency between "locating" "encryption information" that "identifies encrypted portions of frames of video" "within the requested portions of the selected stream," on the one hand, and storing "DRM information that identifies protected portions of the alternative streams" in a "top-level index file" on the other. PO Sur-reply 5.

As discussed above, I continue to find that the Specification and claims of the '588 Patent do not require locating encryption information *within* the requested portions of the selected stream of protected video. Although I agree with Patent Owner that encryption information and DRM information need not be the same, the fact that the Specification can support placement of DRM information in different places (i.e., not only in the requested portions of the selected stream of protected video) supports Petitioner's understanding of limitation [l] of claim 1. Further, I continue to determine that the natural language of that limitation also supports Petitioner's proposed construction and understanding thereof, as discussed above. Lastly, as I adopt Petitioner's proposed interpretation of limitation [l] of claim 1, that interpretation continues to read on all disclosed embodiments, such that no disclosed embodiments are excluded from that interpretation.

In addition, I continue to determine that the more natural interpretation of limitation [l] is that the "encrypted portions of frames of video" are "within the requested portions of the selected stream of protected video," as one would understand from the basic nature of the grammar involved in the limitation. *See* Inst. Dec. 30. A common treatise on

grammar teaches that "[t]he position of words in a sentence is the principle means for showing their relationship," and "[t]he writer must, therefore, bring together the words and groups of words that are related in thought and keep apart those that are not so related." William Strunk, Jr. & E.B. White, *The Elements of Style* 36 (4th ed. 2000). The "within," therefore, most clearly connotes where the particular encrypted portions of frames of video must be located, not necessarily where the encryption information must be located.

Patent Owner cites to other examples of the cited style guide, as well as another guide, to dispute this interpretation. PO Resp. 32–33 (citing Ex. 2014, 87; Ex. 2015, 5). Patent Owner argues that when two clauses modify the first clause, they cannot both immediately follow the first one, arguing that "[t]he limitation certainly would not be clearer if the limitation were written such that the third clause followed the first." *Id.*

In response, I conclude that the most natural reading of limitation [l] results from examination of the entire limitation: "locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video." Ex. 1001, 27:54–57. The "within" most naturally connotes where the encrypted portions of frames of video occur, as opposed to determining where the encryption information may be located. This is further buttressed by the reasons the claim language of the limitation was adopted, per the discussion above. Patent Owner's interpretation is not wrong, i.e., the limitation could be read as Patent Owner suggests, leading to a narrower construction, but I am not persuaded that the construction of limitation [l] must be so limited, on the basis of the words themselves.

I continue to reject Patent Owner's interpretation that limitation [l] requires locating encryption information *within* the requested portions of the selected stream of protected video. *See* Inst. Dec. 27–30; Final Dec. 8. Although it is apparent that encryption information *can* be found within the requested portions, I am not persuaded that the claim language or '588 Patent implicitly or explicitly requires such a relationship. Likewise, although embodiments disclosed in the Specification of the '588 Patent are consistent with Patent Owner's more restrictive construction, the Specification also is consistent with the more grammatically correct construction as well. Thus, I construe limitation [l] as requiring that the encrypted portions of frames of video be within the requested portions of the selected stream of protected video, but I do not construe limitation [l] as requiring that the encryption information be within the requested portions of the selected stream of protected video.

*B. Alleged Obviousness of Claims 1–24 over Chen, Lindahl, and Hurst*

Petitioner contends that claims 1–24 would have been obvious over the combination of Chen, Lindahl, and Hurst. Pet. 17–83. I reference the brief discussions of the cited references in the majority's decision, consider Petitioner's proffered motivation to combine those references and Patent Owner's arguments of lack of motivation to combine and no reasonable expectation of success in achieving the combination in accordance with the Federal Circuit's instructions on remand, then turn to Petitioner's assertions regarding the challenged claims and their elements, and Patent Owner's arguments traversing this ground of unpatentability.

I note that Patent Owner's arguments address elements of independent claims 1 and 12, and the motivation proffered by Petitioner to combine the

cited references, but do not address the subject matter of any of the dependent claims separately. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br.

*1. Petitioner's Proffered Motivation to Combine the References*

Petitioner argues that a person of ordinary skill in the art would have been motivated to combine the teachings of Lindahl and Hurst with Chen, such that the DRM processes, including partial encryption and key management, of Lindahl and Hurst, would have been employed in adaptive streaming systems that Chen teaches were known. Pet. 17. Petitioner asserts that such technologies were commonly used together and were recognized as complementary, and would have been combined for their known and conventional purposes. *Id.* (citing Ex. 1003 ¶ 114). Petitioner also asserts that it was "widely known for video streaming to include these features to account for bandwidth variability over the Internet and address piracy." *Id.* (citing Ex. 1010 ("Chen-924"), Abstract; Ex. 1006 ¶¶ 103–104; Ex. 1007 ¶¶ 36, 39; Ex. 1008, 3:12–23, 6:6–58).

Petitioner acknowledges that although Chen discloses DRM (Ex. 1006 ¶ 522), it does not disclose any particular implementation. Pet. 18. According to Petitioner, one of ordinary skill in the art would have used Lindahl and Hurst to supplement Chen's DRM requirements. *Id.* Petitioner asserts that Lindahl prevented unauthorized access to media while improving computational efficiency through its partial encryption teachings that would have been "well-suited for video streaming applications," and its key management teachings "provided security, simplicity and efficiency

benefits." *Id.* (citing Ex. 1003 ¶¶ 115, 119–122; Ex. 1007 ¶ 95).

Petitioner further asserts that Hurst discloses that alternative streams are encoded at different bitrates and encrypted as a group in the same manner, such as by using the same key, and thus providing a natural and obvious approach to DRM for adaptive streaming. Pet. 19 (citing Ex. 1006 ¶¶ 63–64; Ex. 1003 ¶ 116).

Petitioner argues that one of ordinary skill in the art would have been motivated to apply teachings of Lindahl and Hurst to Chen to address piracy concerns, improve the efficiency of adaptive streaming, optimize the balance between bitrate and bandwidth, and improve the end-user experience with fast startup and seek. Pet. 18–19. Petitioner also asserts that ordinarily skilled artisans would have had a reasonable expectation of success in combining the teachings of Chen, Lindahl, and Hurst because "they were widely known in the art and widely recognized as complementary and compatible techniques that were intended to be used together, and which a [person of ordinary skill in the art] would have been familiar with." *Id.* at 21 (citing Ex. 1003 ¶ 126).

*2. Patent Owner's Arguments Countering Motivation to Combine the References, Petitioner's Responses, and Our Analysis*

Patent Owner asserts that Petitioner has failed to demonstrate that a person of ordinary skill in the art would have been motivated to combine the references as proposed by Petitioner because Petitioner's arguments are conclusory, not supported by sufficient evidence, and Petitioner has not demonstrated "that its proffered goals would be better achieved through its combination over Chen's existing system." PO Resp. 2–3. Patent Owner also argues that aspects of Chen's system are incompatible with partial

frame encryption, or at least beyond the capability of ordinarily skilled artisans to ensure a reasonable likelihood of success, and that the proposed modifications of Chen would actually deteriorate the efficiency of its system, negating Petitioner's proffered goal in its stated reason to combine the references. *Id.* at 3. I address Patent Owner's motivational arguments below and then address the compatibility arguments thereafter.

Patent Owner begins by arguing that Petitioner's purported motivation for combining the references "is not supported by any cognizable evidence," and the unexplained citations to its expert's declaration cannot be relied upon. PO Resp. 4 (citing Consolidated Trial Practice Guide (Nov. 2019), 35–36; *Cisco Sys., Inc. v. C-Cation Techs., LLC*, IPR2014-00454, Paper 12 at 9–10 (PTAB Aug. 29, 2014) (informative)) (emphasis omitted). Patent Owner also argues that "[b]ecause Petitioner's motivation is not supported by any evidence, it fails as a matter of law." *Id.* at 5 (citing *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016)). Petitioner responds that the Petition provides "ample motivation to combine," and that Patent Owner is misrepresenting the Petition's analysis by ascribing it to a single sentence. Pet. Reply 3–4. On this point, I agree with Petitioner.

I determine that Petitioner has sufficiently established that an ordinarily skilled artisan would have had some motivation to combine the teachings of Chen, Lindahl, and Hurst. I am not persuaded by Patent Owner's arguments directed solely to whether Petitioner's motivation to combine the references is unsupported by any evidence.

As Petitioner points out, beyond the exemplary sentence on which Patent Owner's argument focuses, the Petition provides preceding and subsequent paragraphs regarding the reasons for combining Chen, Lindahl,

and Hurst, i.e., more than "to address privacy concerns and improve efficiency." *See* Pet. 17–22. Petitioner discusses express motivations in the secondary references, as well as benefits found in those secondary references, and applies those as reasons to combine elements of the teachings. *Id.* Additionally, I am not persuaded that the Petition's citations to Dr. McDaniel's testimony (Ex. 1003 ¶¶ 114–116, 119–120, 126) in the Petition were "unexplained," and I find that testimony beneficial in considering the proffered motivation to combine Chen, Lindahl, and Hurst.

Patent Owner next argues that Petitioner's proffered motivation is made with the assumption that Chen "did not require any particular DRM implementation." PO Resp. 6 (quoting Pet. 18). Patent Owner counters that Chen discloses fragment-level encryption, such that a person of ordinary skill in the art would have understood that the entire fragment or block is encrypted as a singular unit. *Id.* (citing Ex. 1006 ¶ 522; Ex. 2012 ¶¶ 49–50). Patent Owner distinguishes such encryption from frame or partial-frame encryption, such as disclosed in Lindahl, with encrypted fragments in Chen encompassing between 12 and 30 frames. *Id.* at 6–8 (citing Ex. 2013, 108:5–9, 106:21–107:3; Ex. 1006 ¶ 66, Fig. 9(a); Ex. 2012 ¶¶ 52–53). Patent Owner argues that Petitioner does not identify any fault in Chen's existing system, or show that replacing those aspects with Lindahl's partial frame encryption method would address piracy or improve efficiency when compared to Chen's existing system. *Id.* at 8–9 (citing *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012); *Nichia Corp. v. Everlight Ams., Inc.*, 855 F.3d 1328, 1339 (Fed. Cir. 2017), *cert. denied*, 139 S. Ct. 183 (2018)).

Petitioner counters that Patent Owner has misrepresented Chen's encryption discussion, arguing that paragraph 522 of Chen concerns a "hypothetical exercise that Chen uses 'to simplify the discussion' for concurrent HTTP/TCP requests." Pet. Reply 11. Petitioner argues that it would be improper to limit Chen to an embodiment, especially one that is a hypothetical or optional embodiment. *Id.* at 12. Petitioner also argues that "it would be improper under Federal Circuit case law to require proof that Lindahl's partial encryption is superior to other known encryption techniques." *Id.* at 8 (citing *Novartis Pharm. Corp. v. W.-Ward Pharm. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019)).

Petitioner also emphasizes that the Federal Circuit held that we must have "a specific focus on the petition-asserted combination with Chen['s] disclosures (not with the Chen 'system')." Pet. Remand Br. 2 (citing *Netflix*, slip op. at 11–12) (emphasis omitted). Petitioner also asserts that Chen-924 (U.S. Patent No. 8,243,924 B2, issued Aug. 14, 2012 (Ex. 1010, "Chen-924")) provides independent, unrebutted motivation to combine the references. *Id.* at 3. The Federal Circuit discusses much of Chen-924, as reproduced below:

> Chen-924 (not one of the three references asserted as the combination that would have been obvious to a skilled artisan) describes ABS [adaptive bitrate streaming] with partial frame encryption using various container file formats (none of which are the Matroska file format). Chen-924, col. 1, lines 21–27; *id.*, col. 2, line 66, through col. 3, line 6. The Chen-924 streaming system may "be configured and arranged to monitor network conditions over which the container is received and dynamically modify the downloading based on some predefined criteria of the network conditions." *Id.*, col. 14, lines 61–65. In the Chen-924 system, "encryption may be selectively applied to at least a portion of a video . . . stream . . . of the real-time streamed,

> progressively, or adaptively downloaded container . . . . Selective encryption may further include selectively encrypting at least a portion of [a frame] . . . within the container stream." *Id.*, col. 6, lines 1–9.

*Netflix*, slip op. at 5–6 (alterations in original). Petitioner asserts that "Chen-924 stands ***unrebutted***," with Patent Owner failing to mention it in its briefing.[21] Pet. Remand Br. 3. Petitioner also asserts that Patent Owner argued that "Petitioner must prove that Lindahl's partial encryption was 'better than Chen's existing system' of fragment-level encryption," but those arguments are contrary to the proper legal standard. *Id.* at 4 (citing PO Resp. 6, 8–9, 19).

Patent Owner responds that Petitioner has still failed to prove why persons of ordinary skill in the art would have chosen "disparate features of Chen and Lindahl" to arrive at the claimed invention. PO Remand Resp. Br. 7. Patent Owner also argues that the Petition fails because it does not prove its proffered motivation of "address[ing] piracy concerns and improv[ing] efficiency" and because the combination requires skilled artisans to disregard "everything that Chen is saying as desirable," as well as "the potential problems" with the combination and "an alternative approach [that] might reduce those same problems." *Id.* at 7–8 (citing Pet. 18; Tr. 67:20–68:4; *Arctic Cat*, 876 F.3d at 1363 (Fed. Cir. 2017)) (alterations in original). With respect to Chen-924, Patent Owner argues that it is not in Petitioner's asserted combination of references, that the Petition provides no analysis of how Chen-924 relates to a combination, and that Chen-924 has no relevance to motivation to implement partial frame encryption in a combination that

---

[21] With respect to the Petition, we note that Chen-924 is recited only twice therein, both occurrences on page 20 of the Petition.

meets the claims. *Id.* at 8 (citing Tr. 80:21–81:2, 83:15–85:15; PO Sur-reply 21–22).

I am persuaded that the Petition demonstrates that one of ordinary skill in the art would have had a motivation to combine Chen, Lindahl, and Hurst, as asserted by Petitioner. As the Federal Circuit found, the Petition pointed to and relied upon the portions in Chen describing pre-Chen art, without scalability or FEC features that were part of what Chen describes as aspects of its own inventive system. *Netflix*, slip op. at 9–10 (citing Pet. 17–19, 69–70). I agree with Petitioner that "Chen-924 teaches several embodiments that adaptively stream alternative representations of a video using partially encrypted container files." Pet. 20 (citing Ex. 1010, 14:41–15:60). I determine that Chen-924 provides support for the rationale provided in the Petition, and that one of ordinary skill in the art would have been motivated to combine Chen and Lindahl in view of the disclosure of Chen-924. As discussed above, the Petition does not rely solely on privacy concerns and improvements to efficiency as its motivation to combine the references. *See* Pet. 18–19 (specifying piracy concerns, improvements to the efficiency of adaptive streaming, optimization of the balance between bitrate and bandwidth, and improvements to the end-user experience with fast startup and seek).

With respect to whether one of ordinary skill in the art would have had a reasonable expectation of success in achieving the combination, the Federal Circuit's clarification—that the Petition relies only on limited aspects of Chen—makes it more likely that such success would have been ascertained and achieved by ordinarily skilled artisans. *Netflix*, slip op. at 9–10 (focusing on the "combination of Lindahl with disclosures in Chen

of background art"). In other words, ignoring the scalability and FEC features disclosed in Chen removes reasons why one of ordinary skill in the art would have perceived a lack of reasonable expectation of success in achieving a combination of Chen, Lindahl, and Hurst. Petitioner asserts that persons of ordinary skill in the art would have had a reasonable expectation of success in combining teachings from Chen, Lindahl, and Hurst because those teachings "were widely known in the art and widely recognized as complementary and compatible techniques that were intended to be used together." Pet. Remand Br. 4 (quoting Pet. 21). Petitioner additionally argues that the Federal Circuit held that Patent Owner's arguments—(a) discussing implementing partial frame encryption in Chen's system, which also utilizes FEC and independent scalable layers, and (b) requiring the changes to standard file formats—are legally improper. *Id.* at 5–8. Lastly, Petitioner asserts that Chen-924 provides explicit evidence that there would have been a reasonable expectation of success. *Id.* at 8–9.

Patent Owner responds that Petitioner has failed to show a reasonable expectation of success to make the necessary file formats modifications, as acknowledged by Petitioner's declarant. PO Remand Resp. Br. 9 (citing Ex. 2013, 35:25–36:12). Patent Owner also argues that Petitioner's reliance on Chen-924 and other exhibits to show a reasonable expectation of success is untimely and Chen-924 and Petitioner's other exhibits do not prove that whatever modifications may have been required in the context of those different systems would be the same as, and could be transferred to, Petitioner's combination. *Id.* at 10 (citing PO Sur-reply 21–22).

I agree with Petitioner that there would have been a reasonable expectation of success in combining Chen, Lindahl, and Hurst into a system as asserted in the Petition. Patent Owner's arguments regarding timeliness, i.e., that it had no right to submit sur-reply evidence, which Patent Owner asserts highlights the prejudice from the untimely reply analysis (PO Remand Resp. Br. 10), is unavailing because Chen-924 was cited in the Petition (Pet. 20), and was discussed in Petitioner's Reply (Pet. Reply 16). I determine that Patent Owner had the opportunity to respond but chose not to. Moreover, Petitioner's arguments and evidence were responsive to an issue raised by Patent Owner in its Patent Owner Response, and were therefore timely.[22] *See* PO Resp. 22–24.

With respect to the necessity of file format modifications, I revisit our prior determination in accordance with the Federal Circuit's instructions on remand. *Netflix*, slip op. at 13 (finding our analysis framed around the combination that the court held to be legally incorrect). I agree with Petitioner that Patent Owner and its declarant have not disputed the widespread modification of file formats or use of partial frame encryption with MP4 file format, in the relevant period. Pet. Remand Br. 7. Particularly, in light of the Federal Circuit's direction, I disagree with Patent Owner's arguments that Petitioner was also required to show that a person of ordinary skill in the art could transfer the various file format modifications known in the prior art to Chen (PO Sur-reply 22),

[22] Although I agree with Patent Owner that it had no automatic right to submit sur-reply evidence, Patent Owner could have sought leave to submit such evidence. Notably, Patent Owner did submit other sur-reply evidence without seeking leave. *See* Ex. 2025.

especially in view of the Chen-924's disclosure. *See* Reply 15–16 (citing Ex. 1010, 3:2-6, 4:14–15, 5:63–6:9, 14:41–15:60). Petitioner also points out that Patent Owner took issue with Dr. McDaniel's Declaration, citing only the "use" of file formats, as opposed to modifying file formats. *Id.* (citing PO Resp. 23–24; Ex. 2012 ¶ 80). Petitioner argues that Dr. McDaniel clarified his testimony during his deposition, explaining that students would have been able to modify file formats, and that including partial encryption parameters in a file format was as simple as writing data to a file and reading it back. *Id.* at 7–8 (citing Ex. 2013, 27:2–20; Ex. 1031 ¶ 9). I find Dr. McDaniel's testimony persuasive. *See Keynetik, Inc. v. Samsung Elecs. Co.*, No. 2022-1127, 2023 WL 2003932, at *2 (Fed. Cir. Feb. 15, 2023) (finding the expert's testimony detailing how software modifications would be "simple" and "straightforward" for a skilled artisan was sufficient to establish a reasonable expectation of success and noting that "[w]hile [the expert's] testimony is brief, in the absence of any contradictory evidence, it constitutes substantial evidence to support the Board's finding"). On the other hand, I find Dr. Nielsen's testimony (Ex. 2012 ¶ 80) conclusory and unpersuasive. I find the testimony of Petitioner's declarant, Dr. McDaniel, to be more persuasive, in that he cites to Chen-924, for its express teachings, that one of ordinary skill in the art would have been motivated to combine adaptive bitrate streaming, as taught by Chen, with partial encryption, as taught by Lindahl. Ex. 1031 ¶¶ 2–9. As such, I determine that Petitioner has demonstrated that one of ordinary skill in the art would have had a reasonable expectation of success in the combination of Chen, Lindahl, and Hurst, by a preponderance of the evidence.

Overall, I am persuaded that one of ordinary skill in the art would have had a motivation to combine, and a reasonable expectation of success in achieving the combination of Chen, Lindahl, and Hurst sufficient to render claims 1–24 obvious, as provided in the Petition, by a preponderance of the evidence. I now discuss the Petition's showings with respect to the elements of the challenged claims.

*3. Independent Claim 1*

*a. Limitations [a] and [b]*

With respect to limitation [a][23] (i.e., the preamble of independent claim 1), requiring a playback device that can play protected content from a plurality of alternative streams, Petitioner asserts that Chen and Lindahl teach a client device for playing multiple representations of partially encrypted content, and that Hurst refers to its client device as a media player and teaches that it plays protected content from a plurality of alternative streams. Pet. 22 (citing Ex. 1006 ¶¶ 61, 203, 366; Ex. 1007 ¶ 11; Ex. 1008, 1:15–19, 6:13–17, 8:47–49; Ex. 1003 ¶ 129).

With respect to limitation [b], requiring one or more processors and non-volatile storage containing an application for those processors, Petitioner asserts that the combination teaches a playback device with processors housed within a computer or device and non-volatile storage, such as disk storage or Read Only Memory ("ROM") having applications

[23] Limitation [a] is part of the preamble of claim 1. The parties do not express a position on whether the preamble is limiting. Petitioner, however, addresses each of these limitations in its analysis of the claim. *See, e.g.*, Pet. 22. Although we express no determination on whether the preamble is limiting, for the reasons noted herein, we find that Petitioner sufficiently establishes that limitation [a] is met by the combination of Chen, Lindahl, and Hurst.

causing the processors to perform steps associated with playback. Pet. 23–25 (citing Ex. 1006 ¶¶ 116–118, Fig. 4; Ex. 1007 ¶ 88, Fig. 11; Ex. 1008, 4:64–65, 5:26–39; Ex. 1003 ¶¶ 132–135).

Patent Owner does not raise any argument specifically addressing limitations [a] and [b] of independent claim 1. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitations [a] and [b] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*b. Limitations [c] and [d]*

With respect to limitation [c], obtaining a top level index file identifying a plurality of alternative streams of protected video, Petitioner cites to Chen's Media Presentation Description ("MPD") file, that identifies a plurality of alternative representations of a video, which are streamed to the client device, which can be encoded at different bitrates. Pet. 26 (citing Ex. 1006 ¶¶ 219, 225). Petitioner also cites to Hurst for its teachings of a plurality of alternative streams of protected video, including alternative representations of a content file encoded at varying bitrates and quality. *Id.* at 28 (citing Ex. 1008, 6:32–38, Fig. 2b; Ex. 1003 ¶ 139).

With respect to limitation [d], wherein each of the alternative streams of protective video includes partially encrypted video frames, Petitioner relies on the teachings of Lindahl, wherein portions of each frame are encrypted, while other portions remain unencrypted. Pet. 29–30 (citing Ex. 1007 ¶¶ 55–56, Figs. 5A–5C; Ex. 1003 ¶¶ 141–142).

Patent Owner does not raise any argument specifically addressing limitations [c] and [d] of independent claim 1. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitations [c] and [d] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*c. Limitation [e]*

With respect to limitation [e], claim 1 recites, in part, that encryption occurs using a set of common keys including at least one key. Petitioner argues that both Lindahl and Hurst teach or suggest this limitation, and either is sufficient by itself to render the limitation obvious. Pet. 30 (citing Ex. 1003 ¶¶ 143–151). Petitioner cites to Lindahl, wherein media files may be encrypted with a global key or some other cryptographic key. *Id.* at 31 (citing Ex. 1007 ¶ 66; Ex. 1003 ¶ 144). Petitioner argues that a person of ordinary skill in the art would have been motivated "to apply this teaching to encrypt all media files, including all alternative representations, using a global key to simplify key management particularly for content that is not particularly sensitive." *Id.* (citing Ex. 1003 ¶ 144). Petitioner also argues that "the application of Lindahl to Chen leaves only a finite number of possibilities: either (1) use the same set of keys for all representations of a video, or (2) use different sets of keys," and the use of the same set of keys (as recited in limitation [e]) would have been motivated by Hurst, which teaches that alternative streamlets may be encrypted with the same key. *Id.* at 32–35 (citing Ex. 1008, 18:64–67, Figs. 2b, 3a, 3b; Ex. 1003 ¶¶ 146–149).

Patent Owner does not raise any argument specifically addressing limitation [e] of independent claim 1. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitation [e] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*d. Limitation [f]*

With respect to limitation [f], detailing that the partially encrypted video frames contain encrypted portions and unencrypted portions of data, Petitioner relies on Lindahl for its teaching that each partially encrypted video frame contains partially encrypted blocks, which have encrypted and unencrypted portions. Pet. 36–37 (citing Ex. 1007 ¶¶ 55–56, 60–61, Figs. 5C, 6A, 6B).

Patent Owner does not raise any argument specifically addressing limitation [f] of independent claim 1. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitation [f] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*e. Limitations [g], [h], and [i]*

Limitation [g] details obtaining a copy of the set of common keys, and Petitioner asserts that Lindahl and Hurst teach or suggest this limitation of independent claim 1. Pet. 38–39. Lindahl discloses that as part of playback, "the associated encryption key is obtained 706 from the selected media file" so that "the encrypted media file can be decrypted 808 using the associated encryption key." Ex. 1007 ¶¶ 69–70. Similarly, Hurst discloses that "[t]he

DRM server 1204 is further configured to supply encryption keys to the end user upon authenticating the end user." Ex. 1008, 18:53–55. Petitioner argues that the keys associated with a particular piece of content would have been the set of common keys because the combination teaches symmetric encryption. Pet. 38 (citing Ex. 1007 ¶¶ 8, 49, 66).

Limitation [h] details the detection of the streaming conditions for the playback device, and Petitioner relies on Chen for this limitation. Pet. 39–40. Petitioner argues that Chen teaches the client device detects the available bandwidth so that a stream with a matching data rate can be selected. *Id.* at 39 (citing Ex. 1006 ¶¶ 81, 121).

Limitation [i] details the selection of a particular stream based on the streaming conditions, and Petitioner relies on Chen for this limitation. Pet. 40–41. Petitioner argues that Chen teaches a client device selects blocks from alternative representations, encoded at different bitrates, based on available bandwidth. *Id.* (citing Ex. 1006 ¶¶ 80–81, Fig. 5; Ex. 1003, ¶¶ 161–163).

Patent Owner does not raise any argument specifically addressing limitations [g], [h], and [i] of independent claim 1. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitations [g], [h], and [i] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*f. Limitations [j] and [k]*

Limitation [j] details receiving a container index that provides byte ranges for portions of the selected stream of protected video within an

associated container file, and Petitioner relies on Chen for this limitation. Pet. 42–47. Petitioner argues that Chen teaches that after a representation is selected, the client accesses associated segments for that representation. *Id.* at 43–44 (citing Ex. 1006 ¶¶ 63–64, Fig. 5). Petitioner also argues that Chen discloses that the segments are container files that follow 3GPP or ISO file formats, and that each container file contains an index that provides byte ranges for portions of the selected stream of protected video. *Id.* at 44 (citing Ex. 1006 ¶¶ 119–120, 129, 222; Ex. 1003 ¶¶ 165–166). Petitioner also argues that a person of ordinary skill in the art would have been motivated to provide byte ranges in a segment index to facilitate HTTP range requests for specific fragments within a segment file, as Chen teaches. *Id.* at 47 (citing Ex. 1006 ¶¶ 119–123, 129, 147–150, 201, Fig. 6; Ex. 1003 ¶¶ 167–168).

Limitation [k] details requesting portions of the selected stream of protected video based on the provided byte ranges, and Petitioner relies on Chen to teach this limitation. Pet. 48–52. Petitioner argues that Chen teaches that, after selecting a representation and receiving a segment index for an associated segment, the client requests a fragment of the associated segment based on byte ranges provided by the segment index, which is stored as metadata at the beginning of the file. *Id.* at 48–50 (citing Ex. 1006, ¶¶ 70, 74, 83, 147, 517, Fig. 5).

Patent Owner previously did not raise any arguments directed to limitations [j] and [k] in its Preliminary Response. *See* Inst. Dec. 27. In its Patent Owner Response and Sur-reply, Patent Owner did not address any constructions of any terms contained in limitations [j] and [k]. *See* PO Resp.; PO Sur-reply. On remand, Patent Owner raises arguments regarding

limitations [j] and [k], including that the Petition relies on portions of Chen that are not limited to Chen's "background" art, and cites our Final Written Decision, where Patent Owner asserts that we "correctly found scalability [to be] 'integral' to Chen's fragments/blocks, which are only disclosed as scalable." PO Remand Br. 1–5 (quoting *id.* at 5).

Petitioner responds that Patent Owner attempts to introduce new claim constructions though its argument that "limitation 1[k] requires portions of a file that are separately requestable based on the byte ranges provided in the index file," which Petitioner asserts that Patent Owner uses for various arguments regarding Chen's fragments/blocks. Pet. Remand Resp. Br. 4–5 (quoting PO Remand Br. 2) (citing *id.* at 2–6). Petitioner asserts that these arguments are raised for the first time on remand, where limitations [j] and [k] were not subject to explicit claim constructions previously, and Patent Owner's Response and Sur-reply did not mention the limitations at all. *Id.* at 5. Petitioner also asserts that Patent Owner's arguments with respect to those limitations are beyond the scope of the Remand Briefing Order (Paper 56). *Id.*

I agree with Petitioner that Patent Owner's Remand Brief, specifically pages 1–7, attempt to address aspects of claim 1 for the first time on remand. I also agree that Patent Owner's arguments attempt to recharacterize limitations [j] and [k] to raise issues that Patent Owner did not raise previously, in contravention of our Order that issues raised needed support from "where those issues were raised in previous briefings by the parties." Paper 56, 2. I have addressed whether scalability and FEC are integral to how Chen operates above, as well as whether the Petition relies on those aspects, *supra*. The questions about how Chen operates and what portions

of Chen are asserted in the ground of unpatentability were previously raised, but now are being considered or reconsidered, based on the Federal Circuit's decision. In Patent Owner's Remand Brief, pages 1–7, the citations to argument previously raised do not support the arguments now presented by Patent Owner on remand. As such, I determine Patent Owner's new arguments fall outside the scope of remand, and I dismiss these arguments seeking to distinguish limitations [j] and [k] from the cited prior art combination.[24]

I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitations [j] and [k] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*g. Limitation [l]*

Limitation [l] recites the step of locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video. Petitioner relies on Lindahl to teach or suggest this limitation of independent claim 1. Pet. 52–55. Petitioner argues that Lindahl teaches using encryption parameters to identify encrypted portions, including X, Y, and Z, measured in a number of bits or bytes. *Id.* at 52–53 (citing Ex. 1007 ¶¶ 56–59, Figs. 6A, 6B; Ex. 1003 ¶¶ 182–183). Petitioner argues that Lindahl teaches that the encryption

[24] I note that Petitioner had requested for authorization to file a motion for sanctions, which we held in abeyance until all briefs were filed. *See* Ex. 3003, 1. Petitioner requests sanctions "because of the impropriety of [Patent Owner's] remand brief and prejudice to [Petitioner]." *Id*. at 3. I would deny Petitioner's request as I am not persuaded that Petitioner is prejudiced by the inclusion and/or consideration of specific arguments in Patent Owner's briefs on remand, given the outcome of this proceeding.

parameters are "retrieved" to decrypt the media. *Id.* at 54 (citing Ex. 1007 ¶ 72). Petitioner also argues that a person of ordinary skill in the art "would have been motivated to use encryption parameters, as taught by Lindahl, because it provides flexibility and facilitates different levels of security by controlling the amount and portions of each frame that is encrypted." *Id.* (citing Ex. 1007 ¶¶ 57–58; Ex. 1003 ¶ 186).

Patent Owner argues that "the 'locating' limitation, properly construed, requires, *inter alia*, that 'encryption information' be 'locat[ed]' 'within the requested portions of the selected stream of protected video,'" and that the combination of Lindahl and Chen fails to teach or render obvious limitation [l]. PO Resp. 24–38; PO Sur-Reply 1–8 (quoting PO Resp. 35). As discussed above, I remain unpersuaded regarding Patent Owner's arguments as to how limitation [l] of claim 1 should be interpreted. I also remain persuaded that the "within" term of limitation [l] most clearly connotes where the particular encrypted portions of frames of video must be located, not necessarily where the encryption information must be located. Although it is apparent that encryption information *can* be found within the requested portions, I am not persuaded that the claim language or the '588 Patent explicitly requires such a relationship. *See* Inst. Dec. 27–31; Final Dec. 8. Patent Owner's arguments rest on an interpretation that I do not adopt and, thus, I do not agree that with Patent Owner's underlying premise for its arguments attempting to distinguish limitation [l] from the disclosures of Lindahl and Chen relied on by Petitioner.

On the complete record, I determine, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet

limitation [l] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*h. Limitation [m]*

Limitation [m] details the decryption of each encrypted portion of the frames of video using the set of common keys, and Petitioner relies on Lindahl for this limitation. Pet. 55–56. Petitioner contends that Lindahl discloses that the encryption parameters are located and retrieved to decrypt the video stream, which is divided into frames and then blocks—each block is decrypted using the encryption parameters, which identify the encrypted portions of each frame, using a set of common keys. *Id.* (citing Ex. 1007 ¶ 72; Ex. 1003 ¶¶ 181–191). The Petition also discusses that Hurst teaches that the alternative streamlets of different bitrates may be encrypted with the same key. *Id.* at 32–33 (citing Ex. 1008, 18:64–67). Petitioner also asserts that by "applying Lindahl's teachings, it would have been obvious and straightforward to apply Hurst's key management teachings, with respect to the alternative streams, to Lindahl's teachings regarding cryptographic keys." *Id.* at 35 (citing Ex. 1007 ¶¶ 64–65; Ex. 1008, 18:64–67; Ex. 1003 ¶ 150).

Patent Owner argues that the Petition fails to demonstrate that Chen in view of Lindahl and Hurst renders this limitation obvious. PO Resp. 38–58. Patent Owner addresses the combination of Chen and Lindahl with respect to this limitation (*id.* at 39–52), but I focus on Patent Owner's arguments regarding the combination of Chen with Hurst because Patent Owner has acknowledged that Hurst teaches the use of a set of common keys. *See id.* at 52. Per the discussion above, I agree with Patent Owner and determine that

Hurst discloses the use of a set of common keys; as such I need not address Patent Owner's arguments traversing the combination of Chen and Lindahl.

Patent Owner argues that "[t]he question is whether Hurst teaches [using a set of common keys] for alternative streams of protected content, and Hurst teaches against doing such a thing," instead disclosing the use of a different specialized key for each alternative stream. PO Resp. 52–53. Patent Owner argues that Hurst discloses no benefit from using the same set of keys, but rather touts that using different sets of keys would have benefits. *Id.* at 53–54 (citing Ex. 2012 ¶ 117; Ex. 2013, 91:20–92:3); PO Sur-reply 25. Patent Owner also characterizes the Petition's motivation to combine Hurst with Chen as "essentially that because alternative streams of a video may be accessed as a group, it would be obvious to use the same key to encrypt alternative streams of the video," which Patent Owner argues is conclusory and legally insufficient. *Id.* at 54–55 (citing Pet. 19); PO Sur-reply 23–24. Patent Owner also argues that any implicit motivation to combine should be rejected "as its proffered rationale is a restatement of the '588's own teachings." *Id.* at 56–57 (citing Pet. 19; Ex. 1001, 13:11–21).

Petitioner responds that the Petition provided several motivations for using the same key, stating it was one of two known approaches for ABS, where access was often granted to alternate streams as a group, to switch between based on bandwidth conditions, and would have allowed access to be granted to the alternate streams, as a group, by providing a single key, to simplify the DRM while making the system more portable to diverse network environments. Pet. Reply 24 (citing Pet. 19, 35; Ex. 1006 ¶¶ 63–64; Ex. 1003 ¶ 116; Ex. 1031 ¶ 16). Petitioner also argues that the presence of two options does not amount to a teaching away from a lesser preferred but

still workable option, and that Patent Owner's assertions—that the use of the same key and partial encryption could negatively impact security—are speculative and not supported by evidence. *Id.* at 24–26 (citing Ex. 2012 ¶ 118; Ex. 1031 ¶¶ 13–14).

Looking to the evidence of record in this case, I am persuaded by Petitioner's arguments. The fact that Hurst provides for the same or different keys to be used is suggestive that one of ordinary skill in the art would have viewed the options as alternatives. The Federal Circuit has emphasized that it is "not necessary to show that a combination is 'the *best* option, only that it be a *suitable* option.'" *Netflix*, slip op. at 12 (quoting *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021)). I am persuaded that ordinarily skilled artisans would have viewed the use of a set of common keys as an option, in view of Hurst; indeed, I agree with Petitioner that Hurst teaches the natural and obvious approach to DRM for adaptive streaming, which persons of ordinary skill in the art would have been motivated to apply. *See* Ex. 1003 ¶ 116.

As such, on the complete record, I determine, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitation [m] of independent claim 1, for the reasons explained by Petitioner and as discussed above, by a preponderance of the evidence.

*i. Limitation [n]*

Limitation [n] details the playback of the decrypted frames of video, and Petitioner cites to Chen and Hurst, arguing that Chen teaches that media delivery systems send content to users, who then play back and display the content on their devices, and Hurst discloses that the client device plays back

the content. Pet. 57 (citing Ex. 1006 ¶¶ 16–19; Ex. 1008, 1:15–19, 6:14–22; Ex. 1003 ¶¶ 192–193).

Patent Owner does not raise any argument specifically addressing limitation [n] of independent claim 1. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. I determine, on the complete record, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst meet limitation [n] of independent claim 1, for the reasons explained by Petitioner, by a preponderance of the evidence.

*j. Conclusion Regarding Independent Claim 1*

Neither party presents evidence of objective considerations of nonobviousness. I have reviewed the arguments and evidence and I determine that Petitioner has shown, by a preponderance of the evidence, that the combination of Chen, Lindahl, and Hurst teaches or suggests all of the limitations of independent claim 1 for the reasons explained above and that one of ordinary skill in the art would have been motivated to combine the teachings of the references as proposed by Petitioner with a reasonable expectation of success in so doing.

*4. Independent Claim 12*

Independent claim 12 is directed to a "method for playing protected content from a plurality of alternative streams on a playback device." Ex. 1001, 28:61–62. Petitioner asserts that independent claim 12 recites the same limitations as claim 1 "except for 'using a decoder' and is obvious for the same reasons." Pet. 78. Petitioner also asserts that Chen and Lindahl both teach decoders, and that Hurst's media player, which can play encoded streams, would have obviously been capable of decoding those streams to ensure playback. *Id.* at 78–79 (citing Ex. 1006 ¶ 106; Ex. 1007 ¶ 91;

Ex. 1008, 1:15–19, 8:19–25, 16:3–5; Ex. 1003 ¶¶ 221–222). Petitioner also asserts that the obviousness of the apparatus recited by claim 1 also renders the method of claim 12 obvious. *Id.* at 78 (citing Ex. 1003 ¶ 220).

Patent Owner focuses its discussion on claim 1, addressing claims 1 and 12 together, based on the language common to both claims. *See* PO Resp. 1, 24–25, 35, 38. Patent Owner has previously noted the material identity of the elements of independent claim 1 and 12. *See* Prelim. Resp. 27 n.6.

I agree with the parties that claims 1 and 12 recite analogous limitations. I have reviewed Petitioner's argument and evidence directed to claim 12, *see* Pet. 78–79, and I determine that Petitioner has shown, by a preponderance of the evidence, that the subject matter of independent claim 12 would have been obvious to one of ordinary skill in the art for the reasons discussed above, including the reasons discussed in our consideration of Petitioner's challenge to claim 1.

*5. Dependent Claims 2–11 and 13–24*

Aside from Patent Owner's arguments directed to claims 1 and 12, Patent Owner does not include additional argument directed explicitly to dependent claims 2–11 and 13–24. *See* PO Resp.; PO Sur-Reply; PO Remand Br.; PO Remand Resp. Br. As such, I discuss the dependent claims below in the context of whether Petitioner has demonstrated, by a preponderance of the evidence, that the dependent claims would have been obvious over the combination of the Chen, Lindahl, and Hurst.

Claim 2, which depends from independent claim 1, provides that a container file, with encryption information, containing protected video from at least one of the plurality of alternative streams is obtained, along with a

reference to at least one key. Petitioner asserts that the combination of Chen and Lindahl teaches or suggests this limitation. Pet. 58–62. Petitioner argues that Chen teaches that after a representation is selected, the client obtains associated segments for that representation, which are stored as container files on the server, and Lindahl teaches encryption parameters that identify encrypted portions of video frames and can "be provided on a per file basis" including "in the media file itself," or on a per frame or per block basis. *Id.* at 58–59 (citing Ex. 1006 ¶¶ 63–64; Ex. 1007 ¶ 53). Petitioner also argues that Lindahl teaches locating the appropriate cryptographic key for decryption and playback, and that it would have been obvious to include a reference to that key, such as a key ID. *Id.* at 60–61 (citing Ex. 1007 ¶¶ 8, 83; Ex. 1003 ¶ 198). I determine that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claim 2 for the reasons explained by Petitioner, by a preponderance of the evidence.

Claim 3, which depends from independent claim 1, recites that the located encryption information comprises a reference to the start of an encrypted block of data. Petitioner asserts that claim 3 is taught or suggested by the combination of Chen, Lindahl, and Hurst, where Lindahl's encryption parameters identify encrypted portions of video frames, including variable X, which is an offset to where an encrypted portion of data begins. Pet. 62–63 (citing Ex. 1007 ¶¶ 57–59, Figs. 6A, 6B; Ex. 1003 ¶ 200). I determine, that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claim 3 for the reasons explained by Petitioner, by a preponderance of the evidence.

Claims 4–6 detail that the encryption information of claim 3 can be the size of the encrypted block of data, and can be cryptographic information

that can be utilized to access the encrypted portion of the frame, and can provide a reference to a key of the set of common keys. Petitioner argues that Lindahl discloses variable Y that provides the size of the encrypted block of data, as well as discussion of key information, such as a key ID. Pet. 64–65 (citing Ex. 1007 ¶¶ 57, 83, Figs. 6A, 6B). I determine that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claims 4–6 for the reasons explained by Petitioner, by a preponderance of the evidence.

Claim 7, which depends from independent claim 1, recites the detection of a change in streaming conditions, identifying a second alternative stream, receiving a new container file and requesting portions of the second alternative stream, decrypting the received portions, and playing back the decrypted frames of video. Petitioner argues that Chen teaches detecting changes in available bandwidth to select a stream with a matching data rate, thus switching to a different representation. Pet. 66–67 (citing Ex. 1006 ¶¶ 63–65, 81; Ex. 1003 ¶¶ 205–206). Petitioner identifies the remaining steps after the selection of the second alternative stream to be the same as provided in claim 1, and argues that analogous limitations would have been obvious over Chen, Lindahl, and Hurst for the same reasons. *Id.* at 67–69. I determine that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claim 7 for the reasons explained by Petitioner, by a preponderance of the evidence.

Claim 8, which depends from independent claim 1, and claim 9, which depends from claim 8, are directed to further steps of transmitting a request for content to a set of one or more content distribution servers, transmitting a request for cryptographic information to a set of one or more

DRM servers, and receiving information back in each case. Petitioner argues that Chen teaches requesting streaming media over a channel from one or more media servers, and that Hurst teaches a DRM server authenticating a user and supplying the user with appropriate encryption keys. Pet. 69–73 (citing Ex. 1006 ¶¶ 72, 79, 452; Ex. 1008, 18:51–55, 19:5–8; Ex. 1003 ¶¶ 210–215). I determine that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claims 8 and 9 for the reasons explained by Petitioner, by a preponderance of the evidence.

Claims 10 and 11, which depend from independent claim 1, detail that an associated container file and a separate file containing the selected stream of protected content may be obtained, and that the set of keys may be a plurality of keys. Petitioner argues that Chen teaches that the container index is typically placed at the beginning of the segment file, that the segment index may be provided in a separate file, and that Lindahl teaches using more than one key to encrypt and decrypt the blocks in a video file. Pet. 73–78 (citing Ex. 1006 ¶ 123; Ex. 1007 ¶ 54). I determine that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claims 10 and 11 for the reasons explained by Petitioner, by a preponderance of the evidence.

Claim 23, which depends from independent claim 1, recites that the container index is part of a hierarchical index, and that a lower layer index identifies the location of frames within a specific requested portion of the selected stream of protected video. Petitioner argues that Chen teaches hierarchical indexing. Pet. 80–83 (citing Ex. 1006 ¶¶ 148, 164, 197, Fig. 7(b); Ex. 1003 ¶¶ 234–237). I determine that Petitioner sufficiently

establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claim 23 for the reasons explained by Petitioner, by a preponderance of the evidence.

With respect to claims 13–22 and 24, Petitioner asserts that those claims recite the same limitations as claims 2–11 and 23, respectively, but as method claims. Pet. 79, 83. Petitioner asserts that claims 13–22 and 24 would have been obvious over Chen, Lindahl, and Hurst for the same reasons discussed above with respect to claims 2–11 and 23. *Id.* I agree that claims 13–22 and 24 recite, in method claims, substantially the same limitations as claims 2–11 and 23. Thus, for the same reasons discussed in our consideration of claims 2–11 and 23, I determine that Petitioner sufficiently establishes that the combined teachings of Chen, Lindahl, and Hurst render obvious claims 13–22 and 24 for the reasons explained by Petitioner, by a preponderance of the evidence.

*C. Summary*

I determine that Petitioner has shown by a preponderance of evidence that claims 1–24 would have been obvious over Chen, Lindahl, and Hurst.

For PETITIONER:

Harper Batts
Jeffrey Liang
Chris Ponder
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
hbatts@sheppardmullin.com
cponder@sheppardmullin.com
jliang@sheppardmullin.com
LegalTm-DivX-IPR@sheppardmullin.com

For PATENT OWNER:

Kenneth J. Weatherwax
Nathan Lowenstein
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
DivX_IPRs@lowensteinweatherwax.com

US010225588B2

(12) **United States Patent**
**Kiefer et al.**

(10) **Patent No.: US 10,225,588 B2**
(45) **Date of Patent: *Mar. 5, 2019**

(54) **PLAYBACK DEVICES AND METHODS FOR PLAYING BACK ALTERNATIVE STREAMS OF CONTENT PROTECTED USING A COMMON SET OF CRYPTOGRAPHIC KEYS**

(71) Applicant: **DIVX, LLC**, San Diego, CA (US)

(72) Inventors: **Michael George Kiefer**, Lake Havasu City, AZ (US); **Eric William Grab**, San Diego, CA (US); **Jason Braness**, San Diego, CA (US)

(73) Assignee: **DIVX, LLC**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/136,183**

(22) Filed: **Sep. 19, 2018**

(65) **Prior Publication Data**

US 2019/0020907 A1 Jan. 17, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/481,340, filed on Apr. 6, 2017, which is a continuation of application
(Continued)

(51) **Int. Cl.**
***H04L 29/06*** (2006.01)
***H04N 21/2347*** (2011.01)
(Continued)

(52) **U.S. Cl.**
CPC ....... ***H04N 21/2347*** (2013.01); ***H04L 9/0819*** (2013.01); ***H04L 9/0822*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ........... H04L 2209/603; H04L 63/0428; H04L 9/0819; H04L 9/0822; H04L 9/0861;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,009,331 A 2/1977 Goldmark et al.
4,694,357 A 9/1987 Rahman et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU 2010203605 B2 5/2015
CN 1169229 12/1997
(Continued)

OTHER PUBLICATIONS

Papagiannaki et al., "Experimental Characterization of Home Wireless Networks and Design Implications", INFOCOM 2006, 25th IEEE International Conference of Computer Communications, Proceedings, Apr. 2006, 13 pgs.
(Continued)

*Primary Examiner* — Abiy Getachew
(74) *Attorney, Agent, or Firm* — KPPB LLP

(57) **ABSTRACT**

Systems and methods for performing adaptive bitrate streaming using alternative streams of protected content in accordance with embodiments of the invention are described. One embodiment of the invention includes a processor, and memory containing a client application. In addition, the client application configures the processor to: request a top level index file identifying a plurality of alternative streams of protected content, where each of the alternative streams of protected content are encrypted using common cryptographic information; obtain the common cryptographic information; request portions of content from at least the plurality of alternative streams of protected content; access the protected content using the common cryptographic information; and playback the content.

**24 Claims, 19 Drawing Sheets**



**Related U.S. Application Data**

No. 14/970,412, filed on Dec. 15, 2015, now Pat. No. 9,621,522, which is a continuation of application No. 14/564,003, filed on Dec. 8, 2014, now Pat. No. 9,247,311, which is a continuation of application No. 13/340,623, filed on Dec. 29, 2011, now Pat. No. 8,909,922.

(60) Provisional application No. 61/530,305, filed on Sep. 1, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| ***H04L 9/14*** | (2006.01) |
| ***H04L 9/08*** | (2006.01) |
| ***H04N 21/6334*** | (2011.01) |
| ***H04N 21/4627*** | (2011.01) |
| ***H04N 21/4408*** | (2011.01) |
| ***H04N 21/254*** | (2011.01) |
| ***H04N 21/647*** | (2011.01) |
| ***H04L 9/32*** | (2006.01) |

(52) **U.S. Cl.**
CPC .............. ***H04L 9/0861*** (2013.01); ***H04L 9/14*** (2013.01); ***H04L 9/32*** (2013.01); ***H04L 63/0428*** (2013.01); ***H04N 21/2541*** (2013.01); ***H04N 21/4408*** (2013.01); ***H04N 21/4627*** (2013.01); ***H04N 21/6334*** (2013.01); ***H04N 21/64715*** (2013.01); *H04L 2209/603* (2013.01)

(58) **Field of Classification Search**
CPC ......... H04L 9/14; H04L 9/32; H04N 21/2347; H04N 21/2541; H04N 21/4408; H04N 21/4627; H04N 21/6334; H04N 21/64715
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,802,170 | A | 1/1989 | Trottier |
| 4,964,069 | A | 10/1990 | Ely |
| 5,119,474 | A | 6/1992 | Beitel et al. |
| 5,274,758 | A | 12/1993 | Beitel et al. |
| 5,361,332 | A | 11/1994 | Yoshida et al. |
| 5,396,497 | A | 3/1995 | Veltman |
| 5,404,436 | A | 4/1995 | Hamilton |
| 5,420,801 | A | 5/1995 | Dockter et al. |
| 5,420,974 | A | 5/1995 | Morris et al. |
| 5,471,576 | A | 11/1995 | Yee |
| 5,479,303 | A | 12/1995 | Suzuki et al. |
| 5,487,167 | A | 1/1996 | Dinallo et al. |
| 5,502,766 | A | 3/1996 | Boebert et al. |
| 5,509,070 | A | 4/1996 | Schull |
| 5,533,021 | A | 7/1996 | Branstad et al. |
| 5,537,408 | A | 7/1996 | Branstad et al. |
| 5,539,908 | A | 7/1996 | Chen et al. |
| 5,541,662 | A | 7/1996 | Adams et al. |
| 5,583,652 | A | 12/1996 | Ware |
| 5,589,993 | A | 12/1996 | Naimpally et al. |
| 5,621,794 | A | 4/1997 | Matsuda et al. |
| 5,627,936 | A | 5/1997 | Prasad |
| 5,633,472 | A | 5/1997 | DeWitt et al. |
| 5,642,171 | A | 6/1997 | Baumgartner et al. |
| 5,655,117 | A | 8/1997 | Goldberg et al. |
| 5,664,044 | A | 9/1997 | Ware |
| 5,675,382 | A | 10/1997 | Bauchspies |
| 5,675,511 | A | 10/1997 | Prasad et al. |
| 5,684,542 | A | 11/1997 | Tsukagoshi |
| 5,715,403 | A | 2/1998 | Stefik |
| 5,717,816 | A | 2/1998 | Boyce et al. |
| 5,719,786 | A | 2/1998 | Nelson et al. |
| 5,745,643 | A | 4/1998 | Mishina |
| 5,751,280 | A | 5/1998 | Abbott |
| 5,754,648 | A | 5/1998 | Ryan et al. |
| 5,763,800 | A | 6/1998 | Rossum et al. |
| 5,765,164 | A | 6/1998 | Prasad et al. |
| 5,794,018 | A | 8/1998 | Vrvilo et al. |
| 5,805,700 | A | 9/1998 | Nardone et al. |
| 5,822,524 | A | 10/1998 | Chen et al. |
| 5,828,370 | A | 10/1998 | Moeller et al. |
| 5,841,432 | A | 11/1998 | Carmel et al. |
| 5,844,575 | A | 12/1998 | Reid |
| 5,848,217 | A | 12/1998 | Tsukagoshi et al. |
| 5,867,625 | A | 2/1999 | McLaren |
| 5,887,110 | A | 3/1999 | Sakamoto et al. |
| 5,892,900 | A | 4/1999 | Ginter et al. |
| 5,903,261 | A | 5/1999 | Walsh et al. |
| 5,907,597 | A | 5/1999 | Mark |
| 5,946,446 | A | 8/1999 | Yanagihara |
| 5,956,729 | A | 9/1999 | Goetz et al. |
| 5,959,690 | A | 9/1999 | Toebes, VIII et al. |
| 5,970,147 | A | 10/1999 | Davis |
| 5,999,812 | A | 12/1999 | Himsworth |
| 6,031,622 | A | 2/2000 | Ristow et al. |
| 6,038,257 | A | 3/2000 | Brusewitz et al. |
| 6,044,469 | A | 3/2000 | Horstmann |
| 6,046,778 | A | 4/2000 | Nonomura et al. |
| 6,047,100 | A | 4/2000 | McLaren |
| 6,058,240 | A | 5/2000 | McLaren |
| 6,064,794 | A | 5/2000 | McLaren et al. |
| 6,065,050 | A | 5/2000 | DeMoney |
| 6,018,611 | A | 6/2000 | Nogami et al. |
| 6,079,566 | A | 6/2000 | Eleftheriadis et al. |
| 6,097,877 | A | 8/2000 | Katayama et al. |
| 6,141,754 | A | 10/2000 | Choy |
| 6,155,840 | A | 12/2000 | Sallette |
| 6,169,242 | B1 | 1/2001 | Fay et al. |
| 6,175,921 | B1 | 1/2001 | Rosen |
| 6,195,388 | B1 | 2/2001 | Choi et al. |
| 6,204,883 | B1 | 3/2001 | Tsukagoshi |
| 6,222,981 | B1 | 4/2001 | Rijckaert |
| 6,282,653 | B1 | 8/2001 | Berstis et al. |
| 6,289,450 | B1 | 9/2001 | Pensak et al. |
| 6,292,621 | B1 | 9/2001 | Tanaka et al. |
| 6,308,005 | B1 | 10/2001 | Ando et al. |
| 6,330,286 | B1 | 12/2001 | Lyons et al. |
| 6,374,144 | B1 | 4/2002 | Viviani et al. |
| 6,389,218 | B2 | 5/2002 | Gordon et al. |
| 6,389,473 | B1 | 5/2002 | Carmel et al. |
| 6,395,969 | B1 | 5/2002 | Fuhrer |
| 6,397,230 | B1 | 5/2002 | Carmel et al. |
| 6,418,270 | B1 | 7/2002 | Steenhof et al. |
| 6,449,719 | B1 | 9/2002 | Baker |
| 6,466,671 | B1 | 10/2002 | Maillard et al. |
| 6,466,733 | B1 | 10/2002 | Kim |
| 6,510,513 | B1 | 1/2003 | Danieli |
| 6,510,554 | B1 | 1/2003 | Gordon et al. |
| 6,621,979 | B1 | 9/2003 | Eerenberg et al. |
| 6,625,320 | B1 | 9/2003 | Nilsson et al. |
| 6,658,056 | B1 | 12/2003 | Duruöz et al. |
| 6,665,835 | B1 | 12/2003 | Gutfreund et al. |
| 6,671,408 | B1 | 12/2003 | Kaku |
| 6,697,568 | B1 | 2/2004 | Kaku |
| 6,725,281 | B1 | 4/2004 | Zintel et al. |
| 6,771,703 | B1 | 8/2004 | Oguz et al. |
| 6,807,306 | B1 | 10/2004 | Girgensohn et al. |
| 6,810,031 | B1 | 10/2004 | Hegde et al. |
| 6,810,389 | B1 | 10/2004 | Meyer |
| 6,819,394 | B1 | 11/2004 | Nomura et al. |
| 6,850,252 | B1 | 2/2005 | Hoffberg |
| 6,856,997 | B2 | 2/2005 | Lee et al. |
| 6,859,496 | B1 | 2/2005 | Boroczky et al. |
| 6,917,652 | B2 | 7/2005 | Lyu |
| 6,931,531 | B1 | 8/2005 | Takahashi |
| 6,944,621 | B1 | 9/2005 | Collart |
| 6,944,629 | B1 | 9/2005 | Shioi et al. |
| 6,956,901 | B2 | 10/2005 | Boroczky et al. |
| 6,965,724 | B1 | 11/2005 | Boccon-Gibod et al. |
| 6,965,993 | B2 | 11/2005 | Baker |
| 6,985,588 | B1 | 1/2006 | Glick et al. |
| 6,988,144 | B1 | 1/2006 | Luken et al. |
| 7,007,170 | B2 | 2/2006 | Morten |
| 7,023,924 | B1 | 4/2006 | Keller et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,043,473 | B1 | 5/2006 | Rassool et al. |
| 7,103,906 | B1 | 9/2006 | Katz et al. |
| 7,127,155 | B2 | 10/2006 | Ando et al. |
| 7,150,045 | B2 | 12/2006 | Koelle et al. |
| 7,151,832 | B1 | 12/2006 | Fetkovich et al. |
| 7,151,833 | B2 | 12/2006 | Candelore et al. |
| 7,165,175 | B1 | 1/2007 | Kollmyer et al. |
| 7,185,363 | B1 | 2/2007 | Narin et al. |
| 7,197,234 | B1 | 3/2007 | Chatterton |
| 7,206,940 | B2 | 4/2007 | Evans et al. |
| 7,209,892 | B1 | 4/2007 | Galuten et al. |
| 7,231,132 | B1 | 6/2007 | Davenport |
| 7,237,061 | B1 | 6/2007 | Boic |
| 7,242,772 | B1 | 7/2007 | Tehranchi |
| 7,243,346 | B1 | 7/2007 | Seth et al. |
| 7,295,673 | B2 | 11/2007 | Grab et al. |
| 7,328,345 | B2 | 2/2008 | Morten et al. |
| 7,330,875 | B1 | 2/2008 | Parasnis et al. |
| 7,340,528 | B2 | 3/2008 | Noblecourt et al. |
| 7,349,886 | B2 | 3/2008 | Morten et al. |
| 7,356,143 | B2 | 4/2008 | Morten |
| 7,356,245 | B2 | 4/2008 | Belknap et al. |
| 7,366,788 | B2 | 4/2008 | Jones et al. |
| 7,376,831 | B2 | 5/2008 | Kollmyer et al. |
| 7,406,174 | B2 | 7/2008 | Palmer |
| 7,421,411 | B2 | 9/2008 | Kontio et al. |
| 7,454,780 | B2 | 11/2008 | Katsube et al. |
| 7,457,359 | B2 | 11/2008 | Mabey et al. |
| 7,460,668 | B2 | 12/2008 | Grab et al. |
| 7,472,280 | B2 | 12/2008 | Giobbi |
| 7,478,325 | B2 | 1/2009 | Foehr |
| 7,484,103 | B2 | 1/2009 | Woo et al. |
| 7,493,018 | B2 | 2/2009 | Kim |
| 7,499,938 | B2 | 3/2009 | Collart |
| 7,515,710 | B2 | 4/2009 | Russell et al. |
| 7,526,450 | B2 | 4/2009 | Hughes et al. |
| 7,594,271 | B2 | 9/2009 | Zhuk et al. |
| 7,610,365 | B1 | 10/2009 | Kraft et al. |
| 7,640,435 | B2 | 12/2009 | Morten |
| 7,689,510 | B2 | 3/2010 | Lamkin et al. |
| 7,720,352 | B2 | 5/2010 | Belknap et al. |
| 7,747,853 | B2 | 6/2010 | Candelore et al. |
| 7,761,892 | B2 | 7/2010 | Ellis et al. |
| 7,779,097 | B2 | 8/2010 | Lamkin et al. |
| 7,788,271 | B2 | 8/2010 | Soma et al. |
| 7,817,608 | B2 | 10/2010 | Rassool et al. |
| 7,869,691 | B2 | 1/2011 | Kelly et al. |
| 7,882,034 | B2 | 2/2011 | Hug et al. |
| 7,949,703 | B2 | 5/2011 | Matsuzaki et al. |
| 7,962,942 | B1 | 6/2011 | Craner |
| 7,974,714 | B2 | 7/2011 | Hoffberg |
| 7,991,156 | B1 | 8/2011 | Miller |
| 8,023,562 | B2 | 9/2011 | Zheludkov et al. |
| 8,046,453 | B2 | 10/2011 | Olaiya |
| 8,054,880 | B2 | 11/2011 | Yu et al. |
| 8,065,708 | B1 | 11/2011 | Smyth et al. |
| 8,069,260 | B2 | 11/2011 | Speicher et al. |
| 8,082,442 | B2 | 12/2011 | Keljo et al. |
| 8,195,714 | B2 | 6/2012 | Mckibben et al. |
| 8,201,264 | B2 | 6/2012 | Grab et al. |
| 8,225,061 | B2 | 7/2012 | Greenebaum |
| 8,233,768 | B2 | 7/2012 | Soroushian et al. |
| 8,245,124 | B1 | 8/2012 | Gupta |
| 8,249,168 | B2 | 8/2012 | Graves |
| 8,261,356 | B2 | 9/2012 | Choi et al. |
| 8,265,168 | B1 | 9/2012 | Masterson et al. |
| 8,270,473 | B2 | 9/2012 | Chen et al. |
| 8,270,819 | B2 | 9/2012 | Vannier |
| 8,275,871 | B2 | 9/2012 | Ram et al. |
| 8,289,338 | B2 | 10/2012 | Priyadarshi et al. |
| 8,291,460 | B1 | 10/2012 | Peacock |
| 8,296,434 | B1 | 10/2012 | Miller et al. |
| 8,311,111 | B2 | 11/2012 | Xu et al. |
| 8,311,115 | B2 | 11/2012 | Gu et al. |
| 8,321,556 | B1 | 11/2012 | Chatterjee et al. |
| 8,341,715 | B2 | 12/2012 | Sherkin et al. |
| 8,386,621 | B2 | 2/2013 | Park |
| 8,396,114 | B2 | 3/2013 | Gu et al. |
| 8,401,900 | B2 | 3/2013 | Cansler et al. |
| 8,407,753 | B2 | 3/2013 | Kuo |
| 8,412,841 | B1 | 4/2013 | Swaminathan et al. |
| 8,423,889 | B1 | 4/2013 | Zagorie et al. |
| 8,452,110 | B2 | 5/2013 | Shoham et al. |
| 8,456,380 | B2 | 6/2013 | Pagan |
| 8,472,792 | B2 | 6/2013 | Ahsan et al. |
| 8,473,630 | B1 | 6/2013 | Galligan et al. |
| 8,510,303 | B2 | 8/2013 | Soroushian et al. |
| 8,510,404 | B2 | 8/2013 | Carmel et al. |
| 8,515,265 | B2 | 8/2013 | Kwon et al. |
| 8,516,529 | B2 | 8/2013 | Lajoie et al. |
| 8,527,645 | B1 | 9/2013 | Proffit et al. |
| 8,595,378 | B1 | 11/2013 | Cohn |
| 8,606,069 | B2 | 12/2013 | Okubo et al. |
| 8,640,166 | B1 | 1/2014 | Craner et al. |
| 8,649,669 | B2 | 2/2014 | Braness et al. |
| 8,656,183 | B2 | 2/2014 | Russell et al. |
| 8,677,428 | B2 | 3/2014 | Lewis et al. |
| 8,681,866 | B1 | 3/2014 | Jia |
| 8,689,267 | B2 | 4/2014 | Hunt |
| 8,726,264 | B1 | 5/2014 | Allen et al. |
| RE45,052 | E | 7/2014 | Li |
| 8,767,825 | B1 | 7/2014 | Wang et al. |
| 8,774,609 | B2 | 7/2014 | Drake et al. |
| 8,781,122 | B2 | 7/2014 | Chan et al. |
| 8,805,109 | B2 | 8/2014 | Shoham et al. |
| 8,806,188 | B2 | 8/2014 | Braness et al. |
| 8,832,434 | B2 | 9/2014 | Apostolopoulos et al. |
| 8,843,586 | B2 | 9/2014 | Pantos et al. |
| 8,856,218 | B1 | 10/2014 | Inskip |
| 8,908,984 | B2 | 12/2014 | Shoham et al. |
| 8,909,922 | B2 | 12/2014 | Kiefer et al. |
| 8,914,534 | B2 | 12/2014 | Braness et al. |
| 8,914,836 | B2 | 12/2014 | Shivadas et al. |
| 8,918,535 | B2 | 12/2014 | Ma et al. |
| 8,918,636 | B2 | 12/2014 | Kiefer |
| 8,918,908 | B2 | 12/2014 | Ziskind et al. |
| 8,948,249 | B2 | 2/2015 | Sun et al. |
| 8,997,161 | B2 | 3/2015 | Priyadarshi et al. |
| 8,997,254 | B2 | 3/2015 | Amidei et al. |
| 9,014,471 | B2 | 4/2015 | Shoham et al. |
| 9,025,659 | B2 | 5/2015 | Soroushian et al. |
| 9,042,670 | B2 | 5/2015 | Carmel et al. |
| 9,060,207 | B2 | 6/2015 | Scherkus et al. |
| 9,094,737 | B2 | 7/2015 | Shivadas et al. |
| 9,098,335 | B2 | 8/2015 | Muthiah et al. |
| 9,124,773 | B2 | 9/2015 | Chan et al. |
| 9,125,073 | B2 | 9/2015 | Oyman et al. |
| 9,184,920 | B2 | 11/2015 | Grab et al. |
| 9,191,457 | B2 | 11/2015 | Van Der Schaar |
| 9,197,685 | B2 | 11/2015 | Soroushian |
| 9,203,816 | B2 | 12/2015 | Brueck et al. |
| 9,210,481 | B2 | 12/2015 | Braness et al. |
| 9,215,466 | B2 | 12/2015 | Zhai et al. |
| 9,247,311 | B2 | 1/2016 | Kiefer |
| 9,247,312 | B2 | 1/2016 | Braness et al. |
| 9,247,317 | B2 | 1/2016 | Shivadas et al. |
| 9,253,178 | B2 | 2/2016 | Blom et al. |
| 9,264,475 | B2 | 2/2016 | Shivadas et al. |
| 9,294,531 | B2 | 3/2016 | Zhang et al. |
| 9,313,510 | B2 | 4/2016 | Shivadas et al. |
| 9,343,112 | B2 | 5/2016 | Amidei et al. |
| 9,344,517 | B2 | 5/2016 | Shivadas et al. |
| 9,344,721 | B2 | 5/2016 | Dikvall |
| 9,479,805 | B2 | 10/2016 | Rothschild et al. |
| 9,485,546 | B2 | 11/2016 | Chen et al. |
| 9,571,827 | B2 | 2/2017 | Su et al. |
| 9,584,557 | B2 | 2/2017 | Panje et al. |
| 9,584,847 | B2 | 2/2017 | Ma et al. |
| 9,621,522 | B2 | 4/2017 | Kiefer et al. |
| 9,706,259 | B2 | 7/2017 | Chan et al. |
| 9,712,890 | B2 | 7/2017 | Shivadas et al. |
| 9,798,863 | B2 | 10/2017 | Grab et al. |
| 9,813,740 | B2 | 11/2017 | Panje et al. |
| 9,866,878 | B2 | 1/2018 | Van Der Schaar et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,883,204 | B2 | 1/2018 | Braness et al. |
| 9,906,785 | B2 | 2/2018 | Naletov et al. |
| 9,967,189 | B2 | 5/2018 | Patel et al. |
| 9,967,305 | B2 | 5/2018 | Braness |
| 2001/0030710 | A1 | 10/2001 | Werner |
| 2001/0036355 | A1 | 11/2001 | Kelly et al. |
| 2001/0046299 | A1 | 11/2001 | Wasilewski et al. |
| 2001/0053222 | A1 | 12/2001 | Wakao et al. |
| 2002/0026560 | A1 | 2/2002 | Jordan et al. |
| 2002/0034252 | A1 | 3/2002 | Owen et al. |
| 2002/0051494 | A1 | 5/2002 | Yamaguchi et al. |
| 2002/0057898 | A1 | 5/2002 | Normile |
| 2002/0062313 | A1 | 5/2002 | Lee et al. |
| 2002/0076112 | A1 | 6/2002 | Devara |
| 2002/0087569 | A1 | 7/2002 | Fischer et al. |
| 2002/0091665 | A1 | 7/2002 | Beek et al. |
| 2002/0093571 | A1 | 7/2002 | Hyodo |
| 2002/0110193 | A1 | 8/2002 | Yoo et al. |
| 2002/0116481 | A1 | 8/2002 | Lee |
| 2002/0118953 | A1 | 8/2002 | Kim |
| 2002/0120934 | A1 | 8/2002 | Abrahams et al. |
| 2002/0136298 | A1 | 9/2002 | Anantharamu et al. |
| 2002/0143413 | A1 | 10/2002 | Fay et al. |
| 2002/0143547 | A1 | 10/2002 | Fay et al. |
| 2002/0147980 | A1 | 10/2002 | Satoda |
| 2002/0159598 | A1 | 10/2002 | Rubinstein et al. |
| 2002/0161462 | A1 | 10/2002 | Fay |
| 2002/0180929 | A1 | 12/2002 | Tseng et al. |
| 2002/0184159 | A1 | 12/2002 | Tadayon et al. |
| 2002/0184515 | A1 | 12/2002 | Oho et al. |
| 2002/0191112 | A1 | 12/2002 | Akiyoshi et al. |
| 2002/0191959 | A1 | 12/2002 | Lin et al. |
| 2002/0191960 | A1 | 12/2002 | Fujinami et al. |
| 2003/0001964 | A1 | 1/2003 | Masukura et al. |
| 2003/0002578 | A1 | 1/2003 | Tsukagoshi et al. |
| 2003/0005442 | A1 | 1/2003 | Brodersen et al. |
| 2003/0021296 | A1 | 1/2003 | Wee et al. |
| 2003/0031178 | A1 | 2/2003 | Haeri |
| 2003/0035488 | A1 | 2/2003 | Barrau |
| 2003/0035545 | A1 | 2/2003 | Jiang |
| 2003/0035546 | A1 | 2/2003 | Jiang et al. |
| 2003/0041257 | A1 | 2/2003 | Wee et al. |
| 2003/0061305 | A1 | 3/2003 | Copley et al. |
| 2003/0061369 | A1 | 3/2003 | Aksu et al. |
| 2003/0065777 | A1 | 4/2003 | Mattila et al. |
| 2003/0078930 | A1 | 4/2003 | Surcouf et al. |
| 2003/0093799 | A1 | 5/2003 | Kauffman et al. |
| 2003/0123855 | A1 | 7/2003 | Okada et al. |
| 2003/0128296 | A1 | 7/2003 | Lee |
| 2003/0133506 | A1 | 7/2003 | Haneda |
| 2003/0152370 | A1 | 8/2003 | Otomo et al. |
| 2003/0163824 | A1 | 8/2003 | Gordon et al. |
| 2003/0165328 | A1 | 9/2003 | Grecia |
| 2003/0174844 | A1 | 9/2003 | Candelore |
| 2003/0185302 | A1 | 10/2003 | Abrams |
| 2003/0185542 | A1 | 10/2003 | McVeigh et al. |
| 2003/0206558 | A1 | 11/2003 | Parkkinen et al. |
| 2003/0216922 | A1 | 11/2003 | Gonzales et al. |
| 2003/0229900 | A1 | 12/2003 | Reisman |
| 2003/0231863 | A1 | 12/2003 | Eerenberg et al. |
| 2003/0231867 | A1 | 12/2003 | Gates et al. |
| 2003/0233464 | A1 | 12/2003 | Walpole et al. |
| 2003/0236836 | A1 | 12/2003 | Borthwick |
| 2003/0236907 | A1 | 12/2003 | Stewart et al. |
| 2004/0006701 | A1 | 1/2004 | Kresina |
| 2004/0021684 | A1 | 2/2004 | Millner |
| 2004/0024688 | A1 | 2/2004 | Bi et al. |
| 2004/0025180 | A1 | 2/2004 | Begeja et al. |
| 2004/0031058 | A1 | 2/2004 | Reisman |
| 2004/0039916 | A1 | 2/2004 | Aldis et al. |
| 2004/0047614 | A1 | 3/2004 | Green |
| 2004/0052501 | A1 | 3/2004 | Tam |
| 2004/0071453 | A1 | 4/2004 | Valderas |
| 2004/0081333 | A1 | 4/2004 | Grab et al. |
| 2004/0081434 | A1 | 4/2004 | Jung et al. |
| 2004/0084035 | A1 | 5/2004 | Newton |
| 2004/0093618 | A1 | 5/2004 | Baldwin et al. |
| 2004/0105549 | A1 | 6/2004 | Suzuki et al. |
| 2004/0114687 | A1 | 6/2004 | Ferris et al. |
| 2004/0117347 | A1 | 6/2004 | Seo et al. |
| 2004/0136698 | A1 | 7/2004 | Mock |
| 2004/0139335 | A1 | 7/2004 | Diamand et al. |
| 2004/0143760 | A1 | 7/2004 | Alkove et al. |
| 2004/0146276 | A1 | 7/2004 | Ogawa |
| 2004/0158878 | A1 | 8/2004 | Ratnakar et al. |
| 2004/0184534 | A1 | 9/2004 | Wang |
| 2004/0184616 | A1 | 9/2004 | Morten et al. |
| 2004/0202320 | A1 | 10/2004 | Amini et al. |
| 2004/0217971 | A1 | 11/2004 | Kim |
| 2004/0255115 | A1 | 12/2004 | DeMello et al. |
| 2004/0255236 | A1 | 12/2004 | Collart |
| 2005/0004875 | A1 | 1/2005 | Kontio et al. |
| 2005/0005025 | A1 | 1/2005 | Harville et al. |
| 2005/0015797 | A1 | 1/2005 | Noblecourt et al. |
| 2005/0038826 | A1 | 2/2005 | Bae et al. |
| 2005/0055399 | A1 | 3/2005 | Savchuk |
| 2005/0071280 | A1 | 3/2005 | Irwin et al. |
| 2005/0108320 | A1 | 5/2005 | Lord et al. |
| 2005/0114534 | A1 | 5/2005 | Lee |
| 2005/0114896 | A1 | 5/2005 | Hug |
| 2005/0132208 | A1 | 6/2005 | Hug et al. |
| 2005/0149450 | A1 | 7/2005 | Stefik et al. |
| 2005/0180641 | A1 | 8/2005 | Clark |
| 2005/0183120 | A1 | 8/2005 | Jain et al. |
| 2005/0193070 | A1 | 9/2005 | Brown et al. |
| 2005/0193322 | A1 | 9/2005 | Lamkin et al. |
| 2005/0196147 | A1 | 9/2005 | Seo et al. |
| 2005/0204289 | A1 | 9/2005 | Mohammed et al. |
| 2005/0207442 | A1 | 9/2005 | Van Zoest et al. |
| 2005/0207578 | A1 | 9/2005 | Matsuyama et al. |
| 2005/0254508 | A1 | 11/2005 | Aksu et al. |
| 2005/0273695 | A1 | 12/2005 | Schnurr |
| 2005/0275656 | A1 | 12/2005 | Corbin et al. |
| 2006/0015580 | A1 | 1/2006 | Gabriel et al. |
| 2006/0026294 | A1 | 2/2006 | Virdi et al. |
| 2006/0026302 | A1 | 2/2006 | Bennett et al. |
| 2006/0036549 | A1 | 2/2006 | Wu |
| 2006/0037057 | A1 | 2/2006 | Xu |
| 2006/0052095 | A1 | 3/2006 | Vazvan |
| 2006/0053080 | A1 | 3/2006 | Edmonson et al. |
| 2006/0064605 | A1 | 3/2006 | Giobbi |
| 2006/0078301 | A1 | 4/2006 | Ikeda et al. |
| 2006/0093320 | A1 | 5/2006 | Hallberg et al. |
| 2006/0120378 | A1 | 6/2006 | Usuki et al. |
| 2006/0129909 | A1 | 6/2006 | Butt et al. |
| 2006/0165233 | A1 | 7/2006 | Nonaka et al. |
| 2006/0168639 | A1 | 7/2006 | Gan et al. |
| 2006/0173887 | A1 | 8/2006 | Breitfeld et al. |
| 2006/0179239 | A1 | 8/2006 | Fluhr |
| 2006/0181965 | A1 | 8/2006 | Collart |
| 2006/0235880 | A1 | 10/2006 | Qian |
| 2006/0245727 | A1 | 11/2006 | Nakano et al. |
| 2006/0259588 | A1 | 11/2006 | Lerman et al. |
| 2006/0263056 | A1 | 11/2006 | Lin et al. |
| 2006/0267986 | A1 | 11/2006 | Bae |
| 2006/0274835 | A1 | 12/2006 | Hamilton et al. |
| 2006/0294164 | A1 | 12/2006 | Armangau et al. |
| 2007/0005333 | A1 | 1/2007 | Setiohardjo et al. |
| 2007/0031110 | A1 | 2/2007 | Rijckaert |
| 2007/0033419 | A1 | 2/2007 | Kocher et al. |
| 2007/0044010 | A1 | 2/2007 | Sull et al. |
| 2007/0047901 | A1 | 3/2007 | Ando et al. |
| 2007/0053513 | A1 | 3/2007 | Hoffberg |
| 2007/0058928 | A1 | 3/2007 | Naito et al. |
| 2007/0083617 | A1 | 4/2007 | Chakrabarti et al. |
| 2007/0086528 | A1 | 4/2007 | Mauchly et al. |
| 2007/0100757 | A1 | 5/2007 | Rhoads |
| 2007/0133603 | A1 | 6/2007 | Weaver |
| 2007/0136817 | A1 | 6/2007 | Nguyen |
| 2007/0140647 | A1 | 6/2007 | Kusunoki et al. |
| 2007/0154165 | A1 | 7/2007 | Hemmeryckz-Deleersnijder et al. |
| 2007/0168541 | A1 | 7/2007 | Gupta et al. |
| 2007/0168542 | A1 | 7/2007 | Gupta et al. |
| 2007/0178933 | A1 | 8/2007 | Nelson |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2007/0180125 | A1 | 8/2007 | Knowles et al. |
| 2007/0185982 | A1 | 8/2007 | Nakanowatari et al. |
| 2007/0192810 | A1 | 8/2007 | Pritchett et al. |
| 2007/0217339 | A1 | 9/2007 | Zhao |
| 2007/0217759 | A1 | 9/2007 | Dodd |
| 2007/0234391 | A1 | 10/2007 | Hunter et al. |
| 2007/0239839 | A1 | 10/2007 | Buday et al. |
| 2007/0255940 | A1 | 11/2007 | Ueno |
| 2007/0271317 | A1 | 11/2007 | Carmel et al. |
| 2007/0271385 | A1 | 11/2007 | Davis et al. |
| 2007/0274679 | A1 | 11/2007 | Yahata et al. |
| 2007/0277219 | A1 | 11/2007 | Toebes et al. |
| 2007/0277234 | A1 | 11/2007 | Bessonov et al. |
| 2007/0280298 | A1 | 12/2007 | Hearn et al. |
| 2007/0288745 | A1 | 12/2007 | Kwan |
| 2007/0292107 | A1 | 12/2007 | Yahata et al. |
| 2007/0297422 | A1 | 12/2007 | Matsuo et al. |
| 2008/0005175 | A1 | 1/2008 | Bourke et al. |
| 2008/0008455 | A1 | 1/2008 | De Lange et al. |
| 2008/0043832 | A1 | 2/2008 | Barkley et al. |
| 2008/0046718 | A1 | 2/2008 | Grab |
| 2008/0066099 | A1 | 3/2008 | Brodersen et al. |
| 2008/0066181 | A1 | 3/2008 | Haveson et al. |
| 2008/0077592 | A1 | 3/2008 | Brodie et al. |
| 2008/0086456 | A1 | 4/2008 | Rasanen et al. |
| 2008/0086747 | A1 | 4/2008 | Rasanen et al. |
| 2008/0101466 | A1 | 5/2008 | Swenson et al. |
| 2008/0104633 | A1 | 5/2008 | Noblecourt et al. |
| 2008/0120330 | A1 | 5/2008 | Reed et al. |
| 2008/0120342 | A1 | 5/2008 | Reed et al. |
| 2008/0120389 | A1 | 5/2008 | Bassali et al. |
| 2008/0126248 | A1 | 5/2008 | Lee et al. |
| 2008/0137541 | A1 | 6/2008 | Agarwal et al. |
| 2008/0137736 | A1 | 6/2008 | Richardson et al. |
| 2008/0151817 | A1 | 6/2008 | Fitchett |
| 2008/0172441 | A1 | 7/2008 | Speicher et al. |
| 2008/0187283 | A1 | 8/2008 | Takahashi |
| 2008/0192818 | A1 | 8/2008 | DiPietro et al. |
| 2008/0195664 | A1 | 8/2008 | Maharajh et al. |
| 2008/0195744 | A1 | 8/2008 | Bowra et al. |
| 2008/0201705 | A1 | 8/2008 | Wookey |
| 2008/0205860 | A1 | 8/2008 | Holtman |
| 2008/0209534 | A1 | 8/2008 | Keronen et al. |
| 2008/0240144 | A1 | 10/2008 | Kruse et al. |
| 2008/0256105 | A1 | 10/2008 | Nogawa et al. |
| 2008/0263354 | A1 | 10/2008 | Beuque et al. |
| 2008/0279535 | A1 | 11/2008 | Hague et al. |
| 2008/0294453 | A1 | 11/2008 | Baird-Smith et al. |
| 2008/0298358 | A1 | 12/2008 | John et al. |
| 2008/0310454 | A1 | 12/2008 | Bellwood et al. |
| 2008/0310496 | A1 | 12/2008 | Fang |
| 2009/0031220 | A1 | 1/2009 | Tranchant et al. |
| 2009/0037959 | A1 | 2/2009 | Suh et al. |
| 2009/0048852 | A1 | 2/2009 | Burns et al. |
| 2009/0055546 | A1 | 2/2009 | Jung et al. |
| 2009/0060452 | A1 | 3/2009 | Chaudhri |
| 2009/0064341 | A1 | 3/2009 | Hartung et al. |
| 2009/0066839 | A1 | 3/2009 | Jung et al. |
| 2009/0097644 | A1 | 4/2009 | Haruki |
| 2009/0132599 | A1 | 5/2009 | Soroushian et al. |
| 2009/0132721 | A1 | 5/2009 | Soroushian et al. |
| 2009/0132824 | A1 | 5/2009 | Terada et al. |
| 2009/0136216 | A1 | 5/2009 | Soroushian et al. |
| 2009/0150557 | A1 | 6/2009 | Wormley et al. |
| 2009/0165148 | A1 | 6/2009 | Frey et al. |
| 2009/0168795 | A1 | 7/2009 | Segel et al. |
| 2009/0169181 | A1 | 7/2009 | Priyadarshi et al. |
| 2009/0172201 | A1 | 7/2009 | Carmel et al. |
| 2009/0178090 | A1 | 7/2009 | Oztaskent |
| 2009/0196139 | A1 | 8/2009 | Bates et al. |
| 2009/0201988 | A1 | 8/2009 | Gazier et al. |
| 2009/0217317 | A1 | 8/2009 | White et al. |
| 2009/0226148 | A1 | 9/2009 | Nesvadba et al. |
| 2009/0228395 | A1 | 9/2009 | Wegner et al. |
| 2009/0265737 | A1 | 10/2009 | Issa et al. |
| 2009/0276636 | A1 | 11/2009 | Grab et al. |
| 2009/0290706 | A1 | 11/2009 | Amini et al. |
| 2009/0290708 | A1 | 11/2009 | Schneider et al. |
| 2009/0293116 | A1 | 11/2009 | DeMello |
| 2009/0303241 | A1 | 12/2009 | Priyadarshi et al. |
| 2009/0307258 | A1 | 12/2009 | Priyadarshi et al. |
| 2009/0307267 | A1 | 12/2009 | Chen et al. |
| 2009/0310819 | A1 | 12/2009 | Hatano |
| 2009/0310933 | A1 | 12/2009 | Lee |
| 2009/0313544 | A1 | 12/2009 | Wood et al. |
| 2009/0313564 | A1 | 12/2009 | Rottler et al. |
| 2009/0316783 | A1 | 12/2009 | Au et al. |
| 2009/0328124 | A1 | 12/2009 | Khouzam et al. |
| 2009/0328228 | A1 | 12/2009 | Schnell |
| 2010/0040351 | A1 | 2/2010 | Toma et al. |
| 2010/0057928 | A1 | 3/2010 | Kapoor et al. |
| 2010/0058405 | A1 | 3/2010 | Ramakrishnan et al. |
| 2010/0074324 | A1 | 3/2010 | Qian et al. |
| 2010/0074333 | A1 | 3/2010 | Au et al. |
| 2010/0083322 | A1 | 4/2010 | Rouse |
| 2010/0094969 | A1 | 4/2010 | Zuckerman et al. |
| 2010/0095121 | A1 | 4/2010 | Shetty et al. |
| 2010/0106968 | A1 | 4/2010 | Mori et al. |
| 2010/0107260 | A1 | 4/2010 | Orrell et al. |
| 2010/0111192 | A1 | 5/2010 | Graves |
| 2010/0138903 | A1 | 6/2010 | Medvinsky |
| 2010/0142917 | A1 | 6/2010 | Isaji |
| 2010/0158109 | A1 | 6/2010 | Dahlby et al. |
| 2010/0161825 | A1 | 6/2010 | Ronca et al. |
| 2010/0166060 | A1 | 7/2010 | Ezure et al. |
| 2010/0186092 | A1 | 7/2010 | Takechi et al. |
| 2010/0189183 | A1 | 7/2010 | Gu et al. |
| 2010/0218208 | A1 | 8/2010 | Holden |
| 2010/0228795 | A1 | 9/2010 | Hahn |
| 2010/0235472 | A1 | 9/2010 | Sood et al. |
| 2010/0250532 | A1 | 9/2010 | Soroushian et al. |
| 2010/0290761 | A1 | 11/2010 | Drake et al. |
| 2010/0299522 | A1 | 11/2010 | Khambete et al. |
| 2010/0306249 | A1 | 12/2010 | Hill et al. |
| 2010/0313225 | A1 | 12/2010 | Cholas et al. |
| 2010/0313226 | A1 | 12/2010 | Cholas et al. |
| 2010/0319014 | A1 | 12/2010 | Lockett et al. |
| 2010/0319017 | A1 | 12/2010 | Cook |
| 2010/0332595 | A1 | 12/2010 | Fullagar et al. |
| 2011/0002381 | A1 | 1/2011 | Yang et al. |
| 2011/0016225 | A1 | 1/2011 | Park et al. |
| 2011/0047209 | A1 | 2/2011 | Lindholm et al. |
| 2011/0055585 | A1 | 3/2011 | Lee |
| 2011/0060808 | A1 | 3/2011 | Martin et al. |
| 2011/0066673 | A1 | 3/2011 | Outlaw |
| 2011/0067057 | A1 | 3/2011 | Karaoguz et al. |
| 2011/0078440 | A1 | 3/2011 | Feng et al. |
| 2011/0080940 | A1 | 4/2011 | Bocharov |
| 2011/0082924 | A1 | 4/2011 | Gopalakrishnan |
| 2011/0096828 | A1 | 4/2011 | Chen et al. |
| 2011/0107379 | A1 | 5/2011 | Lajoie et al. |
| 2011/0116772 | A1 | 5/2011 | Kwon et al. |
| 2011/0126191 | A1 | 5/2011 | Hughes et al. |
| 2011/0129011 | A1 | 6/2011 | Cilli et al. |
| 2011/0135090 | A1 | 6/2011 | Chan et al. |
| 2011/0138018 | A1 | 6/2011 | Raveendran et al. |
| 2011/0142415 | A1 | 6/2011 | Rhyu |
| 2011/0145726 | A1 | 6/2011 | Wei et al. |
| 2011/0149753 | A1 | 6/2011 | Bapst et al. |
| 2011/0150100 | A1 | 6/2011 | Abadir |
| 2011/0153785 | A1 | 6/2011 | Minborg et al. |
| 2011/0153835 | A1 | 6/2011 | Rimac et al. |
| 2011/0184738 | A1 | 7/2011 | Kalisky et al. |
| 2011/0191439 | A1 | 8/2011 | Dazzi et al. |
| 2011/0191803 | A1 | 8/2011 | Baldwin et al. |
| 2011/0197237 | A1 | 8/2011 | Turner |
| 2011/0197267 | A1 | 8/2011 | Gravel et al. |
| 2011/0213827 | A1 | 9/2011 | Kaspar et al. |
| 2011/0222786 | A1 | 9/2011 | Carmel et al. |
| 2011/0225302 | A1 | 9/2011 | Park et al. |
| 2011/0225315 | A1 | 9/2011 | Wexler et al. |
| 2011/0225417 | A1 | 9/2011 | Maharajh et al. |
| 2011/0239078 | A1 | 9/2011 | Luby et al. |
| 2011/0246657 | A1 | 10/2011 | Glow |

(56) **References Cited**

U.S. PATENT DOCUMENTS

2011/0246659 A1 10/2011 Bouazizi
2011/0252118 A1 10/2011 Pantos et al.
2011/0264530 A1 10/2011 Santangelo et al.
2011/0268178 A1 11/2011 Park et al.
2011/0276695 A1 11/2011 Maldaner et al.
2011/0283012 A1 11/2011 Melnyk
2011/0291723 A1 12/2011 Hashimoto
2011/0302319 A1 12/2011 Ha et al.
2011/0305273 A1 12/2011 He et al.
2011/0314176 A1 12/2011 Frojdh et al.
2011/0314500 A1 12/2011 Gordon
2012/0005368 A1 1/2012 Knittle et al.
2012/0017282 A1 1/2012 Kang et al.
2012/0023251 A1 1/2012 Pyle et al.
2012/0036365 A1 2/2012 Kyslov et al.
2012/0036544 A1 2/2012 Chen et al.
2012/0066360 A1 3/2012 Ghosh
2012/0093214 A1 4/2012 Urbach
2012/0114302 A1 5/2012 Randall
2012/0124191 A1 5/2012 Lyon
2012/0137336 A1 5/2012 Applegate et al.
2012/0144117 A1 6/2012 Weare et al.
2012/0144445 A1 6/2012 Bonta et al.
2012/0166633 A1 6/2012 Baumback et al.
2012/0170642 A1 7/2012 Braness et al.
2012/0170643 A1 7/2012 Soroushian et al.
2012/0170906 A1 7/2012 Soroushian et al.
2012/0170915 A1 7/2012 Braness et al.
2012/0173751 A1 7/2012 Braness et al.
2012/0177101 A1 7/2012 Van Der Schaar
2012/0179834 A1 7/2012 Van Der Schaar et al.
2012/0201475 A1 8/2012 Carmel et al.
2012/0201476 A1 8/2012 Carmel et al.
2012/0233345 A1 9/2012 Hannuksela
2012/0240176 A1 9/2012 Ma et al.
2012/0254455 A1 10/2012 Adimatyam et al.
2012/0260277 A1 10/2012 Kosciewicz
2012/0263434 A1 10/2012 Wainner et al.
2012/0265562 A1 10/2012 Daouk et al.
2012/0278496 A1 11/2012 Hsu
2012/0289147 A1 11/2012 Raleigh et al.
2012/0294355 A1 11/2012 Holcomb et al.
2012/0297039 A1 11/2012 Acuna et al.
2012/0307883 A1 12/2012 Graves
2012/0311094 A1 12/2012 Biderman et al.
2012/0314778 A1 12/2012 Salustri et al.
2012/0317235 A1 12/2012 Nguyen et al.
2013/0007223 A1 1/2013 Luby et al.
2013/0013730 A1 1/2013 Li et al.
2013/0019107 A1 1/2013 Grab et al.
2013/0019273 A1 1/2013 Ma et al.
2013/0041808 A1 2/2013 Pham et al.
2013/0044821 A1 2/2013 Braness et al.
2013/0046849 A1 2/2013 Wolf
2013/0046902 A1 2/2013 Villegas Nuñez et al.
2013/0051554 A1 2/2013 Braness et al.
2013/0054958 A1 2/2013 Braness et al.
2013/0055084 A1 2/2013 Soroushian et al.
2013/0058480 A1 3/2013 Ziskind et al.
2013/0061040 A1 3/2013 Kiefer et al.
2013/0061045 A1 3/2013 Kiefer et al.
2013/0064466 A1 3/2013 Carmel et al.
2013/0066838 A1 3/2013 Singla et al.
2013/0094565 A1 4/2013 Yang et al.
2013/0097309 A1 4/2013 Ma et al.
2013/0114944 A1 5/2013 Soroushian et al.
2013/0124859 A1 5/2013 Pestoni et al.
2013/0128962 A1 5/2013 Rajagopalan et al.
2013/0152767 A1 6/2013 Katz et al.
2013/0166580 A1 6/2013 Maharajh
2013/0166765 A1 6/2013 Kaufman
2013/0166906 A1 6/2013 Swaminathan et al.
2013/0170561 A1 7/2013 Hannuksela
2013/0170764 A1 7/2013 Carmel et al.
2013/0173513 A1 7/2013 Chu et al.
2013/0179199 A1 7/2013 Ziskind et al.
2013/0179992 A1 7/2013 Ziskind et al.
2013/0182952 A1 7/2013 Carmel et al.
2013/0196292 A1 8/2013 Brennen et al.
2013/0212228 A1 8/2013 Butler
2013/0223812 A1 8/2013 Rossi
2013/0226578 A1 8/2013 Bolton et al.
2013/0226635 A1 8/2013 Fisher
2013/0227081 A1 8/2013 Luby et al.
2013/0227122 A1 8/2013 Gao
2013/0301424 A1 11/2013 Kotecha et al.
2013/0311670 A1 11/2013 Tarbox et al.
2013/0329781 A1 12/2013 Su et al.
2014/0003516 A1 1/2014 Soroushian
2014/0019593 A1 1/2014 Reznik et al.
2014/0037620 A1 2/2014 Ferree et al.
2014/0052823 A1 2/2014 Gavade et al.
2014/0059156 A1 2/2014 Freeman, II et al.
2014/0096171 A1 4/2014 Shivadas et al.
2014/0101722 A1 4/2014 Moore
2014/0115650 A1 4/2014 Zhang et al.
2014/0119432 A1 5/2014 Wang et al.
2014/0140396 A1 5/2014 Wang et al.
2014/0140417 A1 5/2014 Shaffer et al.
2014/0143301 A1 5/2014 Watson et al.
2014/0143431 A1 5/2014 Watson et al.
2014/0143440 A1 5/2014 Ramamurthy et al.
2014/0177734 A1 6/2014 Carmel et al.
2014/0189065 A1 7/2014 Van Der Schaar et al.
2014/0201382 A1 7/2014 Shivadas et al.
2014/0211840 A1 7/2014 Butt et al.
2014/0211859 A1 7/2014 Carmel et al.
2014/0241420 A1 8/2014 Orton-Jay et al.
2014/0241421 A1 8/2014 Orton-Jay et al.
2014/0247869 A1 9/2014 Su et al.
2014/0250473 A1 9/2014 Braness et al.
2014/0258714 A1 9/2014 Grab
2014/0269927 A1 9/2014 Naletov et al.
2014/0269936 A1 9/2014 Shivadas et al.
2014/0280763 A1 9/2014 Grab et al.
2014/0297804 A1 10/2014 Shivadas et al.
2014/0297881 A1 10/2014 Shivadas et al.
2014/0355668 A1 12/2014 Shoham et al.
2014/0359678 A1 12/2014 Shivadas et al.
2014/0359679 A1 12/2014 Shivadas et al.
2014/0359680 A1 12/2014 Shivadas et al.
2014/0376720 A1 12/2014 Chan et al.
2015/0006662 A1 1/2015 Braness
2015/0026677 A1 1/2015 Stevens et al.
2015/0049957 A1 2/2015 Shoham et al.
2015/0063693 A1 3/2015 Carmel et al.
2015/0067715 A1 3/2015 Koat et al.
2015/0104153 A1 4/2015 Braness et al.
2015/0117836 A1 4/2015 Amidei et al.
2015/0117837 A1 4/2015 Amidei et al.
2015/0139419 A1 5/2015 Kiefer et al.
2015/0188758 A1 7/2015 Amidei et al.
2015/0188842 A1 7/2015 Amidei et al.
2015/0188921 A1 7/2015 Amidei et al.
2015/0189017 A1 7/2015 Amidei et al.
2015/0189373 A1 7/2015 Amidei et al.
2015/0288996 A1 10/2015 Van Der Schaar et al.
2015/0334435 A1 11/2015 Shivadas et al.
2015/0373421 A1 12/2015 Chan et al.
2016/0070890 A1 3/2016 Grab et al.
2016/0112382 A1 4/2016 Kiefer et al.
2016/0149981 A1 5/2016 Shivadas et al.
2016/0219303 A1 7/2016 Braness et al.
2017/0214947 A1 7/2017 Kiefer et al.
2017/0280203 A1 9/2017 Chan et al.
2018/0007451 A1 1/2018 Shivadas et al.
2018/0060543 A1 3/2018 Grab et al.
2018/0131980 A1 5/2018 Van Der Schaar et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0220153 | A1 | 8/2018 | Braness et al. |
| 2018/0332094 | A1 | 11/2018 | Braness |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1221284 | A | 6/1999 |
| CN | 1723696 | | 1/2006 |
| EP | 757484 | A2 | 2/1997 |
| EP | 813167 | A2 | 12/1997 |
| EP | 0936812 | A1 | 8/1999 |
| EP | 1056273 | A2 | 11/2000 |
| EP | 1187483 | A2 | 3/2002 |
| EP | 1420580 | A1 | 5/2004 |
| EP | 1553779 | A1 | 7/2005 |
| EP | 1657835 | A1 | 5/2006 |
| EP | 1718074 | A1 | 11/2006 |
| EP | 2486517 | A1 | 8/2012 |
| EP | 2486727 | A1 | 8/2012 |
| EP | 2507995 | A1 | 10/2012 |
| EP | 2564354 | A1 | 3/2013 |
| EP | 2616991 | | 7/2013 |
| EP | 2617192 | | 7/2013 |
| EP | 2661696 | A1 | 11/2013 |
| EP | 2661875 | A1 | 11/2013 |
| EP | 2661895 | A2 | 11/2013 |
| EP | 2486727 | A4 | 3/2014 |
| EP | 2564354 | A4 | 3/2014 |
| EP | 2616991 | A4 | 3/2014 |
| EP | 2617192 | A4 | 3/2014 |
| EP | 2716048 | A1 | 4/2014 |
| EP | 2721826 | A1 | 4/2014 |
| EP | 2486517 | | 6/2014 |
| EP | 2751990 | | 7/2014 |
| EP | 2807821 | | 12/2014 |
| EP | 2751990 | A4 | 4/2015 |
| HK | 1125765 | A | 8/2009 |
| JP | 08046902 | A | 2/1996 |
| JP | 08111842 | A | 4/1996 |
| JP | 08163488 | A | 6/1996 |
| JP | 08287613 | A | 11/1996 |
| JP | 09037225 | A | 2/1997 |
| JP | 11164307 | A | 6/1999 |
| JP | 11275576 | A | 10/1999 |
| JP | 11328929 | A | 11/1999 |
| JP | 2000201343 | A | 7/2000 |
| JP | 02001043668 | A | 2/2001 |
| JP | 2001209726 | A | 8/2001 |
| JP | 2001346165 | A | 12/2001 |
| JP | 2002164880 | A | 6/2002 |
| JP | 2002170363 | A | 6/2002 |
| JP | 2002518898 | A | 6/2002 |
| JP | 2002218384 | A | 8/2002 |
| JP | 2003179597 | A | 6/2003 |
| JP | 2003250113 | A | 9/2003 |
| JP | 2004013823 | A | 1/2004 |
| JP | 2004515941 | A | 5/2004 |
| JP | 2004172830 | A | 6/2004 |
| JP | 2004187161 | A | 7/2004 |
| JP | 2004234128 | A | 8/2004 |
| JP | 2005027153 | | 1/2005 |
| JP | 2005080204 | A | 3/2005 |
| JP | 2006155500 | A | 6/2006 |
| JP | 2006524007 | A | 10/2006 |
| JP | 2007036666 | A | 2/2007 |
| JP | 2007174375 | A | 7/2007 |
| JP | 2007235690 | A | 9/2007 |
| JP | 2007535881 | A | 12/2007 |
| JP | 2008235999 | A | 10/2008 |
| JP | 2009530917 | A | 8/2009 |
| JP | 2013513298 | A | 4/2013 |
| JP | 5200204 | B2 | 6/2013 |
| JP | 2014506430 | A | 3/2014 |
| JP | 5723888 | B2 | 4/2015 |
| JP | 2015167357 | A | 9/2015 |
| JP | 6038805 | B2 | 12/2016 |
| JP | 6078574 | B2 | 1/2017 |
| JP | 2017063453 | | 3/2017 |
| JP | 2018160923 | A | 10/2018 |
| KR | 100221423 | B1 | 9/1999 |
| KR | 2002013664 | | 2/2002 |
| KR | 1020020064888 | A | 8/2002 |
| KR | 100669616 | B1 | 1/2007 |
| KR | 1020130133830 | | 12/2013 |
| KR | 101874907 | B1 | 7/2018 |
| SG | 146026 | | 12/2010 |
| WO | 1995015660 | A1 | 6/1995 |
| WO | 1996013121 | | 5/1996 |
| WO | 1997031445 | A3 | 4/1998 |
| WO | 1999010836 | A1 | 3/1999 |
| WO | 1999065239 | A2 | 12/1999 |
| WO | 0104892 | A1 | 1/2001 |
| WO | 2001031497 | A1 | 5/2001 |
| WO | 2001050732 | A2 | 7/2001 |
| WO | 2001065762 | A2 | 9/2001 |
| WO | 2002001880 | A1 | 1/2002 |
| WO | 2002008948 | A2 | 1/2002 |
| WO | 2002035832 | A2 | 5/2002 |
| WO | 2002037210 | A2 | 5/2002 |
| WO | 2002054196 | A2 | 7/2002 |
| WO | 2003030000 | A1 | 4/2003 |
| WO | 2003096136 | A2 | 11/2003 |
| WO | 2004054247 | A1 | 6/2004 |
| WO | 2004097811 | A1 | 11/2004 |
| WO | 2004102571 | A1 | 11/2004 |
| WO | 2006018843 | A2 | 2/2006 |
| WO | 20060012398 | A2 | 2/2006 |
| WO | 2006018843 | A3 | 12/2006 |
| WO | 2007044590 | A2 | 4/2007 |
| WO | 2007113836 | A2 | 10/2007 |
| WO | 2008010275 | A1 | 1/2008 |
| WO | 2008042242 | A2 | 4/2008 |
| WO | 2008086313 | A1 | 7/2008 |
| WO | 2007113836 | A3 | 11/2008 |
| WO | 2008135932 | A2 | 11/2008 |
| WO | 2007113836 | B1 | 12/2008 |
| WO | 2009065137 | A1 | 5/2009 |
| WO | 2010/05673 | A2 | 1/2010 |
| WO | 2010060106 | A1 | 5/2010 |
| WO | 2010080911 | A1 | 7/2010 |
| WO | 2010089962 | A1 | 8/2010 |
| WO | 2010108053 | A1 | 9/2010 |
| WO | 2010111261 | A1 | 9/2010 |
| WO | 2010122447 | A1 | 10/2010 |
| WO | 2010147878 | A1 | 12/2010 |
| WO | 2011042898 | A1 | 4/2011 |
| WO | 2011042900 | A1 | 4/2011 |
| WO | 2011068668 | A1 | 6/2011 |
| WO | 2011103364 | A1 | 8/2011 |
| WO | 2011132184 | A1 | 10/2011 |
| WO | 2011135558 | A1 | 11/2011 |
| WO | 2012035533 | A2 | 3/2012 |
| WO | 2012035534 | A2 | 3/2012 |
| WO | 2012035534 | A3 | 7/2012 |
| WO | 2012094171 | A1 | 7/2012 |
| WO | 20120094181 | A2 | 7/2012 |
| WO | 20120094189 | A1 | 7/2012 |
| WO | 2012035533 | A3 | 8/2012 |
| WO | 2012162806 | A1 | 12/2012 |
| WO | 2012171113 | A1 | 12/2012 |
| WO | 2013030833 | A1 | 3/2013 |
| WO | 2013032518 | A2 | 3/2013 |
| WO | 2013103986 | A2 | 7/2013 |
| WO | 2013111126 | A2 | 8/2013 |
| WO | 2013111126 | A3 | 8/2013 |
| WO | 2013032518 | A3 | 9/2013 |
| WO | 2013144942 | A1 | 10/2013 |
| WO | 2014145901 | A1 | 9/2014 |
| WO | 2014193996 | A2 | 12/2014 |
| WO | 2014193996 | A3 | 2/2015 |
| WO | 2015031982 | A1 | 3/2015 |

(56) **References Cited**

OTHER PUBLICATIONS

Peek, David, "Consumer Distributed File Systems", Dissertation, Doctor of Philosophy, Computer Science and Engineering, The University of Michigan, 2009, 118 pgs.
Phamdo, "Theory of Data Compression", printed on Oct. 10, 2003, 12 pgs.
RGB Networks, "Comparing Adaptive HTTP Streaming Technologies", Nov. 2011, Retrieved from: http://btreport.net/wp-content/uploads/2012/02/RGB-Adaptive-HTTP-Streaming-Comparison-1211-01.pdf, 20 pgs.
Rosenberg et al., "Indicating User Agent Capabilities in the Session Initiation Protocol (SIP)", Network Working Group, RFC 3840, Aug. 2004, 36 pgs.
Schulzrinne, H., "Real Time Streaming Protocol 2.0 (RTSP): draft-ietfmmusic-rfc2326bis-27", MMUSIC Working Group of the Internet Engineering Task Force (IETF), Mar. 9, 2011, 296 pgs. (presented in two parts).
Siglin, "HTTP Streaming: What You Need to Know", streamingmedia.com, 2010, 15 pgs.
Siglin, "Unifying Global Video Strategies, MP4 File Fragmentation for Broadcast, Mobile and Web Delivery", Nov. 16, 2011, 16 pgs.
Silvio, "adaptive HTTP streaming for open codecs", Oct. 9, 2010, [retrieved on: Mar. 2, 2018], 15 pgs.
Tan, Yap-Peng et al., "Video transcoding for fast forward/reverse video playback", IEEE ICIP, 2002, 4 pgs.
Taxan, "AVel LinkPlayer2 for Consumer", I-O Data USA—Products—Home Entertainment, printed May 4, 2007 from http://www.iodata.com/usa/products/products.php?cat=HNP&sc=AVEL&pld=AVLP2/DVDLA&ts=2&tsc, 1 page.
Tripathi et al., "Improving Multimedia Streaming with Content-Aware Video Scaling", Retrieved from: http://digitalcommons.wpi.edu/computerscience-pubs/96, 2001, 17 pgs.
Unknown, "AVI RIFF File Reference (Direct X 8.1 C++ Archive)", printed from http://msdn.microsoft.com/archive/en-us/dx81_c/directx_cpp/htm/avirifffilereference.asp?fr . . . on Mar. 6, 2006, 7 pgs.
Unknown, "Entropy and Source Coding (Compression)", TCOM 570, Sep. 1999, pp. 1-22.
Venkatramani et al., "Securing Media for Adaptive Streaming", Multimedia 2003 Proceedings of the Eleventh ACM International Conference on Multimedia, Nov. 2-8, 2003, Berkeley, California, 4 pgs.
Wang et al., "Image Quality Assessment: From Error Visibility to Structural Similarity", IEEE Transactions on Image Processing, Apr. 2004, vol. 13, No. 4, pp. 600-612.
Wu, Feng et al., "Next Generation Mobile Multimedia Communications: Media Codec and Media Transport Perspectives", In China Communications, Oct. 2006, pp. 30-44.
Zambelli, "IIS Smooth Streaming Technical Overview", Microsoft Corporation, Mar. 2009, 17 pgs.
"IBM Closes Cryptolopes Unit," Dec. 17, 1997, CNET News, Printed on Apr. 25, 2014 from http://news.cnet.com/IBM-closes-Cryptolopes-unit/2100-1001_3206465.html, 3 pgs.
"Information Technology-Coding of Audio Visual Objects—Part 2: Visual" International Standard, ISO/IEC 14496-2, Third Edition, Jun. 1, 2004, pp. 1-724. (presented in three parts).
U.S. Appl. No. 13/905,804, "Notice of Allowance," dated Aug. 12, 2015, 8 pgs.
Broadq—The Ultimate Home Entertainment Software, printed May 11, 2009 from ittp://web.srchive.org/web/20030401122010/www.broadq.com/qcasttuner/, 1 pg.
Cloakware Corporation, "Protecting Digital Content Using Cloakware Code Transformation Technology", Version 1.2, May 2002, pp. 1-10.
European Search Report Application No. EP 08870152, Search Completed May 19, 2011, dated May 26, 2011, 9 pgs.
European Search Report for Application 11855103.5, search completed Jun. 26, 2014, 9 pgs.
European Search Report for Application 11855237.1, search completed Jun. 12, 2014, 9 pgs.
European Supplementary Search Report for Application EP09759600, completed Jan. 25, 2011, 11 pgs.
Extended European Search Report for European Application EP10821672, completed Jan. 30, 2014, 3 pgs.
Extended European Search Report for European Application EP11824682, completed Feb. 6, 2014, 4 pgs.
Extended European Search Report for European Application No. 14763140.2, Search completed Sep. 26, 2016, dated Oct. 5, 2016, 9 pgs.
Federal Computer Week, "Tool Speeds Info to Vehicles", Jul. 25, 1999, 5 pgs.
Final draft ETSI ES 202 109, V1.1.1, ETSI Standard, Terrestrial Trunked Radio (TETRA); Security; Synchronization mechanism for end-to-end encryption, Oct. 2002, 17 pgs.
HTTP Live Streaming Overview, Networking & Internet, Apple, Inc., Apr. 1, 2011, 38 pgs.
IBM Corporation and Microsoft Corporation, "Multimedia Programming Interface and Data Specifications 1.0", Aug. 1991, printed from http://www.kk.iij4u.or.jp/~kondo/wave/mpidata.txt on Mar. 6, 2006, 100 pgs.
InformationWeek, "Internet on Wheels", InformationWeek: Front End: Daily Dose, Jul. 20, 1999, Printed on Mar. 26, 2014, 3 pgs.
International Preliminary Report for Application No. PCT/US2011/066927, Filed Dec. 22, 2011, dated Jul. 10, 2013, 13 pgs.
International Preliminary Report for International Application No. PCT/US2011/067243, International Filing Date Dec. 23, 2011, dated Jul. 10, 2013, 7 pgs.
International Preliminary Report on Patentability for International Application PCT/US14/30747, dated Sep. 15, 2015, dated Sep. 24, 2015, 6 pgs.
International Preliminary Report on Patentability for International Application No. PCT/US2007/063950, Report Completed Dec. 18, 2009, 3 pgs.
International Preliminary Report on Patentability for International Application No. PCT/US2008/083816, dated May 18, 2010, 6 pgs.
International Preliminary Report on Patentability for International Application No. PCT/US2010/56733, dated Jun. 5, 2012, pgs.
International Preliminary Report on Patentability for International Application No. PCT/US2011/068276, dated Mar. 4, 2014, 23 pgs.
International Preliminary Report on Patentability for International Application PCT/US2011/067167, dated Feb. 25, 2014, 8 pgs.
International Preliminary Report on Patentability for International Application PCT/US2013/043181, dated Dec. 31, 2014, dated Jan. 8, 2015, 11 pgs.
International Preliminary Report on Patentability for International Application PCT/US2014/039852, dated Dec. 1, 2015, dated Dec. 5, 2015, 8 pgs.
International Search Report and Written Opinion for International Application No. PCT/US07/63950, completed Feb. 19, 2008; dated Mar. 19, 2008, 9 pgs.
International Search Report and Written Opinion for International Application No. PCT/US08/87999, completed Feb. 7, 2009, dated Mar. 19, 2009, 6 pgs.
International Search Report and Written Opinion for International Application No. PCT/US09/46588, completed Jul. 13, 2009, dated Jul. 23, 2009, 7 pgs.
International Search Report and Written Opinion for International Application No. PCT/US2004/041667, completed May 24, 2007, dated Jun. 20, 2007, 6 pgs.
International Search Report and Written Opinion for International Application No. PCT/US2005/025845, completed Feb. 5, 2007 and dated May 10, 2007, 8 pgs.
International Search Report and Written Opinion for International Application No. PCT/US2008/083816, completed Jan. 10, 2009, dated Jan. 22, 2009, 7 pgs.
International Search Report and Written Opinion for International Application No. PCT/US2010/020372, Completed Feb. 10, 2009, dated Mar. 1, 2010, 8 pgs.
International Search Report and Written Opinion for International Application No. PCT/US2010/56733, Completed Jan. 3, 2011, dated Jan. 14, 2011, 9 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion for International Application No. PCT/US2011/067243, International Filing Date Dec. 23, 2011, Search Completed Apr. 24, 2012, dated May 8, 2012, 8 pgs.
International Search Report and Written Opinion for International Application No. PCT/US2013/043181, completed Nov. 27, 2013, dated Dec. 6, 2013, 12 pgs.
International Search Report and Written Opinion for International Application PCT/US14/30747, completed Jul. 30, 2014, dated Aug. 22, 2014, 7 pgs.
International Search Report and Written Opinion for International Application PCT/US14/39852, completed Oct. 21, 2014, dated Dec. 5, 2014, 11 pgs.
International Search Report and Written Opinion for International Application PCT/US2011/066927, completed Apr. 3, 2012, dated Apr. 20, 2012, 14 pgs.
International Search Report and Written Opinion for International Application PCT/US2011/067167, completed Jun. 19, 2012, dated Jul. 2, 2012, 11 pgs.
International Search Report and Written Opinion for International Application PCT/US2011/068276, completed Jun. 19, 2013, dated Jul. 8, 2013, 24 pgs.
International Search Report and Written Opinion for PCT/US2013/020572, International Filing Date Jan. 7, 2013, Search Completed Mar. 19, 2013, dated Apr. 29, 2013, 10 pgs.
International Telecommunication Union, Telecommunication Standardization Sector of ITU, H.233, Line Transmission of Non-Telephone Signals, Confidentiality System for Audiovisual Services, ITU-T Recommendation H.233, Mar. 1993, 18 pgs.
ITS International, "Fleet System Opts for Mobile Server", Aug. 26, 1999, Printed on Oct. 21, 2011 from http://www.itsinternational.com/News/article.cfm?recordID=547, 2 pgs.
Lifehacker—Boxqueue Bookmarklet Saves Videos for Later Boxee Watching, printed Jun. 16, 2009 from http://feeds.gawker.com/~r/lifehacker/full/~3/OHvDmrlgZZc/boxqueue-bookmarklet-saves-videos-for-late-boxee-watching, 2 pgs.
Linksys Wireless-B Media Adapter Reviews, printed May 4, 2007 from http://reviews.cnet.com/Linksys_Wireless_B_Media_Adapter/4505-6739_7-30421900.html?tag=box, 5 pgs.
Linksys, KISS DP-500, printed May 4, 2007 from http://www.kiss-technology.com/?p=dp500, 2 pgs.
LINKSYS®: "Enjoy your digital music and pictures on your home entertainment center, without stringing wires!", Model No. WMA 11B, printed May 9, 2007 from http://www.linksys.com/servlet/Satellite?c=L_Product_C2&childpagename=US/Layout&cid=1115416830950&p, 4 pgs.
Microsoft Corporation, "Chapter 8, Multimedia File Formats" 1991, Microsoft Windows Multimedia Programmer's Reference, 23 pgs.
Microsoft Media Platform: Player Framework, "Microsoft Media Platform: Player Framework v2.5 (formerly Silverlight Media Framework)", May 3, 2011, 2 pgs.
Microsoft Media Platform: Player Framework, "Silverlight Media Framework v1.1", Jan. 2010, 2 pgs.
Microsoft Windows® XP Media Center Edition 2005, Frequently asked Questions, printed May 4, 2007 from http://www.microsoft.com/windowsxp/mediacenter/evaluation/faq.mspx, 6 pgs.
Microsoft Windows® XP Media Center Edition 2005: Features, printed May 9, 2007, from http://www.microsoft.com/windowsxp/mediacenter/evaluation/features.mspx, 4 pgs.
Office Action for Chinese Patent Application No. CN200880127596.4, dated May 6, 2014, 8 pgs.
Office Action for U.S. Appl. No. 13/223,210, dated Apr. 30, 2015, 14 pgs.
Office Action for U.S. Appl. No. 14/564,003, dated Apr. 17, 2015, 28 pgs.
Open DML AVI-M-JPEG File Format Subcommittee, "Open DML AVI File Format Extensions", Version 1.02, Feb. 28, 1996, 29 pgs.
PC world.com, Future Gear: PC on the HiFi, and the TV, from http://www.pcworld.com/article/id,108818-page,1/article.html, printed May 4, 2007, from IDG Networks, 2 pgs.
QTV—About BroadQ, printed May 11, 2009 from http://www.broadq.com/en/about.php, 1 page.
Supplementary European Search Report for Application No. EP 04813918, Search Completed Dec. 19, 2012, 3 pgs.
Supplementary European Search Report for Application No. EP 10729513, completed Dec. 9, 2013, 4 pgs.
Supplementary European Search Report for EP Application 11774529, completed Jan. 31, 2014, 2 pgs.
Supplementary European Search Report for International Application No. PCT/US2007063950, Report Completed Jan. 25, 2013, 8 pgs.
Windows Media Center Extender for Xbox, printed May 9, 2007 from http://www.xbox.com/en-US/support/systemuse/xbox/console/mediacenterextender.htm, 2 pgs.
Windows® XP Media Center Edition 2005, "Experience more entertainment", retrieved from http://download.microsoft.com/download/c/9/a/c9a7000a-66b3-455b-860b-1c16f2eecfec/MCE.pdf on May 9, 2007, 2 pgs.
Written Opinion for International Application No. PCT/US2007/063950 filed Mar. 14, 2007, report completed Mar. 1, 2008; dated Mar. 19, 2008, 6 pgs.
Written Opinion for International Application No. PCT/US2009/046588, completed Jul. 14, 2009, dated Jul. 23, 2009, 5 pgs.
Invitation to Pay Add'l Fees Rcvd for International Application PCT/US14/39852, dated Sep. 25, 2014, 2 pgs.
3GPP TS 26.247, V1.3.0, 3rd Generation Partnership Project; Technical Specification Group Services and System Aspects Transparent end-to-end Packet-switches Streaming Services (PSS);, Progressive Download and Dynamic Adaptive Streaming over HTTP (3GP-DASH) (Release 10), Mar. 2011, 72 pgs.
"Adaptive Streaming Comparison", Jan. 28, 2010, 5 pgs.
"Best Practices for Multi-Device Transcoding", Kaltura Open Source Video, Printed on Nov. 27, 2013 from knowledge.kaltura.com/best-practices-multi-device-transcoding, 13 pgs.
"Container format (digital)", printed Aug. 22, 2009 from http://en.wikipedia.org/wiki/Container_format_(digital), 4 pgs.
"Diagram | Matroska", Dec. 17, 2010, Retrieved from http://web.archive.org/web/20101217114656/http:l/matroska.org/technical/diagram/index.html on Jan. 29, 2016, Dec. 17, 2010, 5 pgs.
"Draft CR: Trick Mode for HTTP Streaming", 3GPP TSG-SA4 Meeting #58, Apr. 26-30, 2010, Vancouver, Canada, S4-100237, 3 pgs.
"DVD—MPeg differences", printed Jul. 2, 2009 from http://dvd.sourceforge.net/dvdinfo/dvdmpeg.html, 1 page.
"DVD subtitles", sam.zoy.org/writings/dvd/subtitles, dated Jan. 9, 2001, printed Jul. 2, 2009, 4 pgs.
"Final Committee Draft of MPEG-4 streaming text format", International Organisation for Standardisation, Feb. 2004, 22 pgs.
"IBM Spearheading Intellectual Property Protection Technology for Information on the Internet; Cryptolope Containers Have Arrived", May 1, 1996, Business Wire, Printed on Aug. 1, 2014 from http://www.thefreelibrary.com/IBM+Spearheading+Intellectual+Property+Protection+Technology+for . . . -a018239381, 6 pgs.
"Information Technology—Coding of audio-visual objects—Part 14: MP4 file format", International Standard, ISO/IEC 14496-14, First Edition, Nov. 15, 2003, 18 pgs.
"Information Technology—Coding of audio-visual objects—Part 17: Streaming text", International Organisation for Standardisation, Feb. 2004, 22 pgs.
"Information technology—Coding of audio-visual objects—Part 18: Font compression and streaming", ISO/IEC 14496-18, First edition Jul. 1, 2004, 26 pgs.
"Information technology—Generic coding of moving pictures and associated audio information: Systems", International Standard ISO/IEC 13818-1, Second Edition, Dec. 1, 2000, 174 pgs (presented in two parts).
"Information-Technology—Generic coding of moving pictures and associated audio: Systems, Recommendation H.222.0", International Standard, ISO/IEC 13818-1, Draft 1209, Apr. 25, 1995, 151 pgs.

(56) **References Cited**

OTHER PUBLICATIONS

"Information-Technology—Generic coding of moving pictures and associated audio: Systems, Recommendation H.222.0", International Standard, ISO/IEC 13818-1, Draft 1540, Nov. 13, 1994, 161 pgs.
"Innovation of technology arrived", I-O Data, Nov. 2004, Retrieved from http://www.iodata.com/catalogs/AVLP2DVDLA_Flyer200505.pdf on May 30, 2013, 2 pgs., I-O Data, 2 pgs.
KISS Players, "KISS DP-500", retrieved from http://www.kiss-technology.com/?p=dp500 on May 4, 2007, 1 page.
"Matroska", Wkipedia, Jul. 10, 2017, retrieved from https://en.wikipedia.org/wiki/Matroska on Jul. 20, 2017, 3 pgs.
"Matroska Streaming | Matroska", Retrieved from the Internet: URL:http://web.archive.org/web/201 0121711431 O/http://matroska.org/technical!streaming/index.html [retrieved on Jan. 29, 2016], Dec. 17, 2010, 2 pgs.
"MovieLabs Specification for Next Generation Video—Version 1.0", Motion Picture Laboratories, Inc., 2013, Retrieved from: http://movielabs.com/ngvideo/MovieLabs%20Specification%20for%20Next%20Generation%20Video%20v1.0.pdf, 5 pgs.
"MPEG-2", Wkipedia, Jun. 13, 2017, retrieved from https://en.wikipedia.org/wiki/MPEG-2 on Jul. 20, 2017, 13 pgs.
"MPEG-4 File Format, Version 2", Sustainability of Digital Formats: Planning for Library of Congress Collections, Retrieved from: https://www.loc.gov/preservation/digital/formats/fdd/fdd000155.shtml, Last updated Feb. 21, 2017, 8 pgs.
"MPEG-4 Part 14", Wikipedia, Jul. 10, 2017, retrieved from https://en.wikipedia.org/wiki/MPEG-4_Part_14 on Jul. 20, 2017, 5 pgs.
"Netflix turns on subtitles for PC, Mac streaming", Yahoo! News, Apr. 21, 2010, Printed on Mar. 26, 2014, 3 pgs.
"OpenDML AVI File Format Extensions", OpenDML AVI M-JPEG File Format Subcommittee, retrieved from www.the-labs.com/Video/odmlff2-avidef.pdf, Sep. 1997, 42 pgs.
"OpenDML AVI File Format Extensions Version 1.02", OpenDMLAVI MJPEG File Format Subcommittee. Last revision: Feb. 28, 1996. Reformatting: Sep. 1997, 56 pgs.
"QCast Tuner for PS2", printed May 11, 2009 from http://web.archive.org/web/20030210120605/www.divx.com/software/detail.php?i e=39, 2 pgs.
"Series H: Audiovisual and Multimedia Systems Infrastructure of audiovisual services—Coding of moving video; High efficiency video coding", International Telecommunication Union, ITU-T H.265, Apr. 2015, 634 pages (presented in six parts).
"Smooth Streaming Client", The Official Microsoft IIS Site, Sep. 24, 2010, 4 pgs.
"Specifications | Matroska", Retrieved from the Internet: URL:http://web.archive.org/web/201 00706041303/http:/1www.matroska.org/technical/specs/index.html [retrieved on Jan. 29, 2016, Jul. 6, 2010, 14 pgs.
"Specifications Matroska", Dec. 17, 2010, [retrieved on Mar. 2, 2018], 12 pgs.
"Supplementary European Search Report for Application No. EP 10834935", International Filing Date Nov. 15, 2010, Search Completed May 27, 2014, 9 pgs.
"Supported Media Formats", Supported Media Formats, Android Developers, Printed on Nov. 27, 2013 from developer.android.com/guide/appendix/media-formats.html, 3 pgs.
"Text of ISO/IEC 14496-18/COR1, Font compression and streaming", ITU Study Group 16—Video Coding Experts Group—ISO/IEC MPEG & ITU-T VCEG(ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 06), No. N8664, Oct. 27, 2006, 8 pgs.
"Text of ISO/IEC 14496-18/FDIS, Coding of Moving Pictures and Audio", ITU Study Group 16—Videocoding Experts Group—ISO/IEC MPEG & ITU-T VCEG(ISO/IEC JTC1/SC29/WG11 and ITU-T SG16 06), No. N6215, Dec. 2003, 26 pgs.
"Thread: SSME (Smooth Streaming Medial Element) config.xml review (Smooth Streaming Client configuration file)", Printed on Mar. 26, 2014, 3 pgs.
"Transcoding Best Practices", From movideo, Printed on Nov. 27, 2013 from code.movideo.com/Transcoding_Best_Practices, 5 pgs.
"Using HTTP Live Streaming", iOS Developer Library, http://developer.apple.com/library/ios/#documentation/networkinginternet/conceptual/streamingmediaguide/UsingHTTPLiveStreaming/UsingHTTPLiveStreaming.html#//apple_ref/doc/uid/TP40008332-CH102-SW1, Feb. 11, 2014, 10 pgs.
"Video Manager and Video Title Set IFO file headers", printed Aug. 22, 2009 from http://dvd.sourceforge.net/dvdinfo/ifo.htm, 6 pgs.
"What is a DVD?", printed Aug. 22, 2009 from http://www.videohelp.com/dvd, 8 pgs.
"What is a VOB file", http://www.mpucoder.com/DVD/vobov.html, printed on Jul. 2, 2009, 2 pgs.
"What's on a DVD?", printed Aug. 22, 2009 from http://www.doom9.org/dvd-structure.htm, 5 pgs.
U.S. Appl. No. 13/224,298, "Final Office Action Received", dated May 19, 2014, 26 pgs.
U.S. Appl. No. 13/905,804, "Non-Final Office Action Received", dated Jul. 25, 2014, 15 pgs.
Adams et al, "Will http adaptive streaming become the dominant mode of video delivery in cable networks?", https://www.nctatechnicalpapers.com/Paper/2011/2011-will-http-adaptive-streaming-become-the-dominant-mode-of-video-delivery-in-cable-networks-, 10 pgs.
Adhikari et al., "Unreeling Netflix: Understanding and Improving Multi-CDN Movie Delivery", 2012 Proceedings IEEE InfoCom, Mar. 25-30, 2012, Orlando, Florida, 9 pgs.
Adzic et al., "Optimized Adaptive HTTP Streaming for Mobile Devices", International Society for Optics and Photonics, Applications of Digital Image Processing XXXIV, vol. 8135, Sep. 2011, 10 pgs.
Akhshabi et al., "An Experimental Evaluation of Rate-Adaptation Algorithms in Adaptive Streaming over HTTP", MMSys'11, Feb. 23-25, 2011, 12 pgs.
Anonymous, "Method for the encoding of a compressed video sequence derived from the same video sequence compressed at a different bit rate without loss of data", ip.com, ip.com No. IPCOM000008165D, May 22, 2002, 9 pgs.
Author Unknown, "Blu-ray Disc—Blu-ray Disc—Wikipedia, the free encyclopedia", printed Oct. 30, 2008 from http://en.wikipedia.org/wiki/Blu-ray_Disc, 11 pgs.
Author Unknown, "Blu-ray Movie Bitrates Here—Blu-ray Forum", printed Oct. 30, 2008 from http://forum.blu-ray.com/showthread.php?t=3338, 6 pgs.
Author Unknown, "MPEG-4 Video Encoder: Based on International Standard ISO/IEC 14496-2", Patni Computer Systems, Ltd., printed Jan 24, 2007, USA, pp. 1-15.
Author Unknown, "O'Reilly—802.11 Wireless Networks: The Definitive Guide, Second Edition", printed Oct. 30, 2008 from http://oreilly.com/catalog/9780596100520, 2 pgs.
Author Unknown, "Tunneling QuickTime RTSP and RTP over HTTP", Published by Apple Computer, Inc.: 1999 (month unknown), 6 pgs.
Author Unknown, "Turbo-Charge Your Internet and PC Performance", printed Oct. 30, 2008 from Speedtest.net—The Global Broadband Speed Test, 1 page.
Author Unknown, "White paper, The New Mainstream Wireless LAN Standard", Broadcom Corporation, Jul. 2003, 12 pgs.
Blasiak, "Video Transrating and Transcoding: Overview of Video Transrating and Transcoding Technologies", Ingenient Technologies, TI Developer Conference, Aug. 6-8, 2002, 22 pgs.
Bloom et al., "Copy Protection for DVD Video", Proceedings of the IEEE, vol. 87, No. 7, Jul. 1999, pp. 1267-1276.
Bocharov et al., "Portable encoding of audio-video objects: The Protected Interoperable File Format (PIFF)", Microsoft Corporation, Sep. 8, 2009, Revised: Mar. 9, 2010, 32 pgs.
Bross et al., "High Efficiency Video Coding (HEVC) text specification draft 10 (for FDIS & Last Call)", Joint Collaborative Team on Video Coding (JCT-VC) of ITU-T SG 16 WP 3 and ISO/IEC JTC 1/SC 29/WG 11, Document: JCTVC-L1003_v34, 12th Meeting: Geneva, CH, Jan. 14-23, 2013, 310 pgs (presented in three parts).
Casares et al., "Simplifying Video Editing Using Metadata", DIS2002, 2002, pp. 157-166.

(56) **References Cited**

OTHER PUBLICATIONS

Concolato et al., "Live HTTP Streaming of Video and Subtitles within a Browser", MMSys 2013, Feb. 26-Mar. 1, 2013, Oslo, Norway, 5 pgs.
Deutscher, "IIS Transform Manager Beta—Using the MP4 to Smooth Task", Retrieved from: https://web.archive.org/web/20130328111303/http://blog.johndeutscher.com/category/smooth-streaming, Blog post of Apr. 29, 2011, 14 pgs.
Eskicioglu et al., "An Integrated Approach to Encrypting Scalable Video", Proceedings IEEE International Conference on Multimedia and Expo, Aug. 26-29, 2002, Lausanne, Switzerland, 4 pgs.
Fecheyr-Lippens, "A Review of HTTP Live Streaming", Internet Citation, Jan. 25, 2010, pp. 1-37.
Gannes, "The Lowdown on Apple's HTTP Adaptive Bitrate Streaming", GigaOM, Jun. 10, 2009, 12 pgs.
Garg et al., "An Experimental Study of Throughput for UDP and VoIP Traffic in IEEE 802.11b Networks", Wireless Communications and Networkings, Mar. 2003, pp. 1748-1753.
Gast, "When is 54 Not Equal to 54? A Look at 802.11a, b and g Throughput", Aug. 8, 2003, printed Oct. 30, 2008 from www.oreillynet.com/pub/a/wireless/2003/08/08/wireless_throughput.html, 4 pgs.
Ghosh, "Enhancing Silverlight Video Experiences with Contextual Data", Retrieved from: http://msdn.microsoft.com/en-us/magazine/ee336025.aspx, 2010, 15 pgs.
Griffith, Eric, "The Wireless Digital Picture Frame Arrives", Wi-Fi Planet, printed May 4, 2007 from http://www.wi-fiplanet.com/news/article.php/3093141, Oct. 16, 2003, 3 pgs.
Hartung et al., "DRM Protected Dynamic Adaptive HTTP Streaming", MMSys 2011 Proceedings of the Second Annual ACM Conference on Multimedia Systems, San Jose, California, Feb. 23-25, 2011, pp. 277-282.
Hurtado Guzman, Juan Esteban, "Development and Implementation of an Adaptive HTTP Streaming Framework for H264/MVC Coded Media", Politecnico di Torino, Nov. 2010, 108 pgs.
Hwang et al., "Efficient and User Friendly Inter-domain Device Authentication/Access control for Home Networks", Proceedings of the 2006 International Conference on Embedded and Ubiquitous Computing, Seoul, Korea, Aug. 1-4, 2006, pp. 131-140.
Inlet Technologies, "Adaptive Delivery to iDevices", 2010, 2 pgs.
Inlet Technologies, "Adaptive delivery to iPhone 3.0", 2009, 2 pgs.
Inlet Technologies, "HTTP versus RTMP", 2009, 3 pgs.
Inlet Technologies, "The World's First Live Smooth Streaming Event: The French Open", 2009, 2 pgs.
Kaspar et al., "Using HTTP Pipelining to Improve Progressive Download over Multiple Heterogeneous Interfaces", IEEE ICC proceedings, 2010, 5 pgs.
Kim, Kyuheon, "MPEG-2 ES/PES/TS/PSI", Kyung-Hee University, Oct. 4, 2010, 66 pgs.
Kozintsev et al., "Improving last-hop multicast streaming video over 802.11", Workshop on Broadband Wireless Multimedia, Oct. 2004, pp. 1-10.
Kurzke et al., "Get Your Content Onto Google TV", Google, Retrieved from: http://commondatastorage.googleapis.com/io2012/presentations/live%20to%20website/1300.pdf, 2012, 58 pgs.
Lang, "Expression Encoder, Best Practices for live smooth streaming broadcasting", Microsoft Corporation, 2010, retrieved from http://www.streamingmedia.com/conferences/west2010/presentations/SMWest-12010-Expression-Encoder.pdf, 20 pgs.
Levkov, "Mobile Encoding Guidelines for Android Powered Devices", Adobe Systems Inc., Addendum B, Dec. 22, 2010, 42 pgs.
Li et al., "Content-Aware Playout and Packet Scheduling for Video Streaming Over Wireless Links", IEEE Transactions on Multimedia, vol. 10, No. 5, Aug. 2008, pp. 885-895.
Lian et al., "Efficient video encryption scheme based on advanced video coding", Multimed. Tools Appl. vol. 38, 2008, pp. 75-89.
Liu et al., "A Formal Framework for Component Deployment", OOPSLA 2006, Proceedings of the 21st Annual ACM SIGPLAN Conference on Object-Oriented Programming Systems, Language, and Applications, Portland, Oregon, Oct. 22-26, 2006, pp. 325-344.
Long et al., "Silver: Simplifying Video Editing with Metadata", CHI 2003: New Horizons, Apr. 5-10, 2003, pp. 628-629.
Matroska, "Diagram", Matroska, Technical/Info, Diagram, 2016, retrieved from https://www.matroska.org/technical/diagram/index.html on Jul. 20, 2017, 9 pgs.
Matroska, "Specifications", Matroska, Technical/Info, Specifications, Jun. 25, 2017, retrieved from https://www.matroska.org/technical/specs/index.html on Jul. 20, 2017, 20 pgs.
Miras, "On Quality Aware Adaptation of Internet Video", University of London, PhD dissertation, 2004, 181 pgs.
Morrison, "EA IFF 85 Standard for Interchange Format Files", Jan. 14, 1985, printed from http://www.dcs.ed.ac.uk/home/mxr/gfx/2d/IFF.txt on Mar. 6, 2006, 24 pgs.
Moscoso, Pedro Gomes, "Interactive Internet TV Architecture Based on Scalable Video Coding", Instituto Superior Techico, Universidad Technica de Lisboa, May 2011, 103 pgs.
MSDN, "Adaptive streaming, Expression Studio 2.0", Apr. 23, 2009, 2 pgs.
Nelson, "Arithmetic Coding + Statistical Modeling = Data Compression: Part 1 Arithmetic Coding", Doctor Dobb's Journal, Feb. 1991, USA, pp. 1-12.
Nelson, "Smooth Streaming Deployment Guide", Microsoft Expression Encoder, Aug. 2010, 66 pgs.
Nelson, Michael, "IBM's Cryptolopes", Complex Objects in Digital Libraries Course, Spring 2001, Retrieved from http://www.cs.odu.edu/~mln/teaching/unc/inls210/?method=display&pkg_name=cryptolopes.pkg&element_name=cryptolopes.ppt, 12 pgs.
Noboru, "Play Fast and Fine Video on Web! codec", Co.9 No. 12, Dec. 1, 2003, pp. 178-179.
Noe, A., "Matroska File Format (under construction!)", Retrieved from the Internet: URL:http://web.archive.orgweb/20070821155146/www.matroska.org/technical/specs/matroska.pdf [retrieved on Jan. 19, 2011], Jun. 24, 2007, pp. 1-51.
Noe, Alexander, "AVI File Format", http://www.alexander-noe.com/video/documentation/avi.pdf, Dec. 14, 2006, pp. 1-26.
Noe, Alexander, "Definitions", Apr. 11, 2006, retrieved from http://www.alexander-noe.com/video/amg/definitions.html on Oct. 16, 2013, 2 pgs.
Ooyala, "Widevine Content Protection", Ooyala Support Center for Developers. Ooyala, Inc., 2013. Jun. 3, 2013. http://support.ooyala.com/developers/documentation/concepts/player_v3_widevine_integration.html, 7 pgs.
Oyman et al., "Quality of Experience for HTTP Adaptive Streaming Services", IEEE Communications Magazine, Apr. 2012, vol. 50, No. 4, DOI: 10.1109/MCOM.2012.6178830, pp. 20-27.
Ozer, "The 2012 Encoding and Transcoding Buyers' Guide", Streamingmedia.com, Retrieved from: http://www.streamingmedia.com/Articles/Editorial/Featured-Articles/The-2012-Encoding-and-Transcoding-Buyers-Guide-84210.aspx, 2012, 8 pgs.
Ozer, Jan, "Adaptive Streaming in the Field", Streaming Media, Dec. 2010-Jan. 2011, pp. 36-47.
Padiadpu, Rashmi, "Towards Mobile Learning: A SCORM Player for the Google Android Platform", Master Thesis, Hamburg University of Applied Sciences, 2008, 66 pgs.
Pantos, "HTTP Live Streaming, draft-pantos-http-live-streaming-10", IETF Tools, Oct. 15, 2012, Retrieved from: http://tools.ietf.org/html/draft-pantos-http-live-streaming-10, 37 pgs.
Pantos, R., "HTTP Live Streaming: draft-pantos-http-live-streaming-06", Published by the Internet Engineering Task Force (IETF), Mar. 31, 2011, 24 pgs.
"Microsoft Announces Breakthrough Technology Enabling Simple Access to Broad Set of Digital Content, Including Music, Games, Video, Ring Tones and Pictures", Microsoft, Feb. 12, 2007, Retrieved from https://news.microsoft.com/2007/02/12/microsoft-announces-breakthrough-technology-enabling-simple-access-to-broad-set-of-digital-content-including-music-games-video-ring-tones-and-pictures/, 5 pgs.



10
12
14
Source Encoder
Content Distribution Server
Network
16
20
User Computer
User Computer
18
18


*FIG. 1A*


Source Encoder
12
Processor
12a
Volatile Memory
Source Content
12e
Title ID
12f
Crytographic Info
12g
12b
Non-Volatile Storage
Encoder Application
12d
12c

FIG. 1B


Content Distribution Server
14
Processor
14a
Volatile Memory
14b
Non-volatile Storage
14c
Container File 1
14d
Container File 2
14d
Title ID
14e
Crytographic Info
14f
Title ID
14e
Crytographic Info
14f
Title ID
14e
Crytographic Info
14f
Title ID
14e
Crytographic Info
14f

*FIG. 1C*


Playback Device
20
Processor
20a
Volatile Memory
20b
Non-Volatile Memory
20c
Client Application
20d
Crytographic Data
20e

FIG. 1D


SMIL File
30
MKVFile (Stream 1)
MKVFile (Stream 2)
MKVFile (Stream 3)
MKVFile (Stream 4)
32
32
32
32

FIG. 2


MKVFile
EBML
Segment
SeekHead
SegmentInfo
Tracks
TracksData
TracksData
Payload
Clusters
Cluster: 2 sec GOP
Cluster: 2 sec GOP
Cluster ...
Cues
Hierarchical Index
32
34
36
40
42
43
44
45
46
48
48
48
52
54

*FIG. 3*


Clusters - Audio
Cluster - Audio
Timecode = 0 sec
BlockGroup
Block t=0 sec
BlockGroup
...
Cluster - Audio
Timecode = 0 sec
BlockGroup
Block t=0 sec
BlockGroup
...
Cluster – Audio
...
46
48
60
62
64
66
68
48
48

FIG. 4b


Clusters - Video
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo
ReferenceBlock
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo
ReferenceBlock
Cluster – Video
...
46
48
60
62
64
65
66
68
48
48

FIG. 4a


46
48
60
62v
64v
65v
62a
64a
62s
64s
Clusters
Cluster
Timecode = 0 sec
BlockGroup (Video)
Block t=0 sec
DRMInfo
BlockGroup (Audio)
Block t=0 sec
BlockGroup (Subtitle)
Block t=0 sec
Cluster
Timecode = 0 sec
BlockGroup (Video)
Block t=0 sec
DRMInfo
BlockGroup (Audio)
Block t=0 sec
BlockGroup (Subtitle)
Block t=0 sec
Cluster
...

FIG. 4d


46
48
60
62
64
66
Clusters - Subtitle
Cluster - Subtitle
Timecode = 0 sec
BlockGroup
Block t=0 sec
BlockGroup
...
Cluster - Subtitle
Timecode = 0 sec
BlockGroup
Block t=0 sec
BlockGroup
...
DRMInfo
Cluster - Subtitle
...

FIG. 4c


46
48
60
62
64
65
66
48
48
Clusters - Video
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo
Cluster - Video
...

*FIG. 4e*


74
76
78
79
72
CueTrack
CueClusterPosition
CueClusterSize
CueTime
CueTrackPositions
CuePoint
CuePoint
Cues
70
70
52

*FIG. 5*


74'
78'
79'
CueClusterPosition
CueClusterSize
CueTrackPositions
CuePoint
CuePoint
...
Cues
70'
52'
70'

FIG. 5a



48
60
62
64
65
66
52
70
72
74
78
79
Cues
CuePoint
CueTime=0 sec
CueTrackPositions
CueClusterPosition
CueClusterSize
CuePoint
CueTime=2 sec
CueTrackPositions
CueClusterPosition
CueClusterSize
CuePoint
CueTime=4sec
CueTrackPositions
CueClusterPosition
CueClusterSize
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo
Cluster - Video
Timecode = 0 sec
BlockGroup
Block t=0 sec
DRMInfo
BlockGroup
...
DRMInfo


FIG. 6


52
70
54
80
Cues
CuePoint
CuePoint
CuePoint
CuePoint
CuePoint
CuePoint
...
CuePoint
CuePoint
CuePoint
CuePoint
...
CuePoint
CuePoint
CuePoint
...
HierarchicalIndex
HierarchicalIndexPoint
HierarchicalIndexPoint
HierarchicalIndexPoint
...

*FIG. 7*


100
Start
102
Write headers to MKV files
104
Encode and encrypt frames of source media using encoding parameters for each stream and a common set of frame keys
106
Insert indexes and frame key table into each MKV file
108
Encrypt frame key table
110
Insert DRMHeader including encrypted frame key table into each MKV file
Complete

FIG. 8


120
122
Start
Select portion of source video
123
Encode portion of source video using encoding parameters of each stream
124
Select frame key and encrypt each portion of video using frame key
No
125
Write DRMInfo to BlockGroup element in MKV corresponding to appropriate stream
126
Write encoded media to Cluster element in MKV corresponding to appropriate stream
127
Encoding of source media complete?
Yes
Complete

FIG. 9




FIG. 10


Client
200
HTTP Server
202
Top Level Index Request
Top Level Index Response
MKV Headers Request
MKV Headers Response
MKV Index Request
MKV Index Response
Download Loop
MKV Cluster Element(s) Request
MKV Cluster Element(s) Download

FIG. 11


Client
200
HTTP Server
202
Download Loop
MKV Cluster Element(s) Request
MKV Cluster Element(s) Download
Load Higher Bitrate Stream
Get Next Video Level URI
Cache Current Steam Properties
MKV Headers Request
MKV Headers Response
MKV Index Request
MKV Index Response
Stop Current Stream Download
Download Loop
MKV Cluster Element(s) Request
MKV Cluster Element(s) Download

FIG. 12a


Client
200
HTTP Server
202
Load Properties of Lower Bitrate Stream
Download Loop
MKV Cluster Element(s) Request
MKV Cluster Element(s) Download

FIG. 12b

# PLAYBACK DEVICES AND METHODS FOR PLAYING BACK ALTERNATIVE STREAMS OF CONTENT PROTECTED USING A COMMON SET OF CRYPTOGRAPHIC KEYS

## CROSS REFERENCE TO RELATED APPLICATIONS

The current application is a continuation of U.S. patent application Ser. No. 15/481,340, filed Apr. 6, 2017, entitled "Systems and Methods for Playing Back Alternative Streams of Protected Content Protected Using Common Cryptographic Information" to Kiefer et al., which application is a continuation of U.S. patent application Ser. No. 14/970,412, filed Dec. 15, 2015, entitled "Systems and Methods for Playing Back Alternative Streams of Protected Content Protected Using Common Cryptographic Information" to Kiefer et al., which is a continuation of U.S. patent application Ser. No. 14/564,003, filed Dec. 8, 2014 and issued on Jan. 26, 2016 as U.S. Pat. No. 9,247,311, entitled "Systems and Methods for Playing Back Alternative Streams of Protected Content Protected Using Common Cryptographic Information" to Kiefer et al., which application is a continuation of U.S. patent application Ser. No. 13/340,623, filed Dec. 29, 2011 and issued on Dec. 9, 2014 as U.S. Pat. No. 8,909,922, entitled "Systems and Methods for Playing Back Alternative Streams of Protected Content Protected Using Common Cryptographic Information" to Kiefer et al., which application claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Application Ser. No. 61/530,305 filed Sep. 1, 2011, entitled "Multi-Asset Protected Content Multimedia Delivery System", the disclosures of which are expressly incorporated by reference herein in their entirety.

## FIELD OF THE INVENTION

The present invention generally relates to adaptive streaming and more specifically to adaptive bitrate streaming of encoded media contained within Matroska container files using Hypertext Transfer Protocol.

## BACKGROUND

The term streaming media describes the playback of media on a playback device, where the media is stored on a server and continuously sent to the playback device over a network during playback. Typically, the playback device stores a sufficient quantity of media in a buffer at any given time during playback to prevent disruption of playback due to the playback device completing playback of all the buffered media prior to receipt of the next portion of media. In many instances, content is divided into multiple streams. For example, content can be divided into audio, video, and subtitle streams and some streams can be encoded as alternative streams that are suitable for different network connection bandwidths or comply with specific geographic restrictions and/or other restrictions.

Adaptive bit rate streaming or adaptive streaming involves detecting the present streaming conditions (e.g. the user's network bandwidth and CPU capacity) in real time and adjusting the quality of the streamed media accordingly by selecting between different streams encoded for use at different network connection data rates. Typically, the source media is encoded at multiple bitrates and the playback device or client switches between streaming the different encodings depending on available resources.

Adaptive streaming solutions typically utilize either Hypertext Transfer Protocol (HTTP), published by the Internet Engineering Task Force and the World Wide Web Consortium as RFC 2616 to stream media between a server and a playback device. HTTP is a stateless protocol that enables a playback device to request a byte range within a file. HTTP is described as stateless, because the server is not required to record information concerning the state of the playback device requesting information or the byte ranges requested by the playback device in order to respond to requests received from the playback device.

In adaptive streaming systems, the source media is typically stored on a media server as a top level index file pointing to a number of alternate streams that contain the actual video and audio data. Each stream is typically stored in one or more container files. Different adaptive streaming solutions typically utilize different index and media containers. The Synchronized Multimedia Integration Language (SMIL) developed by the World Wide Web Consortium is utilized to create indexes in several adaptive streaming solutions including IIS Smooth Streaming developed by Microsoft Corporation of Redmond, Wash., and Flash Dynamic Streaming developed by Adobe Systems Incorporated of San Jose, Calif. HTTP Adaptive Bitrate Streaming developed by Apple Computer Incorporated of Cupertino, Calif. implements index files using an extended M3U playlist file (.M3U8), which is a text file containing a list of URIs that typically identify a media container file. The most commonly used media container formats are the MP4 container format specified in MPEG-4 Part 14 (i.e. ISO/IEC 14496-14) and the MPEG transport stream (TS) container specified in MPEG-2 Part 1 (i.e. ISO/IEC Standard 13818-1). The MP4 container format is utilized in IIS Smooth Streaming and Flash Dynamic Streaming. The TS container is used in HTTP Adaptive Bitrate Streaming.

The Matroska container is a media container developed as an open standard project by the Matroska non-profit organization of Aussonne, France. The Matroska container is based upon Extensible Binary Meta Language (EBML), which is a binary derivative of the Extensible Markup Language (XML). Decoding of the Matroska container is supported by many consumer electronics (CE) devices. The DivX Plus file format developed by DivX, LLC of San Diego, Calif. utilizes an extension of the Matroska container format (i.e. is based upon the Matroska container format, but includes elements that are not specified within the Matroska format).

The term Digital Rights Management (DRM) is utilized to describe access control technologies that are used to control access to and/or copying of digital content. DRM systems typically involve the use of cryptographic information to control access to or protect a piece of content. Content protection is typically achieved using cryptographic information such as (but not limited to) one or more encryption keys to encrypt some or all of the content. An important component of most DRM systems is a mechanism for securely providing cryptographic information to authorized playback devices for use in accessing protected content. The protected content cannot be accessed without the cryptographic data and ideally the cryptographic data is bound to specific playback devices and cannot be readily used by unauthorized playback devices or is securely provided to the playback devices (often on a session basis).

## SUMMARY OF THE INVENTION

Systems and methods in accordance with embodiments of the invention perform adaptive bitrate streaming using alter-

native streams of protected content. One embodiment of the invention includes a processor, and memory containing a client application. In addition, the client application configures the processor to: request a top level index file identifying a plurality of alternative streams of protected content, where each of the alternative streams of protected content are encrypted using common cryptographic information; obtain the common cryptographic information; request portions of content from at least the plurality of alternative streams of protected content; access the protected content using the common cryptographic information; and playback the content.

In a further embodiment, the alternative streams of protected content are alternative streams of protected video, each of the alternative streams of protected video includes DRM information indicating portions of frames of video that are encrypted and identifying at least a portion of the common cryptographic information used to access the encrypted portions of the frames of video, and the client application configures the processor to: obtain a protected frame of video from one of the alternative streams of protected video; obtain DRM information indicating a portion of the protected frame of video that is encrypted; identify at least a portion of the common cryptographic information that is used to access the encrypted portion of the protected frame using the DRM information; decrypt the encrypted portion of the protected frame of video using the identified portion of the common cryptographic information; and decode the frame of video.

In another embodiment, each of the alternative streams of protected content is contained within a separate container file, and the top level index file identifies a container file containing each of the alternative streams.

In still further embodiment, the container files containing each of the alternative streams of protected content includes at least one header including the common cryptographic information and information that describes the encoding of the stream of protected content, and the top level index file identifies the location of the at least one header within each container file.

In still another embodiment, the common cryptographic information is a set of encryption keys.

In a yet further embodiment, the common set of encryption keys is encrypted; and the client application configures the processor to securely receive cryptographic information used to unencrypt the common set of encryption keys.

In yet another embodiment, the client application configures the processor to obtain the common cryptographic information by requesting at least one header of a container file identified in the top level index file.

In a further embodiment again, each container file containing one of the alternative streams of protected content further includes an index, and the client application configures the processor to request a portion of content from one of the container files by configuring the processor to: request at least a portion of an index from the container file; identify the portion of the container file containing a specific portion of content using the index; and request the identified portion of the container file.

In another embodiment again, the container files are Matroska container files.

In a further additional embodiment, the common cryptographic information is stored in a common DRM Header element contained within a Tracks element within each of the Matroska container files containing the alternative streams of protected content.

In another additional embodiment, the common cryptographic information is a set of encryption keys; and the set of encryption keys is encrypted and stored within the DRM Header element.

In a still yet further embodiment, the client application configures the processor to: obtain cryptographic information that can be used to unencrypt the set of encryption keys stored within the DRM Header element; and unencrypt the set of encryption keys stored within the DRM Header element using the obtained cryptographic information.

In still yet another embodiment, the client application configures the processor to obtain the DRM Header element by requesting a Tracks element from one of the Matroska container files identified in the top level index file.

In a still further embodiment again, each Mastroska container file containing an alternative stream of protected content further includes an index contained within a Cues element, and the client application configures the processor to request a portion of content from one of the Matroska container files by configuring the processor to: request at least a portion of a Cues element from a Matroska container file containing one of the alternative streams of protected content; identify a portion of the Matroska container file containing a specific portion of content using at least one CueTrackPosition element within the Cues element; and request the portion of the Matroska container file identified by the at least one CueTrackPosition element.

In still another embodiment again, the index includes a plurality of CueTrackPosition elements that identify the location of a plurality of Cluster elements within the Matroska container file.

In a still further additional embodiment, each Cluster element contains a plurality of BlockGroup elements including encoded portions of content, a CueTrack Position element indexes each Cluster element, and each CueTrackPosition element includes the size of the Cluster element that it indexes.

In still another additional embodiment, the alternative streams of protected content are alternative streams of protected video, each of the Matroska container files containing an alternative stream of protected video includes a DRMInfo element in a BlockGroup element containing a protected frame of video, where the DRMInfo element indicates at least a portion of the protected frames of video that is encrypted and identifies at least a portion of the common cryptographic information used to access the at least one encrypted portion of the protected frame of video, and the client application configures the processor to access video frames in a stream of protected video using the common cryptographic information by configuring the processor to: obtain a BlockGroup containing a protected frame of video; parse the BlockGroup element to obtain a DRMInfo element indicating at least a portion of the protected frame of video that is encrypted using an encryption key from the set of encryption keys; decrypt the at least one encrypted portion of the protected frame of video using the identified encryption key; and decode the frame of video.

An embodiment of the method of the invention includes requesting a top level index file identifying a plurality of alternative streams of protected content using a playback device, where each of the alternative streams of protected content are encrypted using common cryptographic information, obtaining the common cryptographic information using the playback device, requesting portions of content from at least the plurality of alternative streams of protected content using the playback device, accessing the protected

content using the playback device and the common cryptographic information, and playing back the content using the playback device.

In a further embodiment of the method of the invention, the alternative streams of protected content are alternative streams of protected video, each of the alternative streams of protected video includes DRM information indicating portions of frames of video that are encrypted and identifying at least a portion of the common cryptographic information used to access the encrypted portions of the frames of video, and the method further includes obtaining a protected frame of video from one of the alternative streams of protected video using the playback device, obtaining DRM information indicating a portion of the protected frame of video that is encrypted using the playback device, identify at least a portion of the common cryptographic information that is used to access the encrypted portion of the protected frame using the playback device and the DRM information, decrypting the encrypted portion of the protected frame of video using the playback device and the identified portion of the common cryptographic information, and decoding the frame of video using the playback device.

In another embodiment of the method of the invention, each of the alternative streams of protected content is contained within a separate container file, and the top level index file identifies a container file containing each of the alternative streams.

In a still further embodiment of the method of the invention, the container files containing each of the alternative streams of protected content include at least one header including the common cryptographic information and information that describes the encoding of the stream of protected content, and the top level index file identifies the location of the at least one header within each container file.

In still another embodiment of the method of the invention, the common cryptographic information is a set of encryption keys.

In a yet further embodiment of the method of the invention, the set of encryption keys is encrypted so that it is accessible using cryptographic information obtained by the playback device, and the method further comprising obtaining cryptographic information using the playback device.

In yet another embodiment of the method of the invention, the set of encryption keys is encrypted using at least one encryption key, and the playback device securely obtains the at least one encryption key.

In a further embodiment again of the method of the invention, the at least one encryption key is encrypted using at least one encryption key included in the cryptographic information bound to the playback device.

Another embodiment again of the method of the invention also includes obtaining the common cryptographic information by requesting at least one header of a container file identified in the top level index file using the playback device.

In a further additional embodiment of the method of the invention, each container file containing one of the alternative streams of protected content further includes an index, and the method further includes: requesting at least a portion of an index from the container file using the playback device; identify the portion of the container file containing a specific portion of content using the playback device and the index; and requesting the identified portion of the container file using the playback device.

In another additional embodiment of the method of the invention, the container files are Matroska container files.

In a still yet further embodiment of the method of the invention, the common cryptographic information is stored in a common DRM Header element contained within a Tracks element within each of the Matroska container files containing the alternative streams of protected content.

In still yet another embodiment of the method of the invention, the common cryptographic information is a set of encryption keys, and the set of encryption keys is encrypted and stored within the DRM Header element.

In a still further embodiment again of the method of the invention, the set of encryption keys is encrypted so that it is accessible using cryptographic information obtained by the playback device, and the method further comprising obtaining cryptographic information using the playback device.

Still another embodiment again of the method of the invention also includes obtaining the DRM Header element by requesting a Tracks element from one of the Matroska container files identified in the top level index file.

In a still further additional embodiment of the method of the invention, each Mastroska container file containing an alternative stream of protected content further includes an index contained within a Cues element, and the method further includes: requesting at least a portion of a Cues element from a Matroska container file containing one of the alternative streams of protected content using the playback device; identifying a portion of the Matroska container file containing a specific portion of content using the playback device and at least one CueTrackPosition element within the Cues element; and requesting the portion of the Matroska container file identified by the at least one CueTrackPosition element.

In still another additional embodiment of the method of the invention, the index includes a plurality of CueTrackPosition elements that identify the location of a plurality of Cluster elements within the Matroska container file.

In a yet further embodiment again of the method of the invention, each Cluster element contains a plurality of BlockGroup elements including encoded portions of content, a CueTrack Position element indexes each Cluster element, and each CueTrackPosition element includes the size of the Cluster element that it indexes.

In yet another embodiment again of the method of the invention, the alternative streams of protected content are alternative streams of protected video, each of the Matroska container files containing an alternative stream of protected video includes a DRMInfo element in a BlockGroup element containing a protected frame of video, where the DRMInfo element indicates at least a portion of the protected frames of video that is encrypted and identifies at least a portion of the common cryptographic information used to access the at least one encrypted portion of the protected frame of video, and the method further includes: obtaining a BlockGroup containing a protected frame of video using the playback device; parsing the BlockGroup element to obtain a DRMInfo element indicating at least a portion of the protected frame of video that is encrypted using the playback device and an encryption key from the set of encryption keys; decrypting the at least one encrypted portion of the protected frame of video using the playback device and the identified encryption key; and decoding the frame of video using the playback device.

Another further embodiment includes a machine readable medium containing processor instructions, where execution of the instructions by a processor causes the processor to perform a process including request a top level index file identifying a plurality of alternative streams of protected

content, where each of the alternative streams of protected content are encrypted using common cryptographic information, obtaining the common cryptographic information, requesting portions of content from at least the plurality of alternative streams of protected content, accessing the protected content using the common cryptographic information, and playing back the content.

In still another further embodiment, the alternative streams of protected content are alternative streams of protected video, each of the alternative streams of protected video includes DRM information indicating portions of frames of video that are encrypted and identifying at least a portion of the common cryptographic information used to access the encrypted portions of the frames of video, and execution of the instructions by a processor also causes the processor to perform a process including: obtaining a protected frame of video from one of the alternative streams of protected video; obtaining DRM information indicating a portion of the protected frame of video that is encrypted; identify at least a portion of the common cryptographic information that is used to access the encrypted portion of the protected frame using the DRM information; decrypting the encrypted portion of the protected frame of video using and the identified portion of the common cryptographic information; and decoding the frame of video.

In yet another further embodiment, the machine readable medium is non-volatile memory.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A is a network diagram of an adaptive bitrate streaming system in accordance with an embodiment of the invention.

FIG. **1**B is a block diagram illustrating a source encoder in accordance with an embodiment of the invention.

FIG. **1**C is a block diagram illustrating a content distribution server in accordance with an embodiment of the invention.

FIG. **1**D is a block diagram illustrating a playback device in accordance with an embodiment of the invention.

FIG. **2** conceptually illustrates a top level index file and Matroska container files generated by the encoding of source media in accordance with embodiments of the invention.

FIG. **3** conceptually illustrates a specialized Matroska container file incorporating a TracksData Payload containing cryptographic information in accordance with an embodiment of the invention.

FIGS. **4***a*-**4***c* conceptually illustrate the insertion of different types of protected media into the Clusters element of a Matroska container file subject to various constraints that facilitate adaptive bitrate streaming in accordance with embodiments of the invention.

FIG. **4***d* conceptually illustrates the multiplexing of different types of protected media into the Clusters element of a Matroska container file subject to various constraints that facilitate adaptive bitrate streaming in accordance with an embodiment of the invention.

FIG. **4***e* conceptually illustrates the inclusion of a protected trick play track into the Clusters element of a Matroska container file subject to various constraints that facilitate adaptive bitrate streaming in accordance with an embodiment of the invention.

FIG. **5** conceptually illustrates a modified Cues element of a specialized Matroska container file, where the Cues element includes information enabling the retrieval of Cluster elements using HTTP byte range requests in accordance with an embodiment of the invention.

FIG. **5***a* conceptually illustrates a modified Cues element of a specialized Matroska container file in accordance with an embodiment of the invention, where the Cues element is similar to the Cues element shown in FIG. **5** with the exception that attributes that are not utilized during adaptive bitrate streaming are removed.

FIG. **6** conceptually illustrates the indexing of Cluster elements within a specialized Matroska container file utilizing modified CuePoint elements within the container file in accordance with embodiments of the invention.

FIG. **7** conceptually illustrates the use of a hierarchical index to index CuePoint elements within a Matroska container file in accordance with embodiments of the invention.

FIG. **8** is a flow chart illustrating a process for encoding and protecting source media for adaptive bitrate streaming in accordance with an embodiment of the invention.

FIG. **9** is a flow chart illustrating a process for encoding and encrypting frames of source video in accordance with an embodiment of the invention.

FIG. **10** conceptually illustrates a DRM header element that can be included in a Matroska container file in accordance with an embodiment of the invention.

FIG. **11** conceptually illustrates communication between a playback device and an HTTP server associated with the commencement of streaming of encoded media contained within Matroska container files indexed by a top level index file in accordance with an embodiment of the invention.

FIGS. **12***a* and **12***b* conceptually illustrate communication between a playback device and an HTTP server associated with switching between streams in response to the streaming conditions experienced by the playback device prior to the decision to switch streams in accordance with embodiments of the invention.

## DETAILED DISCLOSURE OF THE INVENTION

Turning now to the drawings, systems and methods for performing adaptive bitrate streaming using alternative streams of protected content in accordance with embodiments of the invention are illustrated. In a number of embodiments, source media is encoded as a number of alternative streams and the alternative streams are protected using a common set of cryptographic information. In many embodiments, the alternative streams are video streams and each stream is protected by encrypting at least a portion of a plurality of video frames within the stream using the common set of cryptographic information. In several embodiments, the common set of cryptographic information is a set of frame keys. In order to protect a video frame, a frame key can be selected from the set of frame keys and used to encrypt at least a portion of the encoded frame and DRM information can be provided with the protected frame indicating the frame key utilized to perform the encryption and the location of the encrypted portion within the frame. By encrypting each of the alternative streams using the same set of cryptographic information, a playback device can switch between streams without the need to maintain or acquire multiple sets of cryptographic information in memory or to reinitialize the decryption engine of the playback device with a different set of cryptographic information.

In many embodiments, each of the alternative streams is stored in a separate container file referenced by a top level index file. In several embodiments, the common cryptographic information is embedded in each of the container files so that a playback device has access to the cryptographic information irrespective of which alternative is

initially select to commence playback of the media. The common cryptographic information can be stored on a content distribution system and associated with a title identifier or title ID that uniquely identifies the source content used to create the alternative streams. When a new alternative stream is generated, a source encoder can utilize the title ID to request the common cryptographic information from the content distribution system and the common cryptographic information can be utilized to encrypt the new alternative stream and embedded in a container file created to contain the new encrypted alternative stream.

In several embodiments, each stream associated with a piece of source content and/or title ID is stored in a Matroska (MKV) container file. In many embodiments, the Matroska container file is a specialized Matroska container file in that the manner in which the media in each stream is encoded and stored within the container is constrained to improve streaming performance. In several embodiments, the Matroska container file is further specialized in that additional DRM elements (i.e. elements that are not specified as part of the Matroska container format) can be included within the file to facilitate the distribution of protected media during adaptive bitrate streaming. In a number of embodiments, common cryptographic information is included within a DRM header element in each of the Matroska container files and references to the common cryptographic information are made using DRMInfo elements within a BlockGroup element corresponding to a specific frame of encrypted video. In other embodiments, any of a variety of mechanisms can be utilized to store DRM information within a Matroska container in accordance with embodiments of the invention. In several embodiments, each stream (i.e. audio, video, or subtitle) is stored within a separate Matroska container file. In other embodiments, an encoded video stream is multiplexed with one or more encoded audio, and/or subtitle streams in each Matroska container file.

A top level index file containing an index to the streams contained within each of the container files is also generated to enable adaptive bitrate streaming of the encoded media. In many embodiments, the top level index file is a Synchronized Multimedia Integration Language (SMIL) file containing URIs for each of the Matroska container files. In other embodiments, any of a variety of file formats can be utilized in the generation of the top level index file.

The performance of an adaptive bitstrate streaming system in accordance with embodiments of the invention can be significantly enhanced by encoding each portion of the source video at each bit rate in such a way that the portion of video is encoded in each stream as a single (or at least one) closed group of pictures (GOP) starting with an Instantaneous Decoder Refresh (IDR) frame. The GOP for each stream can then be stored as a Cluster element within the Matroska container file for the stream. In this way, the playback device can switch between streams at the completion of the playback of a Cluster and, irrespective of the stream from which a Cluster is obtained the first frame in the Cluster will be an IDR frame and can be decoded without reference to any encoded media other than the encoded media contained within the Cluster element. In many embodiments, the sections of the source video that are encoded as GOPs are all the same duration. In a number of embodiments each two second sequence of the source video is encoded as a GOP.

Adaptive streaming of source media encoded in the manner outlined above can be coordinated by a playback device in accordance with embodiments of the invention.



The playback device obtains information concerning each of the available streams from the top level index file and selects one or more streams to utilize in the playback of the media. The playback device can then obtain header information from the Matroska container files containing the one or more bitstreams or streams, and the headers provide information concerning the decoding of the streams including a DRM header, which contains the cryptographic information utilized to protect the stream. The playback device can also request index information that indexes the encoded media stored within the relevant Matroska container files. The index information can be stored within the Matroska container files or separately from the Matroska container files in the top level index or in separate index files. The index information enables the playback device to request byte ranges corresponding to Cluster elements within the Matroska container file containing specific portions of encoded media via HTTP from the server. As the playback device receives the Cluster elements from the HTTP server, the playback device can evaluate current streaming conditions to determine whether to increase or decrease the bitrate of the streamed media. In the event that the playback device determines that a change in bitrate is necessary, the playback device can obtain header information and index information for the container file(s) containing the desired stream(s) (assuming the playback device has not already obtained this information). The playback device need not perform the computationally intensive process of accessing the encrypted cryptographic information in the header of the new stream, because each of the alternative streams uses common cryptographic information. The index information can then be used to identify the byte range of the Cluster element containing the next portion of the source media encoded at the desired bit rate and the identified Cluster element can be retrieved from the server via HTTP. The next portion of the source media that is requested is typically identified based upon the Cluster elements already requested by the playback device and the Cluster elements buffered by the playback device. The next portion of source media requested from the alternative stream is requested to minimize the likelihood that the buffer of the playback device will underflow (i.e. run out media to playback) prior to receipt of the Cluster element containing the next portion of source media by the playback device. In this way, the playback device can achieve adaptive bitrate streaming by retrieving sequential Cluster elements from the various streams as appropriate to the streaming conditions using the top level index and index information describing the Cluster elements within each of the Matroska container files.

In a number of embodiments, variation in the bitrate between different streams can be achieved by modifying the encoding parameters for each stream including but not limited to the bitrate, frame rate, resolution and sample aspect ratio. The encoding and protection of source video using common cryptographic information for use in adaptive bitrate streaming and the playback of alternative streams of protected content via adaptive bitrate streaming in accordance with embodiments of the invention is discussed further below.

## Adaptive Streaming System Architecture

An adaptive bitrate streaming system in accordance with an embodiment of the invention is illustrated in FIG. **1**. The adaptive streaming system **10** includes a source encoder **12** configured to encode source media as a number of alternative streams and to protect the encoded streams using common cryptographic information. Alternative streams are streams that encode the same media content in different

ways. In several embodiments, the source encoder **12** ingests source content and obtains a title ID and common cryptographic information from a content distribution server **14** that the content distribution server assigns to the source content. The source encoder encodes the alternative streams and protects the streams using the common cryptographic information received from the content distribution server. In many instances, alternative streams encode media content (such as but not limited to video) at different maximum bitrates. In a number of embodiments, the alternative streams are encoded with different resolutions, sample aspect ratios and/or frame rates. When the streams are written to file(s), the common cryptographic information is also written to the file(s). The content distribution server **14** can receive request to access the alternative streams of content (i.e. the title) via the Internet from a playback device such as (but not limited to) a user computer **18** or a mobile phone **20** and can commence streaming content. In several embodiments, the common cryptographic information is protected by encrypting at least a portion of the common cryptographic information using at least one encryption key. The playback device can securely obtain the cryptographic key using a process such as (but not limited to) Hypertext Transfer Protocol Secure or HTTPS. Other processes for securely obtaining cryptographic information to obtain access to encrypted common cryptographic information in accordance with embodiments of the invention are discussed below.

In many embodiments, a playback device commences playback by requesting a top level index file from the content distribution server. The source encoder **12**, the content distribution server **14**, or another server can generate the top level index to the file(s) containing the streams, at least a plurality of which are alternative streams, at the time the request is made or at the time the streams are generated by the source encoder. The playback device can then use HTTP or another appropriate stateless protocol to request portions of the top level index file and the file(s) containing the protected streams via a network **16** such as the Internet.

In many embodiments, the top level index file is a SMIL file and the media is stored in Matroska container files. As is discussed further below, the media can be stored within the Matroska container file in a way that facilitates the protection of the content using common cryptographic information. In many embodiments, the Matroska container files are specialized Matroska container files that include enhancements (i.e. elements that do not form part of the Matroska file format specification) that facilitate retrieval and decryption using common cryptographic information of specific portions of media during adaptive bitrate streaming.

Although a specific content distribution system configured to support adaptive bitrate streaming is illustrated in FIG. **1**A, any of a variety of content distribution system architectures can be utilized to implement an adaptive bitrate streaming system in accordance with embodiments of the invention. Source encoders, content distribution server systems, and playback devices in accordance with embodiments of the invention are discussed further below.

Source Encoders

In many embodiments, a source encoder can be implemented using a server. In other embodiments, the source encoder can be any processing device including a processor and sufficient resources to perform the transcoding and encryption of source media (including but not limited to video, audio, and/or subtitles). A source encoder in accordance with an embodiment of the invention is illustrated in FIG. **1**B. The source encoder **12** is implemented on a computing platform including a processor **12***a*, volatile memory **12***b* and non-volatile storage **12***c*. An encoder application **12***d* is stored in non-volatile storage **12***c*. The encoder application includes the machine readable instructions that configure the processor to encode source content **12***e* as a plurality of streams. In a number of embodiments, the encoder application also configures the source encoder to obtain common cryptographic information **12***g* that can be utilized to protect alternative streams generated using the source content **12***e*. In many embodiments, the source encoder obtains the common cryptographic information and a title ID from a content distribution system. In other embodiments, the source encoder generates a title ID and/or cryptographic data and provides the generated information to a content distribution system.



Although a specific source encoder in accordance with embodiments of the invention is illustrated in FIG. **1**B, any of a variety of computing platforms can be utilized to implement a source encoder that is configured to encode at least one stream of source content as a plurality of alternative streams and to protect each of the alternative streams using common cryptographic information in accordance with embodiments of the invention.

Content Distribution Servers

Content distribution servers in accordance with embodiments of the invention can be responsible for storing protected streams of content for streaming to playback devices using adaptive bitrate streaming processes. Content distribution servers can also store common cryptographic information utilized to protect the alternative streams of protected content. In several embodiments, the common cryptographic information is identified utilizing a title ID associated with the common cryptographic information and a set of streams that form part of a specific title or piece of content. A content distribution server in accordance with an embodiment of the invention is illustrated in FIG. **1**C. The content distribution server is implemented using a computing platform including a processor **14***a*, volatile memory **14***b*, and non-volatile storage **14***c*. In the illustrated embodiment, a plurality of container files **14***d* are stored on the content distribution server. Playback devices can stream content from the content distribution server utilizing adaptive bitrate streaming processes in accordance with embodiments of the invention. To facilitate the creation of new streams with respect to a specific piece of content, the content distribution server also stores title IDs **14***e* for specific pieces of content and common cryptographic information **14***f* associated with each title ID. A source encoder can request common cryptographic information to protect a new stream related to a specific piece of content, by providing a request to the content distribution server that identifies the specific piece of content using the title ID assigned to it.

Although a specific content distribution server is illustrated in FIG. **1**C, any of a variety of computational platform including (but not limited to) platforms in which container files and common cryptographic information are stored on separate servers can be utilized in content distribution systems in accordance with embodiments of the invention.

Playback Devices

Referring back to FIG. **1**A, the illustrated playback devices include personal computers **18** and mobile phones **20**. In other embodiments, playback devices can include consumer electronics devices such as DVD players, Blu-ray players, televisions, set top boxes, video game consoles, tablets, and other devices that are capable of playing back protected media stored on a content distribution server using adaptive bitrate streaming. A playback device in accordance

with an embodiment of the invention is illustrated in FIG. **1**D. The playback device is implemented on a processing platform **20** including a processor **20***a*, volatile memory **20***b*, and non-volatile memory (or other non-volatile storage) **20***c*. The non-volatile memory **20***c* contains a client application **20***d*, which includes machine readable instructions that can be utilized to configure the processor to register with a content distribution system to obtain cryptographic data **20***e* bound to the playback device. The playback device can then use the bound cryptographic data **20***e* to request adaptive bitrate streaming of protected content. As is discussed further below, the alternative streams of protected content utilized to perform adaptive bitrate streaming are protected using common cryptographic information. Once the client application **20***d* has obtained the common cryptographic information, which can be a time consuming and/or computationally intensive process, the playback device can use the same cryptographic information to access content in any of the alternative streams of protected content within a single instance of a title.

Although a specific architecture for a playback device is shown in FIG. **1**D any of a variety of architectures can be utilized that enable playback devices to request portions of the top level index file and the container files in accordance with embodiments of the invention.

File Structure

Files generated by a source encoder and/or stored on an HTTP server for streaming to playback devices in accordance with embodiments of the invention are illustrated in FIG. **2**. The files utilized in the adaptive bitrate streaming of the source media include a top level index **30** and a plurality of container files **32** that each contain at least one stream. The top level index file describes the content of each of the container files. As is discussed further below, the top level index file can take a variety of forms including an SMIL file and the container files can take a variety of forms including a specialized Matroska container file.

In many embodiments, each Matroska container file contains a single protected stream. For example, the stream could be one of a number of alternate video streams protected using common cryptographic information, an audio stream, one of a number of alternate audio streams, a subtitle stream, one of a number of alternate subtitle streams, a trick play stream, or one of a number of alternate trick play streams protected using common cryptographic information. In several embodiments, the Matroska container file includes multiple multiplexed streams. For example, the Matroska container could include a video stream, and one or more audio streams, one or more subtitle streams, and/or one or more trick play streams. As is discussed further below, in many embodiments the Matroska container files are specialized files. The encoding of the media and the manner in which the media is stored within Cluster elements within the Matroska container file can be subject to constraints designed to enhance the performance of an adaptive bitrate streaming system. In a number of embodiments, common cryptographic information is included within a DRM header element in each of the Matroska container files and references to the common cryptographic information are made using DRMInfo elements included within BlockGroup elements of protected (not all frames need be protected to protect the stream). In addition, the Matroska container file can include index elements that facilitate the location and downloading of Cluster elements from the various Matroska container files during the adaptive streaming of the media. Top level index files and Matroska container files that can be used in adaptive bitrate streaming systems in accordance with embodiments of the invention are discussed below.

Top Level Index Files

Playback devices in accordance with many embodiments of the invention utilize a top level index file to identify the container files that contain the streams available to the playback device for use in adaptive bitrate streaming. In many embodiments, the top level index files can include references to container files that each include an alternative stream of encoded media. The playback device can utilize the information in the top level index file to retrieve encoded media from each of the container files according to the streaming conditions experienced by the playback device.

In several embodiments, the top level index file provides information enabling the playback device to retrieve information concerning the encoding of the media in each of the container files and an index to encoded media within each of the container files. In a number of embodiments, each container file includes information concerning the encoded media contained within the container file and an index to the encoded media within the container file and the top level index file indicates the portions of each container file containing this information. Therefore, a playback device can retrieve the top level index file and use the top level index file to request the portions of one or more of the container files that include information concerning the encoded media contained within the container file and an index to the encoded media within the container file. A variety of top level index files that can be utilized in adaptive bitrate streaming systems in accordance with embodiments of the invention are discussed further below.

In a number of embodiments, the top level index file utilized in the adaptive bitrate streaming of media is a SMIL file, which is an XML file that includes a list of URIs describing each of the streams and the container files that contain the streams. The URI can include information such as the "system-bitrate" of the stream contained within the stream and information concerning the location of specific pieces of data within the container file. The top level index SMIL file can be generated when the source media is encoded for playback via adaptive bitrate streaming. Alternatively, the top level index SMIL file can be generated when a playback device requests the commencement of playback of the encoded media. When the playback device receives the top level index SMIL file, the playback device can parse the SMIL file to identify the available streams. The playback device can then select the streams to utilize to playback the content and can use the SMIL file to identify the portions of the container file to download to obtain information concerning the encoding of a specific stream and/or to obtain an index to the encoded media within the container file.

Although top level index SMIL files are described above, any of a variety of top level index file formats can be utilized to create top level index files as appropriate to a specific application in accordance with an embodiment of the invention. The use of top level index files to enable playback of encoded media using adaptive bitrate streaming in accordance with embodiments of the invention is discussed further below.

Storing Protected Media in MKV Files for Adaptive Bitrate Streaming

A Matroska container file used to store encoded video in accordance with an embodiment of the invention is illustrated in FIG. **3**. The container file **32** is an Extensible Binary Markup Language (EBML) file that is an extension of the Matroska container file format. The specialized Matroska

container file **32** includes a standard EBML element **34**, and a standard Segment element **36** that includes a standard Seek Head element **40**, a standard Segment Information element **42**, and a standard Tracks element **44** including a tracks data payload that is a non-standard EBML element containing cryptographic information utilized to access the protected stream(s) contained within the Matroska container file. In many embodiments, the cryptographic data takes the form of a DRMHeaders element (discussed below) that includes a set of keys utilized to access encrypted portions of the stream contained within the Matroska container file. In many embodiments, the set of keys is encrypted in such a way that a playback device can only access the set of keys in the clear using a specific piece or set of cryptographic information.

The Segment element **36** also includes a standard Clusters element **46**. As is described below, the manner in which encoded media is inserted within individual Cluster elements **48** within the Clusters element **46** is constrained to improve the playback of the media in an adaptive streaming system. In many embodiments, the constraints imposed upon the encoded video are consistent with the specification of the Matroska container file format and involve encoding the video so that each cluster includes at least one closed GOP commencing with an IDR frame. In addition to the above elements, the Segment element **36** can optionally include a modified version of the standard Cues element. As is discussed further below, the Cues element includes specialized CuePoint elements (i.e. non-standard CuePoint elements) that facilitate the retrieval of the media contained within specific Cluster elements via HTTP. The Segment element **36** can optionally include a non-standard Hierarchical Index element **54**. The Hierarchical Index element is an extension to the Matroska file format proposed by DivX, LLC of San Diego, Calif. The Hierarchical Index element is described in U.S. patent application Ser. No. 12/272,631, the disclosure of which is incorporated by reference above in its entirety.

The constraints imposed upon the encoding of media and the formatting of the encoded media within the Clusters element of a Matroska container file for adaptive bitrate streaming of protected streams and the additional DRM and index information inserted within the container file in accordance with embodiments of the invention are discussed further below.

Encoding Media for Insertion in Cluster Elements

An adaptive bitrate streaming system provides a playback device with the option of selecting between different protected streams of encoded media during playback according to the streaming conditions experienced by the playback device. In many embodiments, switching between protected streams is facilitated by separately pre-encoding discrete portions of the source media in accordance with the encoding parameters of each stream and then including each separately encoded portion in its own Cluster element within the stream's container file. Furthermore, the media contained within each Cluster is encoded so that the media is capable of playback without reference to media contained in any other Cluster within the stream. In this way, each stream includes a Cluster element corresponding to the same discrete portion of the source media and, at any time, the playback device can select the Cluster element from the stream that is most appropriate to the streaming conditions experienced by the playback device and can commence playback of the media contained within the Cluster element. Accordingly, the playback device can select clusters from different streams as the streaming conditions experienced by the playback device change over time. In several embodiments, the Cluster elements are further constrained so that each Cluster element contains a portion of encoded media from the source media having the same duration. In a number of embodiments, each Cluster element includes two seconds of encoded media. The specific constraints applied to the media encoded within each Cluster element depending upon the type of media (i.e. video, audio, or subtitles) are discussed below.

A Clusters element of a Matroska container file containing a video stream in accordance with an embodiment of the invention is illustrated in FIG. **4***a*. The Clusters element **46** includes a plurality of Cluster elements **48** that each contains a discrete portion of encoded video. In the illustrated embodiment, each Cluster element **48** includes two seconds of encoded video. In other embodiments, the Cluster elements include encoded video having a greater or lesser duration than two seconds. In several embodiments, the encoded video sequences in the Cluster elements have different durations.

Each Cluster element **48** includes a Timecode element **60** indicating the start time of the encoded video within the Cluster element and a plurality of BlockGroup elements. As noted above, the encoded video stored within the Cluster is constrained so that the encoded video can be played back without reference to the encoded video contained within any of the other Cluster elements in the container file. In many embodiments, encoding the video contained within the Cluster element as a GOP in which the first frame is an IDR frame enforces the constraint. In the illustrated embodiment, the first BlockGroup element **62** contains an IDR frame. Therefore, the first BlockGroup element **62** does not include a ReferenceBlock element. The first BlockGroup element **62** includes a Block element **64**, which specifies the Timecode attribute of the frame encoded within the Block element **64** relative to the Timecode of the Cluster element **48** and a DRMInfo element **65** that identifies a portion of the frame that is encrypted and the cryptographic information that can be utilized to access the encrypted portion of the frame. In a number of embodiments, only a small portion of the video frame is encrypted and the DRMInfo includes a reference to the start of an encrypted block of data and the size of the encrypted block of data. As is discussed further below, the common cryptographic information utilized to protect alternative streams of video content is a set of frame keys in many embodiments of the invention and the DRMInfo element can also include an index to a specific frame key in the set of frame keys that can be utilized to access the encrypted block of data in the clear. In other embodiments, any of a variety of information appropriate to identifying encrypted data within a video frame and decrypting the encrypted data can be stored within a DRMInfo element.

Subsequent BlockGroup elements **66** are not restricted in the types of frames that they can contain (other than that they cannot reference frames that are not contained within the Cluster element). Therefore, subsequent BlockGroup elements **66** can include ReferenceBlock elements **68** referencing other BlockGroup element(s) utilized in the decoding of the frame contained within the BlockGroup or can contain IDR frames and are similar to the first BlockGroup element **62**. In addition, subsequent BlockGroup elements **66** can also include DRMInfo elements to describe the manner in which the frame of video contained within the BlockGroup element is protected. As noted above, the manner in which encoded video is inserted within the Cluster elements of the Matroska file conforms with the specification of the Matroska file format.

The insertion of encoded audio and subtitle information within a Clusters element **46** of a Matroska container file in accordance with embodiments of the invention is illustrated in FIGS. **4***b* and **4***c*. In the illustrated embodiments, the encoded media is inserted within the Cluster elements **48** subject to the same constraints applied to the encoded video discussed above with respect to FIG. **4***a*. In addition, the duration of the encoded audio and subtitle information within each Cluster element corresponds to the duration of the encoded video in the corresponding Cluster element of the Matroska container file containing the encoded video. In other embodiments, the Cluster elements within the container files containing the audio and/or subtitle streams need not correspond with the start time and duration of the Cluster elements in the container files containing the alternative video streams. In many embodiments, audio, and/or subtitle tracks are protected and information identifying the protected portions of the stream can be included in an element in a manner similar to that described above with respect to protected video streams.

Muliplexing Streams in a Single MKV Container File

The Clusters elements shown in FIGS. **4***a*-**4***c* assume that a single stream is contained within each Matroska container file. In several embodiments, media from multiple streams is multiplexed within a single Matroska container file. In this way, a single container file can contain a video stream multiplexed with one or more corresponding audio streams, and/or one or more corresponding subtitle streams. Storing the streams in this way can result in duplication of the audio and subtitle streams across multiple alternative video streams. However, the seek time to retrieve encoded media from a video stream and an associated audio, and/or subtitle stream can be reduced due to the adjacent storage of the data on the server. The Clusters element **46** of a Matroska container file containing multiplexed video, audio and subtitle data in accordance with an embodiment of the invention is illustrated in FIG. **4***d*. In the illustrated embodiment, each Cluster element **48** includes additional BlockGroup elements for each of the multiplexed streams. The first Cluster element includes a first BlockGroup element **62***v* for encoded video that includes a Block element **64***v* containing an encoded video frame and indicating the Timecode attribute of the frame relative to the start time of the Cluster element (i.e. the Timecode attribute **60**). A second BlockGroup element **62***a* includes a Block element **64***a* including an encoded audio sequence and indicating the timecode of the encoded audio relative to the start time of the Cluster element, and a third BlockGroup element **62***s* including a Block element **64***s* containing an encoded subtitle and indicating the timecode of the encoded subtitle relative to the start time of the Cluster element. In the illustrated embodiment, only the video stream is protected. Therefore, the BlockGroup elements **62***v* containing the video stream include DRMInfo elements **65***v* to identify the portions of the frames within the video stream that are encrypted. In other embodiments, the audio, and/or subtitle streams can also be protected. Although not shown in the illustrated embodiment, each Cluster element **48** likely would include additional BlockGroup elements containing additional encoded video, audio or subtitles. Despite the multiplexing of the encoded video, audio, and/or subtitle streams, the same constraints concerning the encoded media apply.

Incorporating Trick Play Streams in MKV Container Files for Use in Adaptive Bitrate Streaming Systems

The incorporation of trick play tracks within Matroska container files is proposed by DivX, LLC in U.S. patent application Ser. No. 12/260,404 entitled "Application Enhancement Tracks", filed Oct. 29, 2008, the disclosure of which is hereby incorporated by reference in its entirety. Trick play tracks similar to the trick play tracks described in U.S. patent application Ser. No. 12/260,404 can be used to provide a trick play stream in an adaptive bitrate streaming system in accordance with an embodiment of the invention to provide smooth visual search through source content encoded for adaptive bitrate streaming. A separate trick play stream can be encoded that appears to be an accelerated visual search through the source media when played back, when in reality the trick play stream is simply a separate stream encoding the source media at a lower frame rate. In several embodiments, a trick play stream is generated in the manner outlined in U.S. patent application Ser. No. 12/260,404 and inserting the trick play stream into a Matroska container file subject to the constraints mentioned above with respect to insertion of a video stream into a Matroksa container file. In many embodiments, the trick play stream is also subject to the further constraint that every frame in the GOP of each Cluster element in the trick play stream is encoded as an IDR frame. As with the other video streams, each Cluster element contains a GOP corresponding to the same two seconds of source media as the corresponding Cluster elements in the other streams. There are simply fewer frames in the GOPs of the trick play stream and each frame has a longer duration. In this way, transitions to and from a trick play stream can be treated in the same way as transitions between any of the other encoded streams are treated within an adaptive bitrate streaming system in accordance with embodiments of the invention. In embodiments where the trick play stream(s) are protected, the same common cryptographic information utilized to encrypt the primary video stream(s) is utilized to protect the trick play stream(s). Playback of the frames contained within the trick play stream to achieve accelerated visual search typically involves the playback device manipulating the timecodes assigned to the frames of encoded video prior to providing the frames to the playback device's decoder to achieve a desired increase in rate of accelerated search (e.g. ×2, ×4, ×6, etc.).

A Clusters element containing encoded media from a trick play stream is shown in FIG. **4***e*. In the illustrated embodiment, the encoded trick play stream is inserted within the Cluster elements **48** subject to the same constraints applied to the encoded video discussed above with respect to FIG. **4***a* including the constraint that frames are protected using the common cryptographic information. However, each BlockGroup element contains an IDR. In other embodiments, the Cluster elements within the container files containing the trick play streams need not correspond with the start time and duration of the Cluster elements in the container files containing the alternative video streams.

In many embodiments, source content can be encoded to provide a single trick play stream or multiple trick play streams for use by the adaptive bit rate streaming system. When a single trick play stream is provided, the trick play stream is typically encoded at a low bitrate. When multiple alternative trick play streams are provided, adaptive streaming can also be performed with respect to the trick play streams. In several embodiments, multiple trick play streams are provided to support different rates of accelerated visual search through the encoded media.

Incorporating Indexing Information within MKV Container Files

The specification for the Matroska container file format provides for an optional Cues element that is used to index Block elements within the container file. A modified Cues

element that can be incorporated into a Matroska container file in accordance with an embodiment of the invention to facilitate the requesting of clusters by a playback device using HTTP is illustrated in FIG. **5**. The Cues element **52** is similar to a standard Cues element **52** in that it includes a plurality of standard CuePoint elements **70** that each include a standard CueTime attribute **72**. Each CuePoint element includes a CueTrackPositions element **74** containing the standard CueTrack **76** and CueClusterPosition **78** attributes. In many embodiments, the CuePoint element is mainly configured to identify a specific Cluster element as opposed to a specific Block element within a Cluster element. Although, in several applications the ability to seek to specific Block elements within a Cluster element is required and additional index information is included in the Cues element.

The use of a modified Cues element to index encoded media within a Clusters element of a Matroska file in accordance with an embodiment of the invention is illustrated in FIG. **6**. A CuePoint element is generated to correspond to each Cluster element within the Matroska container file. The CueTime attribute **72** of the CuePoint element **70** corresponds to the Timecode attribute **60** of the corresponding Cluster element **48**. In addition, the CuePoint element contains a CueTrackPositions element **74** having a CueClusterPosition attribute **78** that points to the start of the corresponding Cluster element **48**. The CueTrackPositions element **74** can also include a CueBlockNumber attribute, which is typically used to indicate the Block element containing the first IDR frame within the Cluster element **48**.

As can readily be appreciated the Cues element **52** forms an index to each of the Cluster elements **48** within the Matroska container file. Furthermore, the CueTrackPosition elements provide information that can be used by a playback device to request the byte range of a specific Cluster element **48** via HTTP or another suitable protocol from a remote server. The Cues element of a conventional Matroska file does not directly provide a playback device with information concerning the number of bytes to request from the start of the Cluster element in order to obtain all of the encoded video contained within the Cluster element. The size of a Cluster element is, therefore, inferred by using the CueClusterPosition attribute of the CueTrackPositions element that indexes the first byte of the next Cluster element. Alternatively, additional CueTrackPosition elements could be added that index the last byte of the Cluster element (in addition to the CueTrackPositions elements that index the first byte of the Cluster element), and/or a non-standard CueClusterSize attribute that specifies the size of the Cluster element pointed to by the CueClusterPosition attribute is included in each CueTrackPosition element to assist with the retrieval of specific Cluster elements within a Matroska container file via HTTP byte range requests or a similar protocol.

The modification of the Cues element in the manner outlined above significantly simplifies the retrieval of Cluster elements from a Matroska container file via HTTP or a similar protocol during adaptive bitrate streaming. In addition, by only indexing the first frame in each Cluster the size of the index is significantly reduced. Given that the index is typically downloaded prior to playback, the reduced size of the Cues element (i.e. index) means that playback can commence more rapidly. Using the CueClusterPosition elements, a playback device can request a specific Cluster element from the stream most suited to the streaming conditions experienced by the playback device by simply referencing the index of the relevant Matroska container file using the Timecode attribute for the desired Cluster element.



A number of the attributes within the Cues element are not utilized during adaptive bitrate streaming. Therefore, the Cues element can be further modified by removing the unutilized attributes to reduce the overall size of the index for each Matroska container file. A modified Cues element that can be utilized in a Matroska container file that includes a single encoded stream, where portions of the encoded stream having the same duration are contained in each Cluster element within the Matroska file in accordance with an embodiment of the invention is illustrated in FIG. **5***a*. The Cues element **52'** shown in FIG. **5***a* is similar to the Cues element **52** shown in FIG. **5** with the exception that the CuePoint elements **70'** do not include a CueTime attribute (see **72** in FIG. **5**) and/or the CueTrackPositions elements **74'** do not include a CueTrack attribute (**76** in FIG. **5**). When the portions of encoded media in each Cluster element in the Matroska container file have the same duration, the CueTime attribute is not necessary. When the Matroska contain file includes a single encoded stream, the CueTrack attribute is not necessary. In other embodiments, the Cues element and/or other elements of the Matroska container file can be modified to remove elements and/or attributes that are not necessary for the adaptive bitrate streaming of the encoded stream contained within the Matroska container file, given the manner in which the stream is encoded and inserted in the Matroska container file.

Although various modifications to the Cues element to include information concerning the size of each of the Cluster elements within a Matroska container file and to eliminate unnecessary attributes are described above, many embodiments of the invention utilize a conventional Matroska container. In several embodiments, the playback device simply determines the size of Cluster elements on the fly using information obtained from a conventional Cues element, and/or relies upon a separate index file containing information concerning the size and/or location of the Cluster elements within the MKV container file. In several embodiments, the additional index information is stored in the top level index file. In a number of embodiments, the additional index information is stored in separate files that are identified in the top level index file. When index information utilized to retrieve Cluster elements from a Matroska container file is stored separately from the container file, the Matroska container file is still typically constrained to encode media for inclusion in the Cluster elements in the manner outlined above. In addition, wherever the index information is located, the index information will typically index each Cluster element and include (but not be limited to) information concerning at least the starting location and, in many instances, the size of each Cluster element.

Incorporating Hierarchical Indexes into MKV Containers

Retrieval of media using HTTP during adaptive streaming can be improved by adding additional index information to the Matroska container files used to contain each of the encoded streams. In a number of embodiments, the index is a reduced index in that the index only points to the IDRs at the start of each cluster. In many embodiments, the index of the Matroska container file includes additional non-standard attributes (i.e. attributes that do not form part of the Matroska container file format specification) that specify the size of each of the clusters so that a playback device can retrieve a Cluster element from the Matroska container file via HTTP using a byte range request. In several embodiments, the Matroska container file includes a hierarchical index using a HierarchicalIndex element similar to the hierarchical indexes disclosed in U.S. patent application Ser. No. 12/272,631 entitled "Hierarchical and Reduced Index

Structures for Multimedia Files" to Soroushian et al. filed Nov. 17, 2008 to increase the speed with which a playback device can seek to a specific Cluster element containing encoded media within the container file. The disclosure of U.S. patent application Ser. No. 12/272,631 is hereby incorporated by reference in its entirety.

A hierarchical index included in a Matroska container file using a HierarchicalIndex element in accordance with an embodiment of the invention is illustrated in FIG. **7**. The HierarchicalIndex element **54** includes a plurality of HierarchicalIndexPointer elements **80** that each point to a CuePoint element **70** within the Cues element **52**. In this way, the hierarchical index can be utilized to rapidly locate specific Cluster elements within a Matroska file using the Timecode attribute of the Cluster element. Furthermore, the entire index (i.e. the entire Cues element) need not be downloaded in order to locate a specific Cluster element. The playback device can simply download the hierarchical index and download the specific CuePoint elements that enable the location of a desired Cluster element within the Matroska container file.

In several embodiments, the HierarchicalIndex element is generated so that the HierarchicalIndexPointer elements point to CuePoint elements indexing Cluster elements that are a predetermined time period apart. For example, the HierarchicalIndexPointer elements can point to CuePoint elements indexing Cluster elements that are spaced 30 seconds apart. In other implementations, any of a variety of implementations can be utilized to determine the interval between the CuePoint elements referenced by the higher layers of the hierarchical index. In addition, although a two layer hierarchical index is illustrated in FIG. **7**, hierarchical indexes including three or more layers can also be incorporated within Matroska container files generated for use in adaptive bitrate streaming systems in accordance with embodiments of the invention.

As noted above, index information can be stored in a separate file to the Matroska container file in accordance with embodiments of the invention. In embodiments where the index information is stored separately, the index can be hierarchical to prevent the need to download the entire index for a container file prior to playback and to facilitate seeking within the index.

Encoding and Protecting Source Media for Adaptive Bitrate Streaming

A process for encoding source media as a top level index file and a plurality of Matroska container files for use in an adaptive bitrate streaming system in accordance with an embodiment of the invention is illustrated in FIG. **8**. The encoding process **100** commences by writing headers for each of the MKV files that will contain the streams of content generated using the source content. In the illustrated embodiment, the source content includes a stream of video that is encoded as a plurality of protected streams. The frames of the source video are encoded (**104**) using the encoding parameters associated with each of the alternative streams and portions of the encoded frames can be encrypted using a frame key selected from a set of frame keys. When the encoding and encryption of the streams is complete, an index is inserted (**106**) into each Matroska container file containing an alternative stream of protected video. The common set of frame keys is also encrypted (**108**) and the process writes (**110**) a DRM header including the encrypted set of frame keys to each container file. DRM headers and processes for restricting access to cryptographic information stored within the DRM header of a Matroska container file in accordance with embodiments of the invention are discussed further below.

A process for encoding and protecting frames of video to create a plurality of alternative streams of protected video in accordance with embodiments of the invention is illustrated in FIG. **9**. The process **120** includes selecting (**122**) a first portion of the source media and encoding (**123**) the source media using the encoding parameters for each alternative stream. Assuming that the resulting frame is to be encrypted, a frame key can be selected (**124**) from a common set of frame keys and utilized to encrypt at least a portion of the frame of video. A DRM Info element can then be written (**125**) to a BlockGroup element. The DRMInfo element identifies the portion of the frame that is encrypted and the frame key that can be utilized by a playback device to access the encrypted portion of the frame. The encoded and/or encrypted frame can then be written (**126**) to the BlockGroup element. When the entire source video stream is determined (**127**) as being encoded and protected, then the process is complete.

Each portion of source video that is encoded (**123**) can be encoded as a single GOP commencing with an IDR frame. In many embodiments, encoding parameters used to create the alternative GOPs vary based upon bitrate, frame rate, encoding parameters and resolution. In this way, the portion of media is encoded as a set of interchangeable alternatives and a playback device can select the alternative most appropriate to the streaming conditions experienced by the playback device. When different resolutions are supported, the encoding of the streams is constrained so that each stream has the same display aspect ratio. A constant display aspect ratio can be achieved across different resolution streams by varying the sample aspect ratio with the resolution of the stream. In many instances, reducing resolution can result in higher quality video compared with higher resolution video encoded at the same bit rate.

Although specific processes involving the encoding and protection of a source video stream as a set of alternative streams are illustrated in FIGS. **8** and **9**, any of a variety of processes can be utilized to protect audio, video, and/or subtitle streams using common cryptographic information in accordance with embodiments of the invention. Following the encoding of the source media to create Matroska container files containing each of the protected streams, which can include trick play streams, the Matroska container files can be uploaded to a content distribution server for adaptive bitrate streaming to playback devices. The adaptive bitrate streaming of protected media encoded in accordance with embodiments of the invention using HTTP requests is discussed further below.

DRM Headers

Common cryptographic information utilized in protecting alternative streams can be inserted into container files containing each of the alternative streams. When the container files are Matroska container files, the common cryptographic information can be inserted into the container file as a DRMHeader element. A DRMHeader element configured to contain a set of keys in accordance with an embodiment of the invention is illustrated in FIG. **10**. The DRM Header element **130** includes a plurality of pieces of information **132** including a frame keys record **134** that can be utilized to contain a set of frame keys or frame key table common to each of a plurality of alternative streams.

If the frame key record **134** is communicated in the clear, then any playback device can access the protected streams. Therefore, the frame keys record **134** is typically encrypted

using one or more encryption keys. The encryption key(s) used to encrypt the frame key record **134** can be securely provided to an individual playback device using any of a variety of techniques appropriate to a specific application. In the context of streaming systems that also support the downloading of content.

Although a specific format for storing common cryptographic information in a Matroska container file is illustrated in FIG. **10**, any format can be utilized to store common cryptographic information in a Matroska container file and/or any other container file appropriate to a specific application in accordance with an embodiment of the invention. Adaptive bitrate streaming of protected content in accordance with embodiments of the invention is discussed further below.

Adaptive Bitrate Streaming from MKV Container Files Using HTTP

When source media is encoded so that there are alternative streams of protected media contained in separate Matroska container files for at least one of video, audio, and subtitle content, adaptive streaming of the media contained within the Matroska container files can be achieved using HTTP requests or a similar stateless data transfer protocol. In many embodiments, a playback device requests a top level index file from a content distribution server and uses the index information to identify the streams that are available to the playback device and the cryptographic information required to access any protected streams. The playback device can then retrieve the indexes for one or more of the Matroska files and can use the indexes to request media from one or more of the protected streams contained within the Matroska container files using HTTP requests or using a similar stateless protocol. As noted above, many embodiment of the invention implement the indexes for each of the Matroska container files using a modified Cues element. In several embodiments, the index is a hierarchical index and is also includes a HierarchicalIndex element contained within the Matroska container file. In a number of embodiments, however, the encoded media for each stream is contained within a standard Matroska container file and separate index file(s) can also be provided for each of the container files.

Based upon the streaming conditions experienced by the playback device, the playback device can select media from alternative protected streams encoded at different bitrates. When the media from each of the streams is protected using common cryptographic information and inserted into the Matroska container files in the manner outlined above, transitions between streams can occur upon the completion of playback of media within a Cluster element without the need to retrieve additional cryptographic information. As noted above, the size of the Cluster elements (i.e. the duration of the encoded media within the Cluster elements) is typically chosen so that the playback device is able to respond quickly enough to changing streaming conditions and to instructions from the user that involve utilization of a trick play track. The smaller the Cluster elements (i.e. the smaller the duration of the encoded media within each Cluster element) the higher the overhead associated with requesting each Cluster element. Therefore, a tradeoff exists between the responsiveness of the playback device to changes in streaming conditions and the effective data rate of the adaptive streaming system for a given set of streaming conditions (i.e. the portion of the available bandwidth actually utilized to transmit encoded media). In many embodiments, the size of the Cluster elements is chosen so that each Cluster element contains two seconds of encoded media. In other embodiments, the duration of the encoded media can be greater or less than two seconds and/or the duration of the encoded media can vary from Cluster element to Cluster element.

Communication between a playback device or client and an HTTP server during the playback of media encoded in separate streams contained within Matroska container files indexed by a top level index file in accordance with an embodiment of the invention is illustrated in FIG. **11**. In the illustrated embodiment, the playback device **200** commences playback by requesting the top level index file from the server **202** using an HTTP request or a similar protocol for retrieving data. The server **202** provides the bytes corresponding to the request. The playback device **200** then parses the top level index file to identify the URIs of each of the Matroska container files containing the streams of encoded media derived from a specific piece of source media. The playback device can then request the byte ranges corresponding to headers of one or more of the Matroska container files via HTTP or a similar protocol, where the byte ranges are determined using the information contained in the URI for the relevant Matroska container files (see discussion above). The server returns the following information in response to a request for the byte range containing the headers of a Matroska container file:

ELEM("EBML")
ELEM("SEEKHEAD")
ELEM("SEGMENTINFO")
ELEM("TRACKS")

The EBML element is typically processed by the playback device to ensure that the file version is supported. The SeekHead element is parsed to find the location of the Matroska index elements and the SegmentInfo element contains two key elements utilized in playback: TimecodeScale and Duration. The TimecodeScale specifies the timecode scale for all timecodes within the Segment of the Matroska container file and the Duration specifies the duration of the Segment based upon the TimecodeScale. The Tracks element contains the information used by the playback device to decode the encoded media contained within the Clusters element of the Matroska file including the common cryptographic information, which can take a variety of forms including but not limited to a DRMHeader element. As noted above, adaptive bitrate streaming systems in accordance with embodiments of the invention can support different streams encoded using different encoding parameters including but not limited to frame rate, and resolution. Therefore, the playback device can use the information contained within the Matroska container file's headers to configure the decoder every time a transition is made between encoded streams. Due to the fact that alternative protected streams utilize the same cryptographic information, the engine utilized to decrypt the content on the client **200** (i.e. the software process used to decrypt encrypted portions of frames of video) does not require reconfiguration using different cryptographic information with each stream switch.

In many embodiments, the playback device does not retrieve the headers for all of the Matroska container files indexed in the top level index file. Instead, the playback device determines the stream(s) that will be utilized to initially commence playback and requests the headers from the corresponding Matroska container files. Depending upon the structure of the URIs contained within the top level index file, the playback device can either use information from the URIs or information from the headers of the Matroska container files to request byte ranges from the server that

contain at least a portion of the index from relevant Matroska container files. The byte ranges can correspond to the entire index or can correspond to the top level of a hierarchical index and a portion of a lower level index (i.e. a HierarchicalIndex element and one or more CuePoint elements). The server provides the relevant byte ranges containing the index information to the playback device, and the playback device can use the index information to request the byte ranges of Cluster elements containing encoded media using this information. When the Cluster elements are received, the playback device can extract encoded media from the BlockGroup elements within the Cluster element, and can decode and playback the media within the BlockGroup elements in accordance with their associated Timecode attributes. Prior to decoding the encoded media, the playback device can check for the presence of a DRMInfo element within each BlockGroup of a video stream to identify whether the encoded media is protected. The playback device can use the information within the DRMInfo element to decrypt encrypted portions of the video prior to decoding.

In the illustrated embodiment, the playback device **200** requests sufficient index information from the HTTP server prior to the commencement of playback that the playback device can stream the entirety of each of the selected streams using the index information. In other embodiments, the playback device continuously retrieves index information as media is played back. In several embodiments, all of the index information for the lowest bitrate steam is requested prior to playback so that the index information for the lowest bitrate stream is available to the playback device in the event that streaming conditions deteriorate rapidly during playback.

Switching Between Streams

The communications illustrated in FIG. **11** assume that the playback device continues to request media from the same streams (i.e. Matroska container files) throughout playback of the media. In reality, the streaming conditions experienced by the playback device are likely to change during the playback of the streaming media and the playback device can request media from alternative streams (i.e. different Matroska container files) to provide the best picture quality for the streaming conditions experienced by the playback device. In addition, the playback device may switch streams in order to perform a trick play function that utilizes a trick play track stream.

Communication between a playback device and a server when a playback device switches to a new stream in accordance with embodiments of the invention are illustrated in FIG. **12***a*. The communications illustrated in FIG. **12***a* assume that the index information for the new stream has not been previously requested by the playback device and that downloading of Cluster elements from the old stream proceeds while information is obtained concerning the Matroska container file containing the new stream. When the playback device **200** detects a change in streaming conditions, determines that a higher bitrate stream can be utilized at the present streaming conditions, or receives a trick play instruction from a user, the playback device can use the top level index file to identify the URI for a more appropriate alternative stream to at least one of the video, audio, or subtitle streams from which the playback device is currently requesting encoded media. The playback device can save the information concerning the current stream(s) and can request the byte ranges of the headers for the Matroska container file(s) containing the new stream(s) using the parameters of the corresponding URIs. Caching the information in this way can be beneficial when the playback device attempts to adapt the bitrate of the stream downward. When the playback device experiences a reduction in available bandwidth, the playback device ideally will quickly switch to a lower bitrate stream. Due to the reduced bandwidth experienced by the playback device, the playback device is unlikely to have additional bandwidth to request header and index information. Ideally, the playback device utilizes all available bandwidth to download already requested higher rate Cluster elements and uses locally cached index information to start requesting Cluster elements from Matroska container file(s) containing lower bitrate stream(s). When a hierarchical index is used, the playback device typically will download additional index information. However, the amount of index information that is downloaded is significantly reduced as the headers of the Matroska container file are already cached on the playback device and the playback device only needs a portion of the index in order commence requesting Cluster elements from the Matroska container file(s) containing the new stream(s).

Byte ranges for index information for the Matroska container file(s) containing the new stream(s) can be requested from the HTTP server **202** in a manner similar to that outlined above with respect to FIG. **11**. At which point, the playback device can stop downloading of cluster elements from the previous streams and can commence requesting the byte ranges of the appropriate Cluster elements from the Matroska container file(s) containing the new stream(s) from the HTTP server, using the index information from the Matroska container file(s) to identify the Cluster element(s) containing the encoded media following the encoded media in the last Cluster element retrieved by the playback device. As noted above, the encoding of the alternative streams so that corresponding Cluster elements within alternative streams (i.e. Cluster elements containing the same portion of the source media encoded in accordance with different encoding parameters) start with the same Timecode element and an IDR frame facilitates the smooth transition from one stream to another. In addition, the use of common cryptographic information further facilitates smooth switching between alternative streams.

When the Matroska file includes a hierarchical index, the process for switching between streams can involve downloading less than the entire index of the new streams. The index information can be downloaded by requesting the byte range for the hierarchical index and then using the Timecode attribute of media played back by the playback device **200** to identify the location of CuePoint elements within the Matroska container file(s) containing the new stream(s) that reference Cluster elements containing sequential encoded media and requesting the byte ranges of the CuePoint elements from the HTTP server **202**. After the HTTP server has provided the byte ranges including the CuePoint elements, the playback device can use the information within the CuePoint elements to request byte ranges containing desired Cluster elements from the HTTP server. At which point, playback of the encoded media contained within the Cluster elements proceeds in the manner discussed above.

When the playback device caches the header and the entire index for each stream that has be utilized in the playback of the media, the process of switching back to a previously used stream can be simplified. The playback device already has the header and index information for the Matroska file containing the previously utilized stream and the playback device can simply use this information to start requesting Cluster elements from the Matroska container file of the previously utilized stream via HTTP. Communication

between a playback device and an HTTP server when switching back to a stream(s) for which the playback device has cached header and index information in accordance with an embodiment of the invention is illustrated in FIG. **12***b*. The process illustrated in FIG. **12***b* is ideally performed when adapting bitrate downwards, because a reduction in available resources can be exacerbated by a need to download index information in addition to media. The likelihood of interruption to playback is reduced by increasing the speed with which the playback device can switch between streams and reducing the amount of overhead data downloaded to achieve the switch. When a hierarchical index is utilized, the playback device requests the appropriate portion of the index from the Matroska container file(s) containing the lower bitrate stream(s) prior to requesting Cluster elements from the Matroska container file.

Although the present invention has been described in certain specific aspects, many additional modifications and variations would be apparent to those skilled in the art. It is therefore to be understood that the present invention may be practiced otherwise than specifically described, including various changes in the implementation such as utilizing encoders and decoders that support features beyond those specified within a particular standard with which they comply, without departing from the scope and spirit of the present invention. Thus, embodiments of the present invention should be considered in all respects as illustrative and not restrictive.

What is claimed:

**1**. A playback device for playing protected content from a plurality of alternative streams, comprising:
- a set of one or more processors; and
- a non-volatile storage containing an application for causing the set of one or more processors to perform the steps of:
  - obtaining a top level index file identifying a plurality of alternative streams of protected video, wherein each of the alternative streams of protected video includes partially encrypted video frames that are encrypted using a set of common keys comprising at least one key, and wherein the partially encrypted video frames contain encrypted portions and unencrypted portions of data;
  - obtaining a copy of the set of common keys;
  - detecting streaming conditions for the playback device;
  - selecting a stream from the plurality of alternative streams of protected video based on the detected streaming conditions;
  - receiving a container index that provides byte ranges for portions of the selected stream of protected video within an associated container file;
  - requesting portions of the selected stream of protected video based on the provided byte ranges;
  - locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video;
  - decrypting each encrypted portion of the frames of video identified within the located encryption information using the set of common keys; and
  - playing back the decrypted frames of video obtained from the requested portions of the selected stream of protected video.

**2**. The playback device of claim **1**, wherein the step of requesting portions of the selected stream further comprises the step of obtaining a container file containing protected video from at least one of the plurality of alternative streams, where the container file also includes encryption information that identifies portions of frames of video that are encrypted and a reference to at least one key from the set of common keys to utilize in accessing the encrypted portions of the frames of video.

**3**. The playback device of claim **1**, wherein the located encryption information comprises a reference to the start of an encrypted block of data.

**4**. The playback device of claim **3**, wherein the located encryption information further comprises the size of the encrypted block of data.

**5**. The playback device of claim **3**, wherein the located encryption information further comprises cryptographic information that can be utilized to access the encrypted portion of the frame.

**6**. The playback device of claim **5**, wherein the cryptographic information is a reference to at least one key from the set of common keys.

**7**. The playback device of claim **1**, wherein the application is further for causing the set of processors to perform the steps of:
- detecting a change in the streaming conditions;
- identifying a second alternative stream of protected video based on the detected change;
- receiving a container index that provides byte ranges for portions of the second alternative stream of protected video within a second associated container file;
- requesting portions of the second alternative stream of protected video based on the provided byte ranges;
- decrypting each encrypted portion of the frames of video from the requested portions of the second alternative stream of protected video using the set of common keys; and
- playing back the decrypted frames of video from the requested portions of the second alternative stream of protected video.

**8**. The playback device of claim **1**, wherein the application is further for causing the set of processors to perform the steps of:
- transmitting a request for content to a set of one or more content distribution servers; and
- receiving the content from the set of one or more content distribution servers.

**9**. The playback device of claim **8**, wherein the application is further for causing the set of processors to perform the steps of:
- transmitting a request for cryptographic information including the set of common keys to a set of one or more DRM servers; and
- receiving the cryptographic information from the set of one or more DRM servers.

**10**. The playback device of claim **1**, wherein the application is further for causing the set of processors to perform the step of obtaining the container index from at least one file selected from the group consisting of: the associated container file containing the selected stream of protected content; and a separate file to the associated container file containing the selected stream of protected content.

**11**. The playback device of claim **1**, wherein the common set of keys comprises a plurality of keys.

**12**. A method for playing protected content from a plurality of alternative streams on a playback device, the method comprising:
- obtaining a top level index file identifying a plurality of alternative streams of protected video, wherein each of the alternative streams of protected video includes partially encrypted video frames that are encrypted

using a set of common keys comprising at least one key, and wherein the partially encrypted video frames contain encrypted portions and unencrypted portions of data;

obtaining a copy of the set of common keys;

detecting streaming conditions for the playback device;

selecting a stream from the plurality of alternative streams of protected video based on the detected streaming conditions;

receiving a container index that provides byte ranges for portions of the selected stream of protected video within an associated container file;

requesting portions of the selected stream of protected video based on the provided byte ranges;

locating encryption information that identifies encrypted portions of frames of video within the requested portions of the selected stream of protected video;

decrypting each encrypted portion of the frames of video identified within the located encryption information using the set of common keys; and

playing back the decrypted frames of video obtained from the requested portions of the selected stream of protected video using a decoder.

**13**. The method of claim **12**, wherein requesting portions of the selected stream further comprises obtaining a container file containing protected video from at least one of the plurality of alternative streams, where the container file also includes encryption information that identifies portions of frames of video that are encrypted and a reference to at least one key from the set of common keys to utilize in accessing the encrypted portions of the frames of video.

**14**. The method of claim **12**, wherein the located encryption information comprises a reference to the start of an encrypted block of data.

**15**. The method of claim **14**, wherein the located encryption information further comprises the size of the encrypted block of data.

**16**. The method of claim **14**, wherein the located encryption information further comprises cryptographic information that can be utilized to access the encrypted portion of the frame.

**17**. The method of claim **16**, wherein the cryptographic information is a reference to at least one key from the set of common keys.

**18**. The method of claim **12** further comprising:

detecting a change in the streaming conditions;

identifying a second alternative stream of protected video based on the detected change;

receiving a container index that provides byte ranges for portions of the second alternative stream of protected video within a second associated container file;

requesting portions of the second alternative stream of protected video based on the provided byte ranges;

decrypting each encrypted portion of the frames of video from the requested portions of the second alternative stream of protected video using the set of common keys; and

playing back the decrypted frames of video from the requested portions of the second alternative stream of protected video.

**19**. The method of claim **12** further comprising:

transmitting a request for content to a set of one or more content distribution servers; and

receiving the content from the set of one or more content distribution servers.

**20**. The method of claim **19** further comprising:

transmitting a request for cryptographic information including the set of common keys to a set of one or more DRM servers; and

receiving the cryptographic information from the set of one or more DRM servers.

**21**. The method of claim **12** further comprising obtaining the container index from at least one file selected from the group consisting of: the associated container file containing the selected stream of protected content; and a separate file to the associated container file containing the selected stream of protected content.

**22**. The method of claim **12**, wherein the common set of keys comprises a plurality of keys.

**23**. The playback device of claim **1**, wherein:

the container index is part of a hierarchical index; and

the application is further for causing the set of processors to perform the step of:

obtaining a lower layer index that identifies the location of frames within a specific requested portion of the selected stream of protected video; and

identify partially encrypted video frames from within the specific requested portion of the selected stream using the lower layer index.

**24**. The method of claim **12**, wherein:

the container index is part of a hierarchical index; and

the method further comprises:

obtaining a lower layer index that identifies the location of frames within a specific requested portion of the selected stream of protected video; and identify partially encrypted video frames from within the specific requested portion of the selected stream using the lower layer index.

* * * * *

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and includes 13,792 words.

2. The filing has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark C. Fleming
MARK C. FLEMING
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

June 3, 2024